# EXHIBIT A

1

2

3

4

5

6

7 **STATE OF WASHINGTON**
**KING COUNTY SUPERIOR COURT**

8

9  STATE OF WASHINGTON,                           NO.

10                         Plaintiff,             COMPLAINT FOR INJUNCTIVE
                                                  AND OTHER RELIEF UNDER
11        v.                                      THE CONSUMER PROTECTION
                                                  ACT, RCW 19.86, THE DEBT
12  REED HEIN & ASSOCIATES, LLC, d/b/a            ADJUSTING ACT, RCW 18.28,
    TIMESHARE EXIT TEAM; BRANDON                  AND THE CREDIT SERVICES
13  REED; TREVOR HEIN; MAKAYMAX,                  ORGANIZATION ACT, RCW
    INC.; and HEIN & SONS INDUSTRIES,             19.134
14  INC.,

15                         Defendants.

16        COMES NOW PLAINTIFF, State of Washington, by and through its attorneys Robert

17  W. Ferguson, Attorney General, and M. Elizabeth Howe, Aaron J. Fickes, and Lynda Atkins,

18  Assistant Attorneys General, and brings this action against the above-captioned defendants

19  (Defendants) for violations of the Consumer Protection Act, RCW 19.86, the Debt Adjusting

20  Act, RCW 18.28, and the Credit Services Organization Act, RCW 19.134, associated with

21  unfair and deceptive conduct in the marketing and sale of timeshare "exit" services offered to

22  consumers across the United States and Canada. The State alleges the following on information

23  and belief:

24                              **INTRODUCTION**

25        1.1    In 2012, defendants Brandon Reed and Trevor Hein—at the time employed

26  selling rain gutter systems—formed Reed Hein and Associates, LLC (Reed Hein) and

COMPLAINT FOR INJUNCTIVE AND OTHER                    ATTORNEY GENERAL OF WASHINGTON
RELIEF - 1                                                 Consumer Protection Division
                                                          800 Fifth Avenue, Suite 2000
                                                            Seattle, WA 98104-3188
                                                               (206) 464-7745

immediately began selling "expert" services to release consumers from their timeshare contracts. Contrary to their marketing claims, Reed Hein had no expertise in releasing consumers from timeshare contracts (a service dubbed "exiting" timeshares). Since 2012 Defendants have unfairly and deceptively contracted with more than 32,000 consumers looking to be rid of their unwanted timeshares and have collected millions of dollars in upfront fees from consumers in the process.

      1.2     From Reed Hein's Bellevue, Washington headquarters, Defendants (consisting of Reed Hein, its founders, and their two holding companies) target customers across North America to sell their illusory services. Defendants mislead consumers at every step of the process. Defendants' deceptive advertising has at times portrayed Reed Hein as performing speedy, "risk-free" exit services with a 100% success rate. In reality, customers can wait months or years for an exit that may never come, all while continuing to owe money for their timeshare. The majority of Defendants' customers: (i) do not receive the promised exit, even after years of Reed Hein's claimed work toward it; (ii) receive an exit that causes the customer unanticipated negative financial or other consequences; or (iii) receive an exit the customer could have obtained for themselves, without paying thousands of dollars to Defendants. Of the "exits" Reed Hein has delivered, many do not conform to Reed Hein's marketing claims. For example, Reed Hein has manipulated customers into failing to make payments to the timeshare developer or resort (Resort), which then forecloses on the customer—Defendants do not warn that this is considered an "exit" and thus voids Defendants' supposed "100% money-back guarantee." Among other problems, Reed Hein customers have suffered credit damage and have been subject to debt collection as a result of exits procured by Defendants. Defendants have also congratulated many customers on "successful" exits, only for the customer to find out months or years later that they still own their timeshares and are now behind on their payments. These negative outcomes are for those exits Defendants have actually delivered: according to Defendants' own

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 2

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1  records,[1] of the more than 38,000 exits Reed Hein has been hired to perform since 2012, Reed

2  Hein has delivered only <u>approximately half</u>. More than 4,600 of these exits have been

3  <u>outstanding for three years or more.</u>

4      1.3    Defendants spend more than $1 million per month advertising for new customers,

5  despite having yet to deliver services for nearly 15,000 pending customers. From advertising to

6  services rendered, Defendants present a false front: Undisclosed to its customers and except in

7  rare circumstances, Reed Hein does not negotiate directly with Resorts as it claims. Reed Hein

8  is essentially a referral service for third-party vendors (Vendors): Reed Hein collects a huge fee

9  from its customers—<u>up to $8,795 or more for each timeshare to be exited, usually paid upfront</u>—

10  only to outsource 95% or more of its customers' files to Vendors for a significantly discounted

11  rate, <u>often as low as $500 per file</u>. The Vendors are left to accomplish the timeshare exits

12  however the Vendors see fit, without Defendants' supervision or input, and often without a

13  contract to govern the Vendors' work. Defendants lack the expertise to assess the legitimacy of

14  an exit, and must rely on the Vendor that the exit is complete and/or valid. What few exits Reed

15  Hein accomplishes internally are generally through "surrender" programs offered by the Resorts,

16  which timeshare owners could utilize directly.

17      1.4    The Washington Attorney General has received more than 90 consumer

18  complaints from Defendants' customers regarding their unfair and deceptive business practices.

19  On November 28, 2018, the Better Business Bureau issued an alert regarding a "pattern of

20  complaints" observed in the more than 300 complaints it has received against Reed Hein, which

21  currently holds a "C-" rating with the organization. Moreover, because Defendants misrepresent

22  all aspects of their business, many "satisfied" customers may not realize that they have been

23  deceived as to the work done, that they may have suffered lasting financial damage, and/or that

24  they may even still legally own their timeshares. Numerous Resorts have also filed lawsuits

25

26      [1] The State's allegations herein are based on exit status information disclosed by Defendants on December 17 and 19, 2019, as current through those dates.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 3

1   against Defendants related to Reed Hein's practices. *See, e.g.*, *Diamond Resorts International,*

2   *Inc., et al. v. Reed Hein & Associates, LLC, et al.*, No. 2:17-cv-03007 (D. Nev. 2017).

3         1.5    Virtually every aspect of Defendants' operation is deceptive and/or unfair in

4   violation of the Consumer Protection Act (CPA), and thousands of people across the country and

5   in Canada—including over 2,500 consumers in Washington—have fallen victim to Defendants'

6   practices. Moreover, attendant to their "exit" services, Defendants offer debt adjusting services

7   and credit repair services without complying with the provisions of the Debt Adjusting Act,

8   RCW 18.28, or the Credit Services Organization Act, RCW 19.134. As such, many of Reed

9   Hein's customer contracts are void, and Defendants have committed thousands of *per se*

10  violations of the CPA.

11                               **JURISDICTION AND VENUE**

12        2.1    The Attorney General is authorized to bring this action under the Consumer

13  Protection Act, RCW 19.86.080, the Debt Adjusting Act, RCW 18.28.185, and the Credit

14  Services Organization Act, RCW 19.134.070.

15        2.2    This Court has personal jurisdiction over Defendants pursuant to RCW 4.28.180,

16  RCW 4.28.185, and RCW 19.86.160 because the acts alleged have been committed in this State

17  and Defendant Reed Hein's principal place of business is located in Bellevue, Washington.

18        2.3    Venue is proper in King County pursuant to RCW 4.12.020 and 4.12.025, and

19  Superior Court Civil Rule 82 because Reed Hein is headquartered in King County, transacts

20  business in King County, and provides consumers with a contact address in King County.

21                                       **PARTIES**

22        3.1    The Plaintiff is the State of Washington.

23        3.2    Defendant **Reed Hein** is a limited liability company registered with the

24  Washington Secretary of State. Brandon Reed and Trevor Hein are the registered governing

25  persons of Reed Hein. Reed Hein's corporate office is located at 220 120th Ave NE, Bellevue,

26  WA 98005. Upon information and belief, Reed Hein's principal place of business is located at

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 4

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1   220 120th Ave NE, Bellevue, WA 98005, and the company's former principal place of business

2   was at 3400 188th St. SW #300, Lynnwood, WA 98037. Upon information and belief, Reed

3   Hein operates under the trade names "Reed Hein," "Timeshare Exit Team," "TET," "TSET,"

4   and "RHA," and formerly operated under the names "Reed Hein Travel" and "World Travel

5   Seattle." Reed Hein's primary website is timeshareexiteam.com, but Reed Hein formerly

6   maintained a separate reedhein.com website and maintains dozens of other web domains to

7   redirect to timeshareexitteam.com. On information and belief, Reed Hein began operation in

8   2012.

9        3.3     Defendant **Brandon Reed** was, at all times material to this lawsuit, the co-

10  founder, governor, operator or manager of Reed Hein. Brandon Reed is also a 60% owner of

11  Reed Hein through a wholly-owned Washington corporation, Makaymax, Inc. In these roles,

12  Brandon Reed directs, controls, participates in, and knowingly approves of the policies,

13  activities, and practices alleged in the Complaint herein. Upon information and belief, Brandon

14  Reed resides in Kirkland, Washington.

15       3.4     Defendant **Trevor Hein** was, from Reed Hein's creation through at least

16  approximately July 2016, the co-founder, governor, operator or manager of Reed Hein. In these

17  roles, Trevor Hein directed, controlled, participated in, and knowingly approved of the policies,

18  activities, and practices alleged in the Complaint herein. Trevor Hein is also a 40% owner of

19  Reed Hein through a wholly-owned Delaware corporation, Hein & Sons Industries, Inc. Upon

20  information and belief, Trevor Hein resides in British Columbia, Canada.

21       3.5     On information and belief, Defendant **Makaymax, Inc.,** is a Washington

22  corporation incorporated on June 2, 2015. Makaymax, Inc., is wholly-owned by Brandon Reed

23  and has been operated by Brandon Reed since its formation as a holding company.

24       3.6     On information and belief, Defendant **Hein & Sons Industries, Inc.,** is a

25  Delaware corporation incorporated on March 20, 2012. Hein & Sons Industries, Inc., is wholly-

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 5

1    owned by Trevor Hein and has been operated by Trevor Hein since its formation as a holding

2    company.

3                          **NATURE OF TRADE OR COMMERCE**

4            4.1      Defendants, at all times relevant to this action, have been engaged in trade or

5    commerce within the meaning of RCW 19.86.010(2).

6                                          **FACTS**

7    **A.      Defendants Profess to Provide Timeshare "Exit" Services**

8            5.1      Reed Hein's customers are owners of various types of timeshare interests, *i.e.*,

9    people entitled by contract to the use of a particular Resort's property for a specific interval of

10   time, or entitled to a certain number of "points" that can be exchanged for use of particular Resort

11   properties. Timeshare ownership takes many different legal forms, and can require the timeshare

12   owner to make a variety of different payments, including Resort membership fees and

13   maintenance fees. Many of Reed Hein's customers own timeshare interests that are mortgaged,

14   subject to promissory notes, or otherwise encumbered.

15           5.2      For a variety of reasons, a significant number of timeshare owners are interested

16   in terminating their timeshare interests. Some of these owners are elderly or have had a change

17   in medical or financial circumstances, and no longer want the timeshare obligations. Others

18   regret entering the timeshare contracts at all, some due to claimed unfairness or misfeasance by

19   the Resorts. Regardless of the timeshare owner's motivation, terminating a timeshare interest is

20   not always easily done, and as a result a cottage industry of "exit companies" like Reed Hein has

21   arisen claiming to assist in terminating these interests.

22           5.3      Defendants advertise that Reed Hein can terminate owners' timeshare interests

23   by forcing Resorts to take back their timeshares. Defendants advertise that Reed Hein can

24   perform exits regardless of the circumstances of how the timeshare agreement was reached, the

25   particulars of the contract, and whether the timeshare has a mortgage balance. To attract new

26   customers, Defendants advertise extensively through radio, television, emails, direct mailings,

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 6

1    websites, trade show appearances, and paid endorsements. **Attachment A** to this Complaint

2    includes samples of Reed Hein's online and print advertisements; **Attachment B** to this

3    Complaint includes image captures of timeshareexitteam.com and reedhein.com.

4         5.4      Consumers interested in Reed Hein's services meet with a representative

5    (sometimes called a "Client Advisor") at one of many "local" offices Defendants have set up in

6    metropolitan areas across the country or by webinar. During sales presentations, Client Advisors

7    reiterate that Reed Hein can legally, safely, and permanently get owners out of their timeshare

8    contracts through Reed Hein's "secret," "unique," and "proprietary" process. Unbeknownst to

9    prospective customers, these Client Advisors are commissioned salespeople whom Reed Hein

10    does not require to have expertise in the timeshare industry or in terminating timeshare interests.

11         5.5      For the services Defendants claim to offer, Reed Hein charges a significant fee of

12    between $2,897 to $8,795 or more for the first timeshare exit (some customers have more than

13    one contract to exit). Defendants incentivize upfront payments by offering small discounts, but

14    will also accept payment installments. Reed Hein's contracts from 2019-forward provide that

15    Reed Hein has no obligation to provide services until paid in full.

16         5.6      Defendants consider any fees received as earned upon receipt, despite not having

17    done any assessment to determine whether an exit is possible. Defendants have contracted to

18    receive fees for approximately 38,000 customer "exits" since 2012, collecting millions in upfront

19    fees. Defendants also advertise a "100% money-back guarantee" (Money-Back Guarantee) that

20    Reed Hein will refund its fee if it cannot accomplish an exit. This Guarantee features prominently

21    in Reed Hein's marketing materials, including on its website and advertisements featuring its

22    paid celebrity endorsers.

23         5.7      Defendants tell incoming customers that an exit can take a significant amount of

24    time, currently 18 months or longer. The process is opaque to the customer: Customers receive

25    infrequent updates from Reed Hein "Account Coordinators" (administrative employees who do

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 7

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1  not perform substantive work toward exits) informing them that progress is being made toward

2  an exit.

3         5.8      Eventually, if the process ends, Defendants send customers an "exit letter" on

4  Reed Hein's letterhead congratulating them on being exited from their timeshare contract.

5  Defendants do not always provide any proof of an exit beyond the exit letter. Most customers

6  are left with the impression that Reed Hein has exited them and they face no potential future

7  liability on their timeshare contract.

8         5.9      Virtually every step of this process—from advertising to the exit letter—is unfair,

9  deceptive, and/or outright false:

10        a.      The "exits" Defendants claim to accomplish are often legally invalid,

11 damaging, and/or not as-advertised to customers—or are never delivered at all;

12        b.      Defendants have no proprietary process or internal expertise in the

13 termination of timeshare contracts, and instead covertly outsource 95% or more of their

14 customers to third-party Vendors;

15        c.      Defendants' much-touted Money-Back Guarantee is illusory and seldom

16 honored; and

17        d.      Defendants make unfair or misleading representations to consumers at all

18 stages of their relationship.

19        5.10     Worse still, Reed Hein's signups far outpace its supposed exits. According to

20 their own data as of December 2019, Defendants have nearly 15,000 customers in limbo awaiting

21 an exit, while Defendants continue to take on hundreds more new customers each month.

22 Defendants have delivered only approximately <u>half</u> of the exits for which they have been hired,

23 and many of those exits may be disputed by the Resorts.

24        5.11     In their efforts to bring in revenue by adding new customers, Defendants spend

25 approximately $1 million a month in advertising ($10-12 million per year). With 17,000 exits

26 outstanding (for nearly 15,000 customers), Reed Hein is spending approximately 25% of its

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 8

1   annual revenue to attract more customers rather than servicing its existing backlog. Additionally,

2   on information and belief, Defendants no longer follow their own internal "Do Not Take" List

3   (*i.e.*, Defendants' list of Resorts they cannot exit), meaning that Defendants are knowingly

4   advertising to, and collecting money from, customers whom they cannot service.

5         5.12   Un-exited customers may have no recourse with Reed Hein, despite Defendants'

6   advertised Money-Back Guarantee. Defendants' business practices leave the company far short

7   of the assets needed to honor the Guarantee made to customers whose exits are outstanding. On

8   information and belief, Defendants keep only a minimal operational reserve, such that funds paid

9   by incoming customers must be spent to continue servicing Reed Hein's backlog of un-exited

10   customers.

11   **B.**   **Reed Hein's Exits Are Invalid or Not What Was Advertised to Consumers**

12         5.13   Reed Hein specifically markets that their "exits" involve getting the Resort to

13   "take back" the timeshare or "cancelling" or "annulling" the timeshare contract. For a time,

14   Defendants' advertisements specifically claimed that Reed Hein's process "forced" Resorts to

15   take the timeshare back, but Reed Hein's corporate representative has conceded in deposition

16   testimony that Reed Hein and its Vendors' methods—short of a lawsuit—cannot <u>force</u> the

17   Resorts to do anything, and are successful in returning the timeshare to the Resort only with the

18   Resort's <u>consent</u>.

19         5.14   Instead, Defendants use exit methods of varying legitimacy, and rarely in the

20   form advertised. Brandon Reed has conceded in sworn deposition testimony that several of these

21   methods were "not what [he] told [his] customers," who were told "something completely

22   different."

23         **1.**   **Invalid or Unsafe Exits**

24         **a.**   **Foreclosure and Notice of Termination Exits**

25         5.15   Defendants consider foreclosure by the Resort to be an exit in satisfaction of Reed

26   Hein's contract, because the customer technically no longer owns the timeshare. Likewise,

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 9

1    Defendants consider customers successfully exited when a Resort issues a Notice of Termination

2    of the timeshare contract for nonpayment. Under this strategy, all Reed Hein needs to do to earn

3    its upfront fee is instruct its customer to stop making payments on the timeshare—or impede

4    them from doing so—and wait for the Resort to foreclose or issue a Notice of Termination. Both

5    outcomes can harm a customer's credit rating and create other negative financial consequences.

6    While Defendants have recently begun warning customers of the risk of foreclosure or

7    termination, Defendants do not disclose to customers that Reed Hein or its Vendors are seeking

8    these outcomes, even though more than 1 in 10 of Reed Hein's purportedly successful exits took

9    these forms.

10       5.16    Defendants affirmatively instructed many customers to stop making any

11   payments to their Resort, including mortgage payments. Even after Defendants claim they

12   stopped instructing customers not to pay, Defendants implied that if customers stopped making

13   payments, it could speed up the exit process or even prompt the Resort to "cancel" their

14   timeshare. In addition, Defendants' attorney Vendors would send representation letters to the

15   Resorts that barred the Resorts from communicating directly with the consumers, preventing

16   some consumers from realizing the Resort was demanding payment or threatening foreclosure.

17       5.17    Defendants take credit for such foreclosures even when they know the foreclosure

18   did not result from Reed Hein's supposed work or when Reed Hein was unaware of the

19   foreclosure until informed by the customer. Reed Hein's internal policy manual has a section

20   titled, "I Could Have Just Done This on My Own, I want My Money Back," which instructs

21   employees to refuse refunds based on foreclosures. Employees are further instructed to tell

22   customers: "they did NOT do it on their own. They signed a contract with us and we achieved

23   an exit." Framing foreclosures and Notices of Terminations as successful exits allows

24   Defendants to refuse to provide refunds.

25

26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

### b.    "Notices of Resignation" Exits

5.18    Defendants' claimed "successful" exits include exits by means of "notice of resignation." This involves a Vendor sending a letter to the Resort unilaterally resigning the timeshare ownership, making a statement such as "the particular owner no longer wishes to be a member of the club." On information and belief, these form notices of resignation are rejected by Resorts and have no legal effect unless the Resort consents.

### c.    "Deed Back to Resort" Exits

5.19    Defendants' claimed successful exits include exits by means of a "deed back to the resort." For this method, the Vendor attorney arranges for a quitclaim deed conveying the customer's timeshare interest back to the Resort. The customer signs the deed, and the Vendor arranges for it to be recorded, without obtaining consent from the Resort. Absent the Resort's consent, these "deed backs" are legally invalid and the customer remains liable under the original timeshare contract.

### d.    Invalid (or Potentially Invalid) Exits by Transfers to Third Parties

5.20    Defendants' Vendors also practice a variety of exit methods involving invalid or potentially invalid transfers to third parties. For example, one Vendor regularly "exited" via a method called "deed back to associate." For that method, the Vendor prepares and records a deed purporting to convey the customer's timeshare interest to an "associate" who is paid $100 per deed. The Vendor does not inquire into, or even consider, the associate's ability or intention to pay the fees that come with the timeshare ownership. These "deed to associate" transfers occur without the consent of the Resort and are legally invalid, meaning that the Resort may still pursue payment from Reed Hein's customer.

5.21    Other Vendors used by Defendants purport to locate third-party transferees who are willing to take on the customer's timeshare. While these transfers may be performed with the consent of the Resorts, Reed Hein's customers risk liability if the transfer is later unwound due to an illegitimate transferee. In practice, Reed Hein customers are made to sign and notarize

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 11

1 | transfer paperwork which includes blank spaces for Vendors to insert an unspecified transferee
2 | at a later date; the customer may never even learn the transferee's identity and has no means to
3 | know their legitimacy. If the customer refuses to execute the blank paperwork, Defendants take
4 | the position that the customer has rejected a Reed Hein-procured exit opportunity and voided the
5 | Money-Back Guarantee.

6 |         **e.**    **"Verbal Confirmation from Resort" Exits**

7 |     5.22    Defendants and certain of their Vendors also accept "verbal confirmation" from
8 | the Resort that the Resort will not enforce the timeshare debt, with no further action. These
9 | "verbal confirmation" exits, by nature, do not come with proof that the Reed Hein customer has
10 | been released from their obligations under the timeshare contact or mortgage, and are
11 | unenforceable. Defendants accept that such "Verbal Confirmation from Resort" is effective, and
12 | communicate to the customer that the customer no longer owns the timeshare.

13 |     5.23    These "verbal confirmation" exits have proved worthless to various Reed Hein
14 | customers who, months or years after Reed Hein informed them of the successful exit, received
15 | payment demands from their Resorts for the timeshares they still legally own.

16 |         **f.**    **Unrecognized and Later-Rejected Exits**

17 |     5.24    Defendants claim to have obtained various forms of exits that they know, or
18 | should know, are not recognized by Resorts and the Resorts still consider Reed Hein's customers
19 | to be the legal owner of the timeshares. Defendants do not pursue a legal or any other type of
20 | proceeding to determine whether Reed Hein or the Resort is correct, and instead report to
21 | customers that they are exited from the timeshare. Reed Hein's exit letter contains the caveat
22 | that if the Resort continues to contact the customer, the customer is to contact Reed Hein and
23 | not engage with the Resort. Reed Hein provides multiple misleading explanations as to why a
24 | customer would still be receiving timeshare invoices after an exit, including that the Resort is
25 | trying to trick them into reactivating the timeshare contract.

26 |

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 12

5.25    Additionally, according to the sworn testimony of Reed Hein's corporate representative, Defendants rejected the "notice of resignation," "deed back to resort," and "deed to associate" exit methods as not "safe" in 2016. Despite this, in their advertised count of 19,000 "successful" exits, Defendants include more than 2,600 exits by these methods, meaning that more than 1 out of every 10 exits Reed Hein touts in its marketing are by means Defendants claim they have since rejected.

**2.      Deceptive Exits That Are Not What Was Advertised**

        **a.      Exits by Sale or Transfer to Third Parties**

5.26    Over time, Defendants' marketing has stated that Reed Hein is not a transfer or listing company, and does not sell or transfer timeshares to third parties. Multiple versions of Reed Hein's contracts have also specified: "This is not a listing agreement." Despite this repeated representation, since Reed Hein's inception, Defendants' non-attorney Vendors have primarily exited Reed Hein's customers by transferring or selling their timeshares to third parties.

5.27    Reed Hein's sales scripts even criticize the idea of a customer attempting to resell their timeshare or hiring another company to do so. These scripts argue that the timeshare has no resale value, will not sell, and/or that the customer will be scammed by listing companies during the resell attempt, and that the customer instead should hire Reed Hein. While Reed Hein's marketing specifically warned consumers against paying upfront fees to hire someone to sell their timeshare, Defendants collected significant upfront fees from customers to do just that.

5.28    Defendants even profited from these resales: at least one Vendor pays Reed Hein for timeshare "inventory" to resell, with Reed Hein receiving a percentage of the proceeds. These payments are neither disclosed to the customer nor credited toward their Reed Hein fees. Reed Hein's customer contracts were silent on this subject until 2019, when Defendants added a provision that the customer "waives any right to any compensation that could result from an Exit achieved through the Services."

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 13

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

5.29    Reed Hein's sales scripts also criticize transfers to third parties as an exit method, referencing incidents where timeshare owners were held accountable when the person to whom they transferred the timeshare did not make required payments to the Resort. Yet thousands of Reed Hein customers' "exits" were by transfer to third parties whom neither Reed Hein nor the customer selected. Where "transfers" are referenced at all in Reed Hein's marketing, Defendants create the deceptive net impression that the "transfer" will be back to the Resort rather than to a third party without the Resort's involvement.

5.30    Reed Hein's contracts did not begin to define "exit" as including the possibility of sale or transfer to a third party until 2019, after Defendants became aware of the State's investigation.

### b.    Transfer Vendors and Defendants' Exploitative Re-negotiation of Customers' Exit Agreements

5.31    In approximately 2017, Defendants began outsourcing thousands of their backlogged customer files to transfer company Vendors. Some Vendors required Reed Hein's customers to be current on all their maintenance fees and other payments to their Resorts to perform a transfer. Defendants thus informed hundreds or thousands of their customers who were behind on these payments—the majority of whom were directed by Defendants to stop making payments—that Reed Hein had a guaranteed "exit" for them within 180 days, but the customer needed to make any overdue payments to take advantage of the new "partnership." If customers balked, Defendants informed them that the transfer opportunity was an exit in satisfaction of Reed Hein's contract, and refusal to participate would void Reed Hein's advertised 100% Money-Back Guarantee. Facing the loss of their money, many customers complied.

5.32    Customers who moved forward with transfer Vendors after this point were often asked to execute an "Exit Agreement Addendum" modifying their prior contracts with Reed Hein. The Addendum's contents varied slightly over time, but required the customer to become (and stay) current on all Resort payments for a specified amount of time, after which time Reed Hein would take over financial responsibility for all Resort payments. However, in exchange for

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 14

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1  Reed Hein taking over payment responsibility, the Addendum required that the customer allow

2  Reed Hein and the transfer Vendor <u>unlimited time</u> to complete the exit. Reed Hein thus takes

3  over the payments, but is free to leave the timeshare legally in the customer's name for as long

4  as Defendants desire. This way, Defendants not only escape any time estimates provided to

5  existing customers, but make it so that Reed Hein never has to deliver its promised services so

6  long as Reed Hein can continue to make payments to the Resorts using revenue obtained from

7  other incoming customers.

8             **c.**     **Customers Are Made to Negotiate Their Own Exits**

9         5.33    In recent months, Defendants have implemented a new "exit process." Reed Hein

10  directs customers to file complaints with the Better Business Bureau and state Attorneys General

11  to prompt Resorts to contact the customer, at which point Reed Hein directs the <u>customer</u> to

12  negotiate an exit using talking points provided by Reed Hein. Reed Hein specifically directs

13  these customers not to inform the Resort of Reed Hein's involvement. As with Defendants' other

14  methods, this is not what Defendants advertised to their customers: Customers who hired Reed

15  Hein to "work directly" with Resorts have effectively paid thousands of dollars to Defendants

16  for the privilege of negotiating their own exits.

17  **C.**    **Defendants Do Not Possess the Expertise and Internal Capabilities They Advertise**
18        **and Outsource 95% or More Exits to Vendors**

19         5.34    As early as December 2013, Defendants advertised that "[w]e are industry experts

20  in relieving people of their timeshare commitments." Only a year before, Brandon Reed and

21  Trevor Hein were employed selling rain gutter systems; neither had any experience or training

22  in performing timeshare exits, and they did not hire internal personnel who did. Brandon Reed

23  has testified under oath in other litigation that Reed Hein's business model from inception was

24  to <u>outsource all exit work</u> to third-party Vendors.

25         5.35    Defendants only began attempting "internal" (*i.e.*, non-Vendor) exits in

26  approximately 2015, and even this was limited to contacting Resorts about voluntary surrender

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 15

1  programs for unwanted timeshares—which the customer could have done for free. The

2  employees making these contacts, including Reed Hein's former office manager, had no

3  specialized training or experience. Only in 2016 did Defendants hire contractors or employees

4  with backgrounds in the timeshare industry to attempt to negotiate exits with Resorts, and only

5  then as a "secondary" measure as Defendants continued to outsource first to Vendors.

6         **1.     Defendants Fail to Disclose or Actively Conceal the Extent that Reed
7               Hein's Services Will Be Outsourced**

8  5.36    In most cases, Defendants immediately determine that the customer's exit will be

9  outsourced, but Defendants will often conceal or fail to disclose the Vendor's involvement unless

10  or until the Vendor's exit process necessitates disclosure, such as if the Vendor wants legal

11  documents executed.

12  5.37    In assigning a Vendor, Defendants do not do the case-by-case analysis of the

13  customer's timeshare that is promised in their advertising. Instead, 95% of the time, Defendants

14  decide whether the file should go to an attorney Vendor or non-attorney Vendor based solely on

15  whether the timeshare is encumbered.

16  5.38    Reed Hein has also broken ties with several of its Vendors, which often leaves

17  Defendants without a mechanism to affect the desired exit. During such periods, Defendants

18  continue to sign up customers for services but do not inform the customers that no work will be

19  done toward their timeshare exit until Reed Hein can locate a new Vendor. For example, for

20  several months in late 2018, Defendants did not have an attorney Vendor to whom they could

21  send incoming Reed Hein customers, after cutting off new assignments to all their existing

22  attorney Vendors. Reed Hein nevertheless continued to take on customers with encumbered

23  timeshares, without informing them that that no action would be taken on their exits until Reed

24  Hein located a new Vendor. Reed Hein ultimately had to restore its relationship with a prior

25  Vendor—who had previously sued Reed Hein for breach of contract for failing to send enough

26  customer files—to start work on these exits.

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1     5.39     Reed Hein would not necessarily tell their customers that work by an attorney (let

2     alone a third party) was contemplated for their exit, and salespersons were trained to convey

3     Reed Hein's hope that no attorney would be necessary. In many instances, Reed Hein neglected

4     to obtain a power of attorney before hiring a Vendor attorney on the customer's behalf, or

5     allowed a power of attorney to lapse before hiring one. Customers have complained to Reed

6     Hein, demanding a refund, on the basis that they did not realize Reed Hein would be hiring an

7     unknown third party.

8     5.40     In many cases, Defendants directed and trained their employees not to reveal the

9     identity of Defendants' Vendors, even in circumstances where they were permitted to indicate a

10     Vendor was being used. Employees also referred to Vendors in communications with customers

11     as though the Vendors were in-house personnel.

12     5.41     Where there was a Vendor contract, Defendants sometimes built in a provision

13     barring the Vendor from speaking to Reed Hein's customers. When one of Reed Hein's Vendor

14     attorneys began interacting with customers and sending them direct communications, including

15     an outline of Reed Hein's fee arrangement with the attorney, Defendants advised those

16     customers that the communications were "a formality" or should be ignored.

17     5.42     Attorney Vendors send representation letters to Resorts indicating the customer

18     (not Reed Hein) has retained the attorney to seek an exit of the timeshare. Attorneys send these

19     letters even when the customer does not know the attorney's identity or even that the attorney

20     has been retained. This is despite the fact that some of Reed Hein's attorney Vendor contracts

21     explicitly provided that Reed Hein customers would not have an attorney-client relationship with

22     the attorney and barred Reed Hein from implying that the attorney Vendor represented the

23     customer.

24     5.43     Defendants internally recognized that Reed Hein's contracts with customers did

25     not provide for Reed Hein to outsource exit services to a third-party Vendor. Reed Hein

26     employees were instructed in approximately April 2018 that they could direct customers to an

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 17

assignment provision in the contract as a basis for authority to outsource the exits, and "reset customer expectations" about third-party Vendors accordingly. Defendants only revised their contract to permit outsourcing of exit services in 2019, after commencement of the State's pre-litigation investigation.

**2.      Defendants Exercise Little to No Supervision Over Their Vendors**

5.44     On information and belief, Defendants maintain so little oversight of their Vendors that Defendants were unable to provide a complete Vendor list, contact information for all Vendors, or even the last names of their primary contacts at several of their Vendors, in the course of the State's investigation. In fact, Defendants' lack of supervision and oversight is to such degree that Reed Hein was once surprised to find itself accused of misappropriating a customer's timeshare "points," when these points were actually taken by a Vendor to whom Reed Hein had given the customer's Resort logon credentials.

5.45     Because many of these Vendor relationships are not governed by a written contract, Defendants have little to no control over what the Vendor does, or recourse if the Vendor does not perform. What few contracts Defendants do enter into with Vendors often provide the Vendors with broad discretion to act without consulting Reed Hein. Because of this, several of Defendants' Vendors have further subcontracted out the consumer's file, with or without Defendants' knowledge, without Defendants' oversight, and without a contract between Defendants and the subcontractor.

**3.      Defendants Rely on the Vendors' Assessment that An Exit is Complete or Valid and Do Not Perform Due Diligence**

5.46     Because Defendants do not possess expertise in timeshare law, Defendants must rely entirely on the assessment of their Vendors as to whether a purported exit is complete or legally valid.

5.47     Until at least approximately 2016, Defendants did not perform any work to validate an exit by one of their Vendors, and would send "exit letters" to customers based on as

1 little as a verbal representation by the Vendor that an exit was complete. Defendants would not

2 further verify or require documentation from the Vendor.

3     5.48  Defendants also did not understand or supervise their Vendors' methods.

4 Brandon Reed testified in a recent deposition that, when retaining an attorney Vendor who

5 would ultimately be responsible for more than 6,000 purported exits, Reed "assumed he did

6 lawyer work. He did attorney work, whatever that is."

7     5.49  For years, and with Defendants' knowledge, that same attorney Vendor sent

8 hundreds of boilerplate letters to Resorts on behalf of Reed Hein customers alleging that the

9 customers wanted to exit their timeshares on the basis of fraud and/or misrepresentation. The

10 Vendor made no effort to determine whether there was a basis for such allegations. Defendants

11 accepted the attorney's letters accusing Resorts of fraud as a viable strategy to compel Resorts

12 to allow cancellation of timeshare contracts.

13     5.50  On multiple occasions, Defendants falsely communicated to customers that they

14 had been exited from their timeshares in reliance on information or legal assessments from Reed

15 Hein's Vendors. Many of these customers stopped making payments to Resorts on the basis of

16 Defendants' false assertion that they were exited, and became delinquent in their payments.

17 **D.**    **Defendants' Advertised Money-Back Guarantee Is Deceptive and Illusory**

18     5.51  Defendants feature a "100%" Money-Back Guarantee prominently in Reed

19 Hein's marketing materials and sales presentations, creating the deceptive net impression that

20

21

22

23

24

25

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 19

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

Reed Hein's services are risk-free because the customer can always get their money back. Reed Hein's Money-Back Guarantee, however, is illusory.



**Fig. 1. Timeshareexitteam.com as of December 4, 2019.**

5.52    The fine print of the Money-Back Guarantee has varied over time, but in every version Reed Hein attaches numerous caveats and qualifications that allow the company to avoid paying a refund at its discretion, which Reed Hein exercises in almost any circumstance to deny payment. Defendants' contractual small print does not correct the deceptive net impression created by its website and marketing materials.

5.53    Defendants have consistently interpreted the Money-Back Guarantee so that Reed Hein does not have to perform any deliverables in any specific span of time. Reed Hein will then use that as a ground to deny customers a refund and claim that Reed Hein is still working on a customer's file or that an exit may be forthcoming. Even now, the current fine print of the Guarantee only renders a customer "eligible" for a refund if three years have passed.

5.54    Defendants also build in a variety of pitfalls designed to void the Money-Back Guarantee:

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

a. Reed Hein voids the Guarantee if it has any exit offer, regardless of cost or form. Defendants interpret this to include if a customer rejects one of its Vendors, even if the Resort has never been contacted.

b. Reed Hein also voids its Money-Back Guarantee if the customer fails in its "duties," such as continuing to pay Resort fees, even if Reed Hein advised the customer not to pay.

c. The most recent version of the Money-Back Guarantee declares the Guarantee void if the customer achieves their own exit: meaning that Defendants are entitled to keep the customer's funds even if they never did any work.

d. A Reed Hein internal policy manual states that, "we do not offer refunds for . . . cancellations" of its customer contracts entered between approximately 2016 and early 2019, which include the Money-Back Guarantee.

5.55    In practice, Defendants' refund policy is that customers are not entitled to their full money back unless and until Reed Hein (in its discretion) determines that it is unable to obtain an exit. Defendants regularly deny requests for full refunds on the basis that Reed Hein has already begun work, and do not proactively refund money even if the exit has gone undelivered for years. Reed Hein typically does not honor its 100% Money-Back Guarantee unless the customer threatens to complain to a third party, such as the news media or the Washington State Attorney General's Office. Reed Hein has even conditioned refunds on customers taking down negative reviews or complaints online.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 21

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

**E.      Defendants Make Misrepresentations and/or Create Deceptive Net Impressions at Every Stage of their Relationship with Consumers**

**1.      Misrepresentations Regarding the Safety and Efficacy of Exits**

5.56      Defendants advertise that the timeshare "exits" they will obtain on behalf of customers will be permanent and legal, and that the customer will not be harmed by the exit process. In particular, Defendants advertised that Reed Hein could get customers out of their timeshare "safely, legitimately, forever" or "safely, legally, forever." As discussed further above, the "exits" obtained by Defendants often do not meet these criteria.

5.57      "Safely" or "Securely": Defendants' marketing and sales presentations convey to potential customers that Reed Hein's services are safe, and even "100% risk free." In truth, many of Reed Hein's exit methods expose customers to debt collection actions, foreclosure, lawsuits, credit damage, unanticipated tax liability, and other consequences that Defendants did not include in their marketing. Defendants failed to disclose these risks to many customers, or told them there was no risk of these consequences.

5.58      Defendants claim they discontinued marketing that Reed Hein's exits were "safe" in late 2017, because they did not see any advertising benefit to the term. However, "safely, legally, and forever" still appears on Defendants' website.

5.59      "Legitimately" or "legally": Defendants' marketing and advertising conveys that the exits sold are valid and in accordance with applicable law. However, as discussed in section B, many of the exits ultimately obtained are legally questionable or wholly invalid.

5.60      Despite this, Defendants market their services to any timeshare owner, regardless of circumstances or the implicated Resort. In doing so, Defendants create the deceptive net impression that any timeshare contract can be legitimately exited using their services, even if there is no legal basis to break the timeshare contract. Some Resorts will not work with exit companies in any circumstance.

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

5.61    For those customers who are not legally exited, timeshare fees under their contract, including late fees, continue to accrue. Some customers only learn this when contacted by collections agencies or when the Resort forecloses on the customer's timeshare.

5.62    For many of Defendants' invalid exits, Resorts continue to send invoices and payment demands to the Reed Hein customer. Defendants inform their customers that it is "normal" for the Resort to continue to send payment demands, either because the Resort is attempting to trick the customer into somehow reactivating the exited timeshare contract or because the Resort's billing department has not gotten word of the exit. On information and belief, Defendants make these representations to consumers to prevent them from realizing that the exit is invalid or that the customer still is financially obligated to the Resort.

5.63    "Forever": Defendants' marketing and advertising conveys that the exits it obtains are permanent. In practice, Defendants will declare that a customer is exited for the purposes of satisfying Reed Hein's contractual obligations even though the exit is such that the Resort may still attempt to enforce the contract.

### 2.    Misrepresentations and Deceptive Net Impression Regarding Defendants' Expertise and Capabilities

5.64    From Reed Hein's inception, Defendants have advertised that they had unique, secret, or proprietary methods to affect timeshare exits. Defendants tell consumers who attend sales presentations that Reed Hein has special methods their competitors do not. All of Defendants' exit methods, (i.e., hiring a third-party Vendor to perform the exit or calling Resorts to ask if they have surrender programs), are available to the public.

5.65    Defendants' marketing to consumers also fosters the impression that Reed Hein itself is performing work internally to exit consumers from timeshares. At various times, Defendants have advertised that they have a "skilled in-house team" to handle exits, which Defendants interpret as applying to the customer service team interacting with Reed Hein's customers, who are neither skilled nor trained in timeshare exits.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 23

1    5.66    Defendants' misrepresentations also extend to the size and local reach of the Reed

2    Hein organization. Over time, Defendants have advertised that Reed Hein has more than 30

3    satellite offices in local markets. Defendants' marketing stresses that Reed Hein has "real,"

4    "physical" offices for its customers across the U.S. and Canada, staffed by employees with

5    "local" experience. In reality, only Reed Hein's Canadian and U.S. headquarters were staffed

6    full time. Reed Hein's many other "offices" are virtual offices: rental office space used by one

7    or two regional salespeople for appointment-only sales meetings.

8    5.67    Defendants' marketing also falsely touts "local" expertise and connections to

9    handle timeshare issues particular to a Resort or region. In reality, Defendants will outsource

10   customer files to Reed Hein's current preferred Vendor regardless of where the customer's

11   timeshare is located. For example, of the approximately 38,000 timeshares Defendants were

12   hired to exit, Defendants outsourced more than 6,000 customers' files to a single-attorney law

13   office in Palm Springs, California; more than 6,000 to a single-attorney law office in Pawnee,

14   Oklahoma; more than 2,000 to a Seattle, Washington law firm; and more than 5,000 to a transfer

15   company based in Ozark, Missouri.

16   **3.    Misrepresentations Regarding Working "Directly" with Resorts**

17   5.68    Defendants mislead consumers that their "exits" are the result of "work[ing]

18   directly with resorts" and getting Resorts to "take[] the property back." Defendants misrepresent

19   that they have developed relationships with timeshares that facilitate negotiation of an exit.

20   5.69    Reed Hein does not have the relationships with Resorts that it claims, and many

21   Resorts affirmatively refuse to deal with timeshare exit companies, Reed Hein in particular.

22   Contrary to their marketing, Defendants take affirmative steps not to interact directly with

23   Resorts, and many times have actively concealed Reed Hein's involvement in a customer's

24   request for an exit. Reed Hein employees have specifically directed customers not to mention

25   that they have hired Reed Hein.

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 24

5.70   For Vendor exits, only the Vendor interacts with the Resort, and the Vendor identifies itself as working on behalf of the customer rather than Reed Hein. Reed Hein's marketing efforts have only recently begun referring to "partners" in the exit process; prior to 2017 Reed Hein's marketing indicated that Reed Hein itself would accomplish the exit on behalf of the customer, and hire a third party "if needed" after Reed Hein's own efforts failed.

5.71   Even Reed Hein's internal team conceals its role in negotiations. Employees act under a power of attorney granted by the consumer to the individual employee rather than Reed Hein. The employee does not identify him or herself to the Resort as acting on behalf of Reed Hein, forgoes company letterhead, and communicates from sources (e.g. private email addresses, post office boxes, and cellular telephones) that are not associated with Reed Hein.

**4.      Misrepresentations Regarding the Speed of Exit Services.**

5.72   To attract consumers, Defendants have advertised that they can accomplish their exit services quickly and immediately free consumers from payment obligations to their timeshares. Among other representations, Defendants state "Never pay another maintenance fee" and "Why wait . . . we can get you out now." In some cases, Reed Hein employees explicitly told customers their exit could be accomplished before the next year's maintenance fees were due to be paid.

5.73   In reality, Defendants' supposed exits take months or years to accomplish, even according to their own disclaimers and estimates. Over time, Defendants' estimate of the timetable for a timeshare exit has stretched from as little as 30 days to (currently) 18 months or more, during which time the customer is still legally obligated to pay any fees and costs associated with their timeshare. In fact, more than 4,600 of Reed Hein's outstanding exits as of December 2019 had been pending for three years or more.

**5.      Misrepresentations regarding Reed Hein's Success Rate**

5.74   Through at least March 2015, Defendants advertised that Reed Hein had a 100% success rate in exiting consumers from their timeshares. Reed Hein contracts during this period

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 25

1  even described the company's services as a "100% certain solution." Documents provided to

2  customers at the time of signing up for Reed Hein's services informed them "Please do not

3  despair, we will get you out. It's not a question of IF, only a question of WHEN." On information

4  and belief, Defendants' claimed 100% success rate was untrue when made, and Defendants

5  ultimately ceased to make this representation in recognition that they could not substantiate it.

6       5.75    On information and belief, Defendants have advertised that Reed Hein

7  accomplishes more than a thousand "exits" per month. Reed Hein's corporate representative has

8  since conceded in sworn testimony that the "thousand" referred to in these advertisements was

9  the number of customers who signed up for Reed Hein's services per month, who had yet to be

10  exited at all.

11       5.76    Defendants now claim to have performed <u>only approximately half</u> of the more

12  than 38,000 exits Reed Hein has been paid to accomplish since the company began operation.

13
        **6.**       **Defendants Create the Deceptive Net Impression that Reed Hein is a Law**
14                    **Firm and Misrepresent that Reed Hein Performs "Consumer Protection"**

15       5.77    Defendants' marketing and branding create a deceptive net impression that Reed

16  Hein is a law firm and/or that Reed Hein employs in-house attorneys with timeshare expertise.

17  Reed Hein has no actual attorney "associates" and the only attorneys on Reed Hein's payroll

18  serve as corporate counsel. On information and belief, representatives of Reed Hein have also

19  directly made misrepresentations to this effect.

20       5.78    Defendants' sales scripts and presentations also reinforced this impression.

21  Scripts referred to "Our Attorneys – They are consumer advocate attorneys," and did not specify

22  that any attorneys used are Vendors.

23       5.79    Representations made by Defendants on reedhein.com and

24  timeshareexitteam.com bolster the misimpression that Reed Hein is a law firm or has in-house

25  timeshare attorneys. Timeshareexitteam.com routinely referred to Reed Hein as a "firm"

26  employing "consumer advocates" for the benefit of "clients." Through at least September 2014,

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    reedhein.com specifically advertised "expertise" in, among other things, the legal fields of

2    "Mortgage Mediation" and "Automotive Contracts." Through at least May of 2015,

3    Reedhein.com also stated that Defendants protect[ed] consumers "when they are misled by false

4    advertising, deceptive sales practices, defective products, and various other unfair trade

5    practices."

6    **Fig. 2. Reed Hein.com webpage as of Sept 2, 2014 (retrieved from archive.org).**



YOUR TRUST IN REED HEIN IS OUR BIGGEST ACHIEVEMENT

Reed Hein's & Associates protects consumers when they are misled by false advertising, deceptive sales practices, defective products, data privacy breaches, and various other unfair trade practices.

We Offer a Free Consultation

Contact Us

**Areas of Expertise:**

✓ Timeshare Exits
✓ Home Improvement
✓ Automotive Contracts
✓ Mortgage Mediation
✓ Debt Collector Harassment
✓ Credit Repair

16    5.80    Reedhein.com also stated that Defendants "represent consumers," who are

17    referred to as "our firm's clients," and claimed that Defendants' services included "preparing the

18    strongest case for you."

19    5.81    Defendants did not add language to their website disclaiming that Reed Hein was

20    a law firm until sometime after September 2015 (in small print), and did not add a similar

21    disclaimer to their contracts until February, 2016 or later.

22    5.82    Defendants further create the impression that they are lawyers after they are hired;

23    Reed Hein employees were trained not to disclose the names of attorneys or that these attorneys

24    were third-party Vendors. In customer communications, employees routinely referred to Vendor

25    attorneys as "the attorney," "our attorney," or "your attorney." Defendants also insert Reed Hein

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 27

1    personnel between the customer and any attorney, telling the customer that they must liaise with

2    the attorney through their Reed Hein representatives.

3        5.83    At least some of Defendants' customers understood Reed Hein to be a law firm

4    or to have lawyers on staff when they retained Defendants' services.

5        5.84    Also central to Defendants' marketing is the representation that Reed Hein is a

6    "Consumer Protection Firm" or "Consumer Protection Group" employing a team of "consumer

7    advocates" to look out for consumer interests.

8

9    

10

11    **Fig. 3. Timeshareexitteam.com as of Sept. 5, 2015 (retrieved from archive.org).**

12        5.85    In using these terms, Defendants create the impression that Reed Hein is

13    performing work to protect consumers or redress consumer harm. Reed Hein further bolsters this

14    impression by trading on public perception of the timeshare industry and stating that Resorts are

15    victimizing consumers.

16        5.86    Contrary to these repeated representations, Reed Hein's sole work consists of

17    selling timeshare exit services for profit. The employees who sign up Reed Hein's customers are

18    commissioned salespeople whose compensation was (through January 2018) based <u>solely</u> on the

19    sales they closed. As Reed Hein's corporate representative conceded in a recent deposition, Reed

20    Hein's "goal . . . is to sell as many exits as possible and generate as much revenue and income

21    as possible."

22        **7.**    **Defendants Deceptively Manipulate Online Reviews to Create Positive**

23               **Perception of Reed Hein's Abilities and Services**

24        5.87    Defendants also manipulate online reviews of Reed Hein's services in order to

25    attract and maintain customers, and discredit negative commentary by unhappy customers. This

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 28

1 includes having employees pose as satisfied customers online and leave fabricated reviews

2 describing positive experiences with Reed Hein.

3      5.88    Defendants further manipulate online reviews by hosting a false and deceptive

4 online review aggregator on the timeshareexitteam.com website. Defendants' "Timeshare Exit

5 Team review summary" purports to aggregate 1-star (Bad) through 5-star (Excellent) reviews

6 from Google.com, Trustpilot.com, and Birdeye.com but omits more than two hundred negative

7 (*i.e.*, 1- and 2-star) reviews posted to those review websites. Through this deceptive "review

8 summary," Defendants falsely represent and/or create the impression that no negative reviews

9 of the company exist, when in fact hundreds of such reviews have been posted online including

10 approximately one hundred 1- and 2-star reviews on the Better Business Bureau's website.

11      5.89    Reed Hein also specifically misrepresented for several years that they had no

12 complaints with the Better Business Bureau or the Washington State Attorney General's Office,

13 or any other form of "action" from a U.S. or Canadian government agency. This

14 misrepresentation, which was included in contracts signed by Reed Hein customers through at

15 least May 2016, was untrue by as early as 2014.

16
17 **8.    Defendants Make Specific Misrepresentations to Consumers During Sales Presentations**

18      5.90    Defendants present their salespeople as having expertise in the timeshare industry

19 and Reed Hein's "proprietary" exit process. In fact, the salespeople are not required to have any

20 timeshare-related experience and are not even told how Reed Hein obtains the exits.

21      5.91    Defendants advertise that their significant fee is a onetime cost (except for a

22 potential Resort-required settlement fee), compared to perpetual Resort fees. However, Reed

23 Hein does not disclose that it may later ask for more money if the exit opportunity it obtains

24 requires additional payments to a third-party Vendor, claiming this is allowed under their

25 contracts because the money is not going to Reed Hein. Furthermore, Reed Hein now requires

26 that customers keep paying for—but not use—the timeshare; customers thus have to pay Reed

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 29

1  Hein's fee <u>and</u> the Resort fees for the duration of the exit process, without the enjoyment of their

2  timeshare.

3       5.92    Reed Hein's fee calculation itself is deceptive: Customers are falsely told the fee

4  is calculated based on the work necessary to obtain an exit. Instead, Reed Hein's fee is based on

5  a formula designed to appear palatable to the potential customer when compared to the amount

6  of the customers' annual timeshare and maintenance fees, and the remaining amount of any

7  mortgage or other encumbrance.

8      **9.**     **Defendants Continue to Make Misrepresentations After Customers Hire the Company and Through the "Exit" Itself**

9

10           **a.**     **Defendants Withhold Information or Provide False Information to Their Customers**

11       5.93    Defendants regularly misrepresent to the customer the status of their exit and any

12  work that has been done. This includes making representations that Reed Hein has made

13  immediate contact with Resorts and is engaged in negotiation, when Defendants have made no

14  contact with the Resort or have made only informational inquiries. This also includes describing

15  that an exit is underway or being finalized, when no work has been done or when the Vendor

16  has not communicated any status information to Defendants. Defendants often have so little

17  knowledge of their own customers' status that the <u>customers</u> must inform Reed Hein that they

18  are in foreclosure or have obtained their own exits.

19       5.94    Defendants direct their employees to respond to customer inquiries with generic,

20  pre-approved language representing that work is ongoing on their exit. This includes stock

21  phrases such as "we are continuing to negotiate" and blaming any delays in the exit process on

22  being "at the mercy of" the Resorts. These stock phrases are sent even if the customer's file has

23  not yet been referred to a Vendor, or if the Resort has not yet been contacted.

24       5.95    Defendants also routinely refuse to provide proof of work to customers, claiming

25  that it is "proprietary." Defendants refuse to provide such documentation in part because any

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 30

1   such work would be in the possession of Vendors, not Reed Hein, and in part because providing

2   proof of work would expose Defendants' many misrepresentations.

3       5.96    Defendants further structure customer service at Reed Hein to obscure

4   information from their customers. Customers complain that their inquiries are ignored or that

5   Reed Hein employees stall in responding, that they are made to re-submit or re-execute

6   documents that they have already provided, and that their files are frequently reassigned so that

7   they have no steady point of contact.

8       5.97    Defendants even had a specific written policy to diffuse customer complaints and

9   inquiries without escalating the call to a supervisor. Employees were instructed to tell the

10  customer they were being transferred to the "next level of support," but to actually transfer them

11  to another employee at the same level with no additional information. As the policy noted, "[i]n

12  most cases, speaking to any other member of the team is enough."

13      5.98    On the other hand, Defendants prioritize "Alpha" level complaints and refund

14  requests where the customer threatens to contact the Better Business Bureau, State Attorneys

15  General, private attorneys, or The Dave Ramsey Show (Reed Hein's most profitable

16  endorsement).

17
          **b.      Defendants Manipulate Customers to Cut Off Their Access to the
18            Resort to Conceal Defendants' True Business Model**

19      5.99    Customers who hire Reed Hein are told to cease all communication with Resorts

20  because communicating with the Resort might derail efforts to exit the timeshare. Customers are

21  explicitly instructed to hang up the phone if the Resort calls them, and to forward any Resort

22  correspondence to Reed Hein without responding. In addition to this, customers surrender their

23  logon credentials for the Resort to Reed Hein, allowing Reed Hein to change the contact

24  information for the account and prevent the Resort from reaching the customer. Where a Vendor

25  attorney has sent a representation letter on behalf of a Reed Hein customer, the Resort is also

26  bound to only communicate with the attorney.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 31

1       5.100    These actions cut off the customers' only other source of information regarding

2 their timeshare, and prevent the customer from assessing the true scope of Defendants' work.

3 This can lead to direct harm: For example, for years an attorney Vendor discarded all billing

4 statements he received for Reed Hein customers, deeming them "trash," resulting in hundreds of

5 Reed Hein customers not knowing that their Resorts were still demanding payment.

6       5.101    Reed Hein cuts off contact between the customer and the Resort in part to prevent

7 the Resort from expressing to the customer that Reed Hein is misleading the customer. Reed

8 Hein's corporate representative has also admitted that Reed Hein is concerned that if the

9 customer is in contact with the Resort, the Resort may offer an exit directly to the customer and

10 undercut Reed Hein's business.

11 **F.**     **Defendants Further Manipulate Customers Through Deceptive Offers of Credit**

12        **Repair Services**

13       5.102    On information and belief, Defendants represent to consumers that Defendants

14 will preserve the consumer's credit record, history, or rating, or assist in repairing the consumer's

15 credit if it should be negatively impacted by Reed Hein's exit process.

16       5.103    Beginning as early as September 2014, Defendants represented directly via

17 reedhein.com that Reed Hein had expertise in credit repair services. This representation was

18 made continually through at least May 2015.



19

20

21

22

23

24

25

26     **Fig. 4. reedhein.com webpage as of May 3, 2015 (retrieved from archive.org).**

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 32

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    5.104   Beginning as early as 2016, Defendants began representing directly to customers

2    that Reed Hein would provide credit repair services where necessary as part of the exit services

3    customer's paid Reed Hein to perform, or negotiate directly with Resorts to have the Resorts

4    withdraw any negative credit reporting. On information and belief, Defendants continued to

5    claim that Reed Hein would provide assistance or help with credit repair as part of Reed Hein's

6    services through at least December 2018.

7    5.105   On information and belief, despite promising credit repair to incoming customers

8    as part of Reed Hein's services, Defendants began refusing to provide such services in

9    approximately March of 2018. Defendants acknowledged to customers that these services were

10   promised, but informed them that Reed Hein did not offer credit repair "anymore."

**1.      Defendants Never Provided the Advertised Credit Repair and Instead Hired Vendors**

13   5.106   Although Defendants created the impression that Reed Hein itself would provide

14   credit repair services, these services were provided by third party Vendors, if at all. On occasions

15   where Defendants actually disclosed that a third party Vendor would be involved, usually after

16   a customer hired Reed Hein, Defendants reserved sole discretion to select the Vendor.

17   5.107   On information and belief, as with their exit Vendors, no written contracts

18   governed Reed Hein's relationship with the credit repair companies. Additionally, on

19   information and belief, no contracts were entered between the customer and the credit repair

20   companies. The entire arrangement was governed by verbal agreements between Defendants and

21   their Vendors, undisclosed to Reed Hein's customers.

**2.      Defendants Do Not Comply With Statutory Requirements for Credit Service Organizations**

24   5.108   In association with their advertised services, including credit repair, Defendants

25   offer a three-day cancellation policy in exchange for a full refund. Defendants' contracts do not

26   include any statement, conspicuous or otherwise, regarding a customer's right to cancel the

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1  contract at any time prior to midnight of the _fifth day_ after the date of the transaction, or any

2  reference to an attached notice of cancellation form to be completed in such event. No such

3  attached cancellation form is provided.

4  5.109   In association with their advertised services, including credit repair, Defendants'

5  contracts do not specify the total of all payments to be made by the customer. Instead, the

6  contracts specify Defendants' initial fees, and provide the customer may be required to pay

7  unspecified transfer or settlement fees in the future.

8  5.110   In association with their advertised services, including credit repair, Defendants

9  charge customers prior to full and complete performance of the services Reed Hein has agreed

10  to provide. On information and belief, Defendants have not obtained a surety bond in any

11  amount from a surety company admitted to do business in Washington with respect to credit

12  repair services. On information and belief, nor have Defendants established a trust account at a

13  federally-insured bank with respect to their advertised credit repair services.

14  5.111   In association with their advertised services, including credit repair, Defendants

15  do not provide customers with any written statements reflecting the information set forth in RCW

16  19.134.050 and, as such, Defendants do not keep any signed acknowledgments of the customer's

17  receipt of these written statements on file.

18  **G.      Defendants Mislead Consumers in Performance of Debt Adjustment Services**

19  5.112   Defendants explicitly adjust consumer debt in the context of selling services to

20  release consumers from mortgaged or otherwise encumbered timeshare interests. Defendants'

21  marketing recognizes that Defendants' services represent the adjustment of consumer debt,

22  characterizing timeshare ownership as "debt" and "perpetual liability." Despite this recognition,

23  Defendants routinely engage in acts prohibited for debt adjusters:

24  5.113   Defendants' fees, which they attempt to collect upfront, are in the range of

25  thousands of dollars, far in excess of the twenty-five dollar initial fee permissible to debt

26  adjusters. Defendants also regularly charge more than fifteen percent of the total debt owed to

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 34

1   the mortgagor, including charging a "base price calculated at 30% of [the] mortgage amount" to

2   resolve "[a]ny mortgage over $30,001."

3          5.114   Because Defendants actively conceal from Resorts that customers have hired

4   Reed Hein, Reed Hein routinely fails to notify its customers' creditors (the Resorts) of the

5   retention of its services. Reed Hein also fails to provide a monthly accounting to its customers

6   of any kind.

7          5.115   Defendants improperly fail to include in their contracts the provisions mandated

8   by RCW 18.28.100(7), and fail to hold payments received from customers in a separate trust

9   account or make payments on behalf of customers from that account.

10          5.116   Defendants also improperly pay a $150 referral fee to customers to refer other

11   prospective customers to Reed Hein for services which include debt adjustment services.

12          5.117   Lastly, Defendants' Powers of Attorney, which specifically allow Reed Hein or

13   its employees to negotiate "Timeshare Interest/ Debt" and settle with customers' secured

14   creditors, improperly authorize Defendants to employ or terminate the services of attorneys or

15   arrange the terms of or compensate for the services of attorneys on behalf of Reed Hein's

16   customers.

## FIRST CAUSE OF ACTION
### (VIOLATIONS OF THE CONSUMER PROTECTION ACT, RCW 19.86.020)

19          6.1    Plaintiff re-alleges Paragraphs 1.1 through 5.117 and incorporates them as if set

20   fully herein.

21          6.2    Defendants engaged in the following acts or practices constituting unfair or

22   deceptive acts in trade or commerce:

23                  a.      Misrepresenting, directly or indirectly, that Reed Hein terminates

24   consumers' obligations with respect to their timeshares by forcing Resorts to cancel or annul

25   timeshare contracts or take back the timeshare;

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 35

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1      b.      Misrepresenting, directly or indirectly, that Reed Hein negotiates directly

2  with Resorts to terminate consumers' obligations with respect to their timeshares;

3      c.      Misrepresenting, directly or indirectly, that Reed Hein itself will perform

4  services toward terminating consumers' obligations with respect to their timeshares, rather than

5  through the use of third-party Vendors;

6      d.      Outsourcing services performed for Reed Hein customers to third-party

7  Vendors where the customer's contract with Reed Hein did not provide for Reed Hein to hire a third

8  party or assign responsibility for performance of the services in the contract;

9      e.      Outsourcing services performed for Reed Hein customers to third-party

10  Vendors with whom Reed Hein and/or the customer does not have a contract;

11      f.      Misrepresenting, directly or indirectly, that Reed Hein personnel have

12  performed services toward terminating consumers' obligations with respect to their timeshares

13  when any services have in fact been performed by a Vendor;

14      g.      Failing to supervise and maintain oversight over services performed by

15  Vendors where the customer contracted with Reed Hein to receive such services;

16      h.      Delivering services to customers that are legally ineffective at terminating

17  the customers' obligations with respect to their timeshare;

18      i.      Delivering services to customers that create the risk of legal action against

19  customers for invalid transfers of their timeshare;

20      j.      Interpreting foreclosure and/or Notice of Termination for nonpayment as a

21  successful termination of customers' obligations with respect to their timeshare without disclosing

22  this interpretation to customers at the point of sale;

23      k.      Misrepresenting, directly or indirectly, that customers' obligations with

24  respect to their timeshare have been terminated when they have not been;

25

26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1          l.      Misrepresenting, directly or indirectly, that customers' obligations with

2  respect to their timeshare have been terminated when Defendants know or should know the Resort

3  does not recognize the termination;

4          m.    Misrepresenting, directly or indirectly, that Reed Hein has made progress

5  toward and/or performed services toward terminating a customer's obligations with respect to their

6  timeshare when no such services have been performed;

7          n.     Misrepresenting, directly or indirectly, that Reed Hein does not obtain

8  proceeds from the sale of a customer's timeshare to a third party;

9          o.     Misrepresenting, directly or indirectly, that Reed Hein would perform

10  services toward terminating customers' obligations with respect to encumbered timeshares during

11  periods when Reed Hein was not providing services or outsourcing services on encumbered

12  timeshares to Vendors;

13          p.     Misrepresenting, directly or indirectly, that Reed Hein has developed

14  relationships with Resorts that facilitate termination of customers' obligations with respect to

15  timeshares;

16          q.     Misrepresenting, directly or indirectly, that consumers will not face negative

17  consequences if they cease making payments to Resorts with respect to their timeshares;

18          r.      Impeding customers' communications with Resorts with respect to the

19  customers' obligations regarding their timeshares, including payment obligations;

20          s.     Misrepresenting, directly or indirectly, that Reed Hein's services do not

21  present any risk to customers, including but not limited to risk of foreclosure by Resorts with respect

22  to customers' timeshares;

23          t.     Misrepresenting, directly or indirectly, that Defendants have expertise, trade

24  secrets, or unique or proprietary strategies and methods that Reed Hein will employ toward

25  terminating consumers' obligations with respect to their timeshares;

26

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1           u.        Misrepresenting, directly or indirectly, that Reed Hein will terminate

2 consumers' obligations with respect to their timeshare safely, legitimately, legally, permanently, or

3 forever;

4           v.        Giving customers the deceptive net impression that Reed Hein has local

5 and/or region-specific expertise;

6           w.       Misrepresenting, directly or indirectly, that Reed Hein's fees are calculated

7 based on the services required to terminate a customers' obligations with respect to their timeshare;

8           x.        Misrepresenting, directly or indirectly, that Reed Hein has a 100% success

9 rate and/or the highest success rate in the industry;

10           y.        Creating the deceptive net impression that Reed Hein can terminate any

11 customer's obligations with respect to their timeshare, regardless of circumstances;

12           z.        Misrepresenting, directly or indirectly, that consumers who hire Reed Hein

13 will not have to make further payments to Resorts with respect to their timeshares;

14           aa.      Misrepresenting, directly or indirectly, the amount of time that it will take

15 for Reed Hein to terminate customers' obligations with respect to their timeshare;

16           bb.      Misrepresenting, directly or indirectly, or creating the deceptive net

17 impression that Reed Hein is a law firm and/or Reed Hein performs "consumer protection" services;

18           cc.      Misrepresenting, directly or indirectly, or creating the deceptive net

19 impression that Reed Hein employs in-house attorneys who perform services to terminate

20 consumers' obligations with respect to their timeshares;

21           dd.      Misrepresenting, directly or indirectly, that no complaints about Reed Hein

22 had been filed with the Better Business Bureau or the Washington State Attorney General's Office,

23 or that Reed Hein had not been the subject of any other form of "action" from a U.S. or Canadian

24 government agency;

25           ee.      Manipulating online reviews of Reed Hein by having Reed Hein

26 representatives pose as satisfied customers and leave fabricated reviews;

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 38

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1     ff.  Displaying an online review summary on timeshareexitteam.com which

2 omits 1- and 2- star reviews from the summarized review sources;

3     gg.  Misrepresenting, directly or indirectly, that terminations of a customers'

4 obligations with respect to their timeshares were the result of services provided by Reed Hein when

5 Defendants know that Reed Hein had not provided services resulting in the termination;

6     hh.  Forming contracts with customers who own timeshares with Resorts on

7 Reed Hein's internal "Do Not Take" list;

8     ii.  Requiring customers to sign "Exit Agreement Addendums," which

9 substantially change the terms of the customers' contract with Reed Hein, under threat of voiding

10 Defendants' Money-Back Guarantee;

11     jj.  Creating the deceptive net impression that Defendants' Money-Back

12 Guarantee entitles customers to a full refund of fees paid to Reed Hein if dissatisfied with Reed

13 Hein's services;

14     kk.  Offering a Money-Back Guarantee that may be voided if Reed Hein offers

15 to terminate a customer's timeshare interest through a method rejected by the customer because the

16 method does not correspond the methods described in Reed Hein's marketing or representations at

17 sales presentations;

18     ll.  Offering a Money-Back Guarantee that permits Reed Hein to refuse to

19 refund customers' payments if Reed Hein expresses an intent to continue to attempt performance

20 under the contract where the Money-Back Guarantee does not require Reed Hein to perform within

21 a specified amount of time;

22     mm.  Refusing to honor the Money-Back Guarantee in circumstances where the

23 basis to void the Guarantee was the customer's failure to pay the Resort at Defendants' direction;

24     nn.  Conditioning honoring the Money-Back Guarantee on a customer's

25 withdrawal of public negative reviews or complaints to third parties;

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 39

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

oo.     Misrepresenting, directly or indirectly, that consumers face no risk of credit damage from Reed Hein's services; and

pp.     Misrepresenting, directly or indirectly, that Reed Hein provides credit repair services when Reed Hein later refuses to provide such services.

6.3     Defendants' practices outlined above affect the public interest and have the capacity to deceive a substantial number of consumers and are unfair or deceptive acts or practices in trade or commerce in violation of RCW 19.86.020.

## SECOND CAUSE OF ACTION
### (VIOLATIONS OF THE DEBT ADJUSTING ACT, RCW 18.28.080, 18.28.110, 18.28.120, 18.28.130, and 18.28.150)

7.1     Plaintiff re-alleges Paragraphs 1.1 through 6.3 and incorporates them as if set fully herein.

7.2     Defendants act as debt adjusters, as defined by RCW 18.28.010, by engaging in or holding themselves out as engaging in the business of debt adjusting for compensation. Defendants engage in or hold themselves out as engaging in the business of debt adjusting, as defined by RCW 18.28.010, by managing, counseling, settling, adjusting, prorating, or liquidating the indebtedness of a debtor, or receiving funds for the purpose of distributing said funds among creditors in payment or partial payment of obligations of a debtor.

7.3     Defendants violated, and continue to violate, RCW 18.28.080(1), by charging an initial amount of more than twenty-five dollars for debt adjusting services as part of Defendants' total fee.

7.4     Defendants violated, and continue to violate, RCW 18.28.080(1), by charging a total fee for Defendants' debt adjusting services of more than fifteen percent of the total debt listed by the debtor on the contract.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 40

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

7.5     Defendants violated, and continue to violate, RCW 18.28.080(2), by retaining fees charged to consumers without notifying creditors that the consumer has engaged Reed Hein in a program of debt adjusting.

7.6     Defendants violated, and continue to violate, RCW 18.28.100, by failing to include in every contract between Defendants and a debtor the information, terms, and notices set forth in that statute, including the required "NOTICE TO DEBTOR" in ten point boldface type or larger directly above the space reserved in the contract for the debtor's signature. RCW 18.28.100(7).

7.7     Defendants violated, and continue to violate, RCW 18.28.110(5), by failing to render an accounting to each debtor with whom they have contracted for debt adjustment services at least once a month, indicating the total amount received from or on behalf of the debtor, the total amount paid to each creditor, the total amount which any creditor has agreed to accept as payment in full on any debt owed the creditor by the debtor, the amount of charges deducted, and any amount held in trust.

7.8     Defendants violated, and continue to violate, RCW 18.28.120(6), by advertising, displaying, distributing, broadcasting or televising their services in a manner wherein false, misleading or deceptive statements or representations are made with regard to Defendants' debt adjustment services and/or the charges to be made for Defendants' debt adjustment services, including the false, misleading or deceptive statements and misrepresentations alleged in paragraphs 6.2.a. through 6.2.pp.

7.9     Defendants violated, and continue to violate, RCW 18.28.120(7), by offering, paying, or giving cash or other compensation to customers for referring prospective customers to Reed Hein.

7.10    Defendants violated, and continue to violate, RCW 18.28.130(3), by accepting Powers of Attorney authorizing Defendants to employ or terminate the services of attorneys or arrange the terms of or compensate for the services of attorneys on behalf of debtors.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 41

1    7.11    Defendants violated, and continue to violate, RCW 18.28.150(1), by failing to hold

2  payments received from debtors in trust in a separate trust account and by failing to make payments

3  on behalf of debtors from such an account.

4    7.12    Pursuant to RCW 18.28.185, a violation of the Debt Adjustment Act is an unfair act

5  or practice in trade or commerce and a *per se* violation of the Consumer Protection Act, RCW

6  19.86.

7    7.13    Pursuant to RCW 18.28.090, Defendants' contracts with all debtors to whom

8  Defendants collected fees in excess of those permitted by RCW 18.28.080 are void and all funds

9  received by Defendants which have not been paid on the debtors' behalf to their creditors must be

10  returned to the debtors.

### THIRD CAUSE OF ACTION
### (VIOLATIONS OF THE CREDIT SERVICES ORGANIZATION ACT, RCW 19.134.020, 19.134.040, and 19.134.060)

14    8.1    Plaintiff re-alleges Paragraphs 1.1 through 7.13 and incorporates them as if set fully

15  herein.

16    8.2    Defendants act as a credit services organization in Washington, as defined by RCW

17  19.134.010, by representing to Reed Hein customers who are "buyers," as defined in the same

18  statute, that with respect to the extension of credit by others Defendants can or will, in exchange for

19  the payment of money or other valuable consideration, sell, provide, or perform the following (the

20  "Credit Services"):

21    a.    Improving, saving, or preserving a buyer's credit record, history, or rating;

22  or

23    b.    Providing advice or assistance to a buyer with regard to improving, saving,

24  or preserving a buyer's credit record, history, or rating.

25    8.3    Defendants violated, and continue to violate, RCW 19.134.020(1), by charging

26  and/or receiving money or other valuable consideration prior to full and complete performance of

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 42

1 | the Credit Services that Defendants have agreed to perform for buyers without obtaining a surety

2 | bond of $10,000 issued by a surety company admitted to do business in Washington and

3 | establishing a trust account at a federally-insured bank or savings and loan association located in

4 | Washington.

5 |       8.4      Defendants violated, and continue to violate, RCW 19.134.020(4), by making or

6 | using untrue or misleading representations in the offer or sale of the Credit Services and engaging,

7 | directly or indirectly, in acts, practices, and courses of business that operate or would operate as

8 | fraud or deception to persons in connection with the offer or sale of the Credit Services, including

9 | using the untrue or misleading representations alleged in paragraphs 6.2.a. through 6.2.pp.

10 |       8.5      Defendants violated, and continue to violate, RCW 19.134.040, by failing to provide

11 | buyers of the Credit Services, before execution of a contract or agreement between buyers and

12 | Defendants and/or before the receipt by Defendants of money or other valuable consideration from

13 | buyers, whichever occurs first, with a statement in writing containing all of the information set forth

14 | in RCW 19.134.050.

15 |       8.6      Defendants violated, and continue to violate, RCW 19.134.040, by failing to

16 | maintain on file, for a period of two years, exact copies of statements personally signed by buyers

17 | acknowledging receipt of written statements containing all of the information required by RCW

18 | 19.134.050.

19 |       8.7      Defendants violated, and continue to violate, RCW 19.134.060, by failing to include

20 | all of the following in contracts which include purchase of the Credit Services:

21 |       a.      A conspicuous statement in bold face type, in immediate proximity to the

22 | space reserved for the signature of the buyer, as follows: "You, the buyer, may cancel this contract

23 | at any time prior to midnight on the fifth day after the date of the transaction. See attached notice of

24 | cancellation form for an explanation of this right," as set forth in RCW 19.134.060(1)(a);

25 |

26 |

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 43

1          b.      The terms and conditions of payment, including the total of all payments to

2     be made by the buyer, whether to Defendants or to some other person, as set forth in RCW

3     19.134.060(1)(b); and/or,

4          c.      An accompanying form, completed in duplicate and easily detachable,

5     captioned "Notice of Cancellation" and containing in bold face type the cancellation language set

6     forth in RCW 19.134.060(2).

7     8.8      Pursuant to RCW 19.134.070(5), a violation of the Credit Services Organization Act

8     is an unfair act or practice in trade or commerce and a *per se* violation of the Consumer Protection

9     Act, RCW 19.86.

10                          **PRAYER FOR RELIEF**

11    WHEREFORE, the STATE OF WASHINGTON prays that this Court grant the

12    following relief:

13    9.1      That the Court issue a preliminary injunction enjoining and restraining Defendants

14    and their representatives, officers, agents, servants, employees, and all other persons acting or

15    claiming to act for, on behalf of, or in active concert or participation with Defendants offering or

16    selling the Timeshare Exit Services, Debt Adjustment Services, and/or Credit Services described

17    herein until such further order of the Court. RCW 7.40.040.

18    9.2      That the Court adjudge and decree that Defendants have engaged in the conduct

19    complained of herein.

20    9.3      That the Court adjudge and decree that the conduct complained of herein in

21    Paragraphs 6.1 through 6.3 constitutes unfair or deceptive acts or practices in violation of the

22    Consumer Protection Act, Chapter 19.86 RCW.

23    9.4      That the Court assess civil penalties pursuant to RCW 19.86.140 of up to $2,000 per

24    violation for each and every violation of RCW 19.86.020 committed by Defendants.

25    9.5      That the Court adjudge and decree that the conduct complained of in Paragraphs 7.1

26    through 7.13 constitutes violations of the Debt Adjusting Act, Chapter 18.28 RCW.

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 44

1        9.6     That the Court assess civil penalties pursuant to RCW 19.86.140 of up to $2,000 per

2    violation for each and every violation of RCW 18.28 committed by Defendants.

3        9.7     That the Court adjudge and decree that the conduct complained of in Paragraphs 8.1

4    through 8.8 constitutes violations of the Credit Services Organization Act, Chapter 19.134 RCW.

5        9.8     That the Court assess civil penalties pursuant to RCW 19.86.140 of up to $2,000 per

6    violation for each and every violation of RCW 19.134 committed by Defendants.

7        9.9     That the Court issue a permanent injunction enjoining and restraining Defendants

8    and their representatives, successors, assignees, officers, agents, servants, employees, and all other

9    persons acting or claiming to act for, on behalf of, or in active concert or participation with

10   Defendants from continuing or engaging in the unlawful conduct complained of herein.

11       9.10    That the Court make such orders pursuant to RCW 19.86.080 as it deems

12   appropriate to provide for restitution to consumers of money or property that may have been

13   acquired by Defendants by means of the unlawful conduct complained of herein, regardless of the

14   geographical location of the consumers' residences.

15       9.11    That the Court make such orders pursuant to RCW 19.86.080 as it deems

16   appropriate to provide that Plaintiff, State of Washington, have and recover from Defendants the

17   costs of this action, including reasonable attorneys' fees.

18

19   / / /

20

21   / / /

22

23   / / /

24

25   / / /

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 45

ATTORNEY GENERAL OF WASHINGTON
Consumer Protection Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7745

1    9.12    That the Court order such other relief as it may deem just and proper to fully and

2    effectively dissipate the effects of the conduct complained of herein, or which may otherwise seem

3    proper to the Court.

4        DATED this 4th day of February, 2020.

5

6                                ROBERT W. FERGUSON
                                 Attorney General

7

8

9                                _____
                                 M. ELIZABETH HOWE, WSBA# 53140

10                               AARON J. FICKES, WSBA# 51584
                                 LYNDA ATKINS, WSBA# 52396

11                               Assistant Attorneys General
                                 Attorneys for Plaintiff State of Washington

12                               800 Fifth Avenue, Suite 2000
                                 Seattle, WA 98104

13                               (206) 464-7745

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR INJUNCTIVE AND OTHER
RELIEF - 46

# ATTACHMENT A

# We are NOT a listing company.

Our Consumer Protection Firm is ready to help you dissolve your timeshare contract.

**Safely. Legally. Forever.**

What makes us different:
- Free Consultation
- Local Offices
- Nationally Endorsed and BBB Accredited
- 100% Money Back Guarantee

## Testimonials

They did exactly what they said they'd do... and the people were so kind and willing to answer any questions.

— Marcia D

The team was professional, honest, and I am now timeshare free. I am very pleased with the experience.

— Sue C

**Nationally Endorsed by**



**timeshareexitteam.com**

**1-855-733-3434**

BY reedhein
A CONSUMER PROTECTION FIRM

**Tiffany V.**
Client Advisor
Lynnwood, WA





RHA000242

# DITCH YOUR TIMESHARE

we can help you
**EXIT YOUR TIMESHARE**

100% GUARANTEED

Schedule your free consultation today.



**timeshareexitteam.com**
BY reedhein
A CONSUMER PROTECTION FIRM

**1-855-733-3434**



Nationally Endorsed by
**DAVE RAMSEY**
THE ... SHOW





RHA000243

# Do NOT pay 2015 maintenance fees!!



**CONTACT THE
TIMESHARE EXIT TEAM NOW**

## It's not too late

### Call today!
# 1-855-733-3434

**WE ARE <u>NOT</u>
A LISTING COMPANY**

# 100%
## GUARANTEED SUCCESS

- Has your timeshare become a burden?
- Do you wish you could get out of your contract?
- Are you tired of paying maintenance fees for nothing?
- Are you upset by rising maintenance costs and special assessments?
- Do you have timeshare weeks going to waste?
- Are you tired of hearing 'NOT available'?



**timeshareexitteam.com**
BY reedhein A CONSUMER PROTECTION FIRM

BY reed**hein** ASSOCIATES A CONSUMER PROTECTION FIRM

RHA000179

 **Timeshare Exit Team**
Sponsored (demo) · 🌐

**Like Page**

100% money back guarantee. We will get you out or give you every penny back.



Exit Your Timeshare!
Schedule your free consultation.

Learn More

RHA000218

 **Timeshare Exit Team**
Sponsored · 

 👍 **Like Page**

Avoid timeshare resale scams!

Let the Timeshare Exit Team help you get out of your timeshare with our unique exit strategy and money back guarantee.



Timeshare Exit Team - A Consumer Protection Group

Sign up for a free consultation today!

WWW.TIMESHAREEXITTEAM.COM

**Learn More**

29 Reactions   6 Comments

 **Like**           **Comment**

RHA000203

# ATTACHMENT B

12/4/2019       About Us | Timeshare Exit Team™ | Safe. Legit. Exit Guarantee.

Case 2:23-cv-00630-JLR   Document 33-1   Filed 10/05/23   Page 55 of 201



About Us ⌄    Exit Your Timeshare ⌄    Resources ⌄    **Free Consultation** 

📱 Click to Call      ↗ Free Consultation



# We're Here for You

## Why We Started.

Timeshare Exit Team is the industry leader in helping people exit their unwanted timeshares. The United States alone has over 9.5 million timeshare owners.[1] Understanding this hardship, Timeshare Exit Team started in 2012 with one goal in mind: help consumers find financial and emotional freedom from their timeshare situation.

Owners must have a way to safely and legally end their timeshare ownership when it no longer fits their lifestyle. When timeshare owners find that their resort is unwilling to take back their ownership, and that there is little or no demand for their unit on the secondary market, Timeshare Exit Team steps in to provide a safe and permanent way out.

If you are an unsatisfied timeshare owner who has been unsuccessful at exiting on your own, Timeshare Exit Team is here to help.

## 9,500,000
### Timeshares Owned[1]

1. State of the Vacation Timeshare Industry: United States Study, 2017 Edition, 2017

12/4/2019      About Us | Timeshare Exit Team™ | 100% Legitimate. Guaranteed.

Case 2:23-cv-00630-JLR Document 33-1 Filed 10/05/23 Page 56 of 201

Free Consultation.
**Start Today.**
1.855.207.2722

## Our Story.

Our founder, Brandon Reed, started Timeshare Exit Team after realizing his two timeshares no longer fit his lifestyle and had become a financial burden to him and his family. He called the resorts to cancel his timeshares, but to no avail. He then tried to sell his timeshares but there was no market for them. Next, he did his research on exit options but found upfront listing companies were the only option; something the FTC urges consumers to avoid. Developing a legitimate process to exit took Brandon time, research, and persistence. Realizing there was an immediate need for an honest and transparent resource to help relieve burdened timeshare owners, he got started helping others right away. Today, Timeshare Exit Team helps thousands of customers exit their timeshare every year.

Timeshare Exit Team now has over 30 local offices across the US and Canada and has become the foremost leader in the timeshare exit industry. Our track record of success shows in the words of our many exited customers.

If you need to get out of an unwanted timeshare, we'd love to learn more about your situation and discuss what exit option is right for you. Contact Timeshare Exit Team today to learn more and schedule your free consultation.

At Timeshare Exit Team, our mission is to be a trusted partner to consumers by providing solutions that ultimately return financial control.

# Get Your Free Consultation Today.

Schedule Now

## Get Your Free Consultation Today.

Learn your options. Speak with a Consultant face-to-face about how you can exit your timeshare.

Schedule Now







**Meet Our Team.**

We are specialists in Timeshare Exits so you don't have to be. **Meet your team.**

**Our guarantee.**

We are so confident in our results that we offer a 100% money-back guarantee. **Learn more.**

**Where we are.**

Come meet with one of our consultants face-to-face. **Find a location** near you today.



Contact Us  |  Careers  |  Terms & Conditions  |  Reviews

© 2013-2019 Reed Hein & Associates, LLC. **Reed Hein is not a law firm\***

Case 2:23-cv-00630-JLR Document 83-1 Filed 10/05/23 Page 59 of 201



About Us ⌄    Exit Your Timeshare ⌄    Resources ⌄    **Free Consultation**





📞 Click to Call      ⤢ Free Consultation

# How Timeshare Exit Team Can Help You Get Out Of Your Timeshare

[ Learn More ]

## You are not alone.

There are over 9 million timeshare owners in the United States alone[1] and 74% are locked into lifetime contracts with perpetuity commitments[1] that can pass on to their next of kin. With an average annual maintenance fee of $970,[1] and a difficult booking process, timeshare ownership can become frustrating.  Timeshare Exit Team was founded on the principle that consumers should have an option when it comes to exercising their rights. We are here to eliminate your unwanted timeshare and help you move one step closer to financial peace of mind.

## 74%
Have Lifetime Contracts[1]

## 9,500,000
Timeshares Owned[1]

1. State of the Vacation Timeshare Industry: United States Study, 2017 Edition, 2017







**How we help you.**

We curate a team of industry experts to get you out of your timeshare. Learn more about **our process**.

**Our guarantee.**

We are so confident in our results that we offer a 100% money-back guarantee. **Learn more.**

**Where we are.**

Come meet with one of our consultants face-to-face. **Find a location** near you today.

# Get started today.

Find the best solution to timeshare freedom by scheduling a FREE consultation.

**1.855.207.2722**

| First | | Last | |
|---|---|---|---|

| Phone | | Email | |
|---|---|---|---|

| Zip Code | | State | |
|---|---|---|---|

| Timeshare name |
|---|

| Tell us about your situation. How can we help? |
|---|

| How did you hear about us? |
|---|

☐ By checking this box, I acknowledge, consent, and agree to the Terms and Conditions outlined on TimeshareExitTeam.com. By submitting the "Get a Free Consultation" form, I consent to be contacted by Timeshare Exit Team about this request at the telephone number(s) and email(s) provided above.

**Get a Free Consultation**



### Dave Ramsey Approved

*"After years of being asked how to get out of timeshares, I'm excited to announce that we finally found a company I trust to help my listeners get rid of this horrible product. Timeshare Exit Team has a 100% guarantee that they will get you out or you get every bit of your money back! These are the folks that I trust."*

**Learn More**

Nationally Endorsed by
THE DAVE RAMSEY SHOW



## We are here for you.

When newlyweds Pete and Ramona first received that special offer postcard, a vacation seemed like a great idea. Little did they know that it would lead to an unfortunate situation: ownership of a timeshare with increasing annual fees. Years later, Ramona heard Dave Ramsey mention Timeshare Exit Team on his radio show and decided to give it a shot.

Hear how it turned out.



Dave Ramsey Approved

*"After years of being asked how to get out of timeshares, I'm excited to announce that we finally found a company I trust to help my listeners get rid of this horrible product. Timeshare Exit Team has a 100% guarantee that they will get you out or you get every bit of your money back! These are the folks that I trust."*

Learn More

## Get Your Free Consultation Today.

Schedule Now

## Get Your Free Consultation Today.

Learn your options. Speak with a Consultant face-to-face about how you can exit your timeshare.

Schedule Now



© 2013-2019 Reed Hein & Associates, LLC. Reed Hein is not a law firm*



http://www.reedhein.com/ ___ Go

19 captures
14 Oct 2012 – 26 May 2019

SEP **02** 2014





HOME        SERVICES        ABOUT        CONTACT



YOUR TRUST IN REED HEIN IS OUR BIGGEST ACHIEVEMENT

Reed Hein's & Associates protects consumers when they are misled by false advertising, deceptive sales practices, defective products, data privacy breaches, and various other unfair trade practices.

**We Offer a Free Consultation**

Contact Us

**Areas of Expertise:**

✓ Timeshare Exits

✓ Home Improvement

✓ Automotive Contracts

✓ Mortgage Mediation

✓ Debt Collector Harassment

✓ Credit Repair

## WHY SHOULD YOU DITCH YOUR TIMESHARE? SIMPLE:

False Advertising & Service Misrepresentation

Defective or Dangerous Products & Services

Undisclosed, Hidden, Surprise, or Unwarranted Fees

  

http://www.reedhein.com/   Go

19 captures
14 Oct 2012 - 26 May 2019

OCT | SEP 02 2014 | OCT
2012 | | 2016



HOME     SERVICES     ABOUT     CONTACT

## Breaches of Warranty



## Coercion & Intimidation



## Any Other Deceptive Trade Practices



## Why Choose Reedhein?

Every time consumers make a purchase, we do so believing that we will get what we have paid for. Unfortunately, this is not always the case. It is all too common for businesses to take advantage of consumers through fraud, deception or other bad faith practices. Consumers victimized by these practices can sustain serious financial and personal damage. If you have reason to believe that you have been defrauded by a business, it is crucial to speak to a consumer advocate about your situation.



Case 2:23-cv-00630-JLR Document 33-1 Filed 10/05/23 Page 68 of 201

INTERNET ARCHIVE WaybackMachine
http://www.reedhein.com/ Go
19 captures
14 Oct 2012 - 26 May 2019
OCT SEP OCT
2012 02 2014 2016
About this capture

reedhein
& ASSOCIATES
Your Consumer Protection Firm

HOME SERVICES ABOUT CONTACT

## CONTACT US

First Name (required)

Last Name (required)

Email (required)

Phone (required)

Zip Code (required)

SUBMIT »



http://www.reedhein.com/    Go

OCT **SEP** OCT

◄ **02** ►

19 captures
14 Oct 2012 - 26 May 2019

2012 **2014** 2016





HOME        SERVICES        ABOUT        CONTACT



Copyright 2014 · Reed Hein & Associates · Powered by Horn of the Ox

**EXHIBIT 1**

1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON
10                      AT SEATTLE

11   BRIAN ADOLPH, individually and on behalf          Case No.
     of all others similarly situated; KERRI
12   ADOLPH, individually and on behalf of all
     others similarly situated;                        COMPLAINT FOR DAMAGES
13
            Plaintiff,
14
     v.
15
     REED HEIN & ASSOCIATES d/b/a
16   TIMESHARE EXIT TEAM; MAKAYMAX
     INC.; HEIN & SONS INDUSTRIES, INC.;
17   BRANDON REED, individually; and
     TREVOR HEIN, individually,
18
            Defendants.
19

20

21          COME NOW PLAINTIFFS Brian and Kerri Adolph, individually and on behalf of all

22   others similarly situated, by and through their attorney Gregory Albert of Albert Law PLLC, and

23   brings this class action against the above captioned Defendants for negligent misrepresentation,

24   common law fraud, breach of contract, breach of fiduciary duty, unjust enrichment, and

25

     **COMPLAINT FOR DAMAGES - 1**                            ALBERT LAW PLLC
                                                           3131 Western Avenue, Suite 410
                                                                Seattle, WA 98121
                                                              Phone: (206) 576-8044

numerous violations of the Consumer Protection Act, RCW 19.86 *et seq.*, associated with unfair and deceptive conduct in the marketing and sale of timeshare "exit" services offered to consumers across the United States and Canada. Plaintiffs allege the following on information and belief:

## I.      INTRODUCTION

1.      Reed Hein and Associates, doing business as "Timeshare Exit Team," is a company that had defrauded tens of thousands of customers out of tens of millions of dollars. It falsely advertises it has "specialized knowledge" and a "proprietary process" that allows it to "force" developers and vacation resorts to release customers from unwanted timeshare obligations. Using deceptive statements and false advertisements, it solicits potential customers into meetings with "client advisors," who are paid commissions and uniformly advise clients to spend tens thousands of dollars for services Reed Hein does not know how to provide. The client advisors use scripts containing objectively false statements to induce clients into purchasing Reed Hein's services. The client advisors advise customers that 1) their children will inherit their allegedly perpetual timeshare obligation, 2) real lawyers are unable to perform the work Reed Hein performs, and 3) Reed Hein is the customers' "**ONLY HOPE**!" Reed Hein then convinces customers that it will act as their "fiduciary," but rather than put its clients' money in trust or escrow Reed Hein immediately treats the money as earned revenue and spends or disburses it. Reed Hein then "processes" its customers' claims through a variety of convoluted schemes designed to look like they have legal significance they do not have. At the end of the process, Reed Hein tells customers to stop paying their bills and sends customers a letter stating it "exited" them from their timeshare obligations. For the first five years, Reed Hein relied upon the fact that timeshare developers are reluctant to take legal action against customers.  However, developers have now begun interfering with Reed Hein's model, creating a backlog of tens of thousands of customers Reed Hein cannot even pretend to service. When the customers have sought refunds under Reed Hein's "100% Money-Back Guarantee), Reed Hein contrives a variety of reasons not

**COMPLAINT FOR DAMAGES - 2**

to honor the guarantees, even after customers have waited 3-4 years for Reed Hein to provide services. Vacation resorts and developers have also begun targeting Reed Hein customers with lawsuits, which Reed Hein does not disclose to customers, despite claiming to be their agent. The only legally valid 'exits' Reed Hein customers ever achieve are exits they could, and often do, achieve on their own. The remainder receive nothing.

2. Brian and Kerri Adolph spent $14,486.00 on Reid Hein's illusory services without receiving any results.

## II. PARTIES

### a. Plaintiffs

3. Plaintiff Brian and Kerri Adolph are married. They are residents of the State of North Carolina.

### b. Defendants

4. Defendant **Brandon Reed** was, at all times material to this lawsuit, the co-founder, governor, operator or manager of Reed Hein & Associates. Brandon Reed is also a 60% owner of Reed Hein through a wholly-owned Washington corporation, Makaymax, Inc. In these roles, Brandon Reed directs, controls, participates in, and knowingly approves of the policies, activities, and practices alleged in the Complaint herein. Upon information and belief, Brandon Reed resides in Kirkland, Washington.

5. Defendant **Trevor Hein** was, from Reed Rein's creation through at least approximately July 2016, the co-founder, governor, operator or manager of Reed Hein. In these roles, Trevor Hein directed, controlled, participated in, and knowingly approved of the policies, activities, and practices alleged in the Complaint herein. Trevor Hein is, or was, a 40% owner of Reed Hein through a wholly-owned Delaware corporation, Hein & Sons Industries, Inc. Upon information and belief, Trevor Hein resides in British Columbia, Canada.

**COMPLAINT FOR DAMAGES - 3**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

6.      On information and belief, Defendant **Hein & Sons Industries, Inc.,** is a Delaware corporation incorporated on March 20, 2012. Hein & Sons Industries, Inc., is wholly-owned by Trevor Hein and has been operated by Trevor Hein since its formation as a holding company.

7.      Defendant **Reed Hein** is a limited liability company registered with the Washington Secretary of State. Brandon Reed and Trevor Hein are the registered governing persons of Reed Hein. Reed Hein's corporate office is located at 121 3rd Ave. Suite 200, Kirkland WA. Upon information and belief, Reed Hein's principal place of business is located at 220 120th Ave NE, Bellevue, WA 98005, and the company's former principal place of business was at 3400 188th St. SW #300, Lynnwood, WA 98037. Upon information and belief, Reed Hein & Associates operates under the trade names "Reed Hein," "Timeshare Exit Team," "TET," "TSET,"and "RHA," and formerly operated under the names "Reed Hein Travel" and "World Travel Seattle." Reed Hein's primary website is timeshareexitteam.com., but Reed Hein formerly maintained a separate reedhein.com website and maintains dozens of other web domains to redirect to timeshareexitteam.com. On information and belief, Reed Hein began operation in 2012.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified in part at 28 U.S.C. §§ 1332 and 1453. This case involves a minimally diverse, nationwide prospective class of over 100 member that involves an amount-in-controversy exceeding $5 million.

### IV.      FACTUAL ALLEGATIONS

9.      The following allegations are made based on evidence, the parties' own sworn testimony, information, and belief.

10.      Unless indicated otherwise, the following allegations have been ongoing at all times relevant hereto.

**COMPLAINT FOR DAMAGES - 4**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

11.     Reed Hein & Associates doing business as Timeshare Exit Team describes itself as a company that can "force" timeshare companies (resorts, timeshare brokers, etc.) to forego consumer's timeshare obligation ("timeshare exits"). The company claims to have helped tens of thousands of customers exit their timeshare contracts. In 2018, it claimed a revenue of $38 million and spent approximately $9 million in advertising.

12.     In September 2019, Brian and Kerri Adolph purchased a timeshare from Wyndham Resorts, potentially obligating them to pay approximately $510.82 per month in timeshare-mortgage payments for a period of ten years. The Adolphs sought to terminate or significantly reduce that obligation after hearing about Rein Hein's services through its extensive marketing campaign. Reid Hein's false advertising and unfair business practices described herein deceived the Adolphs into paying Reed Hein a fee. In March 2020, Mr. and Mrs. Adolph paid $14,486 to Reed Hein in exchange for the company's services.

13.     According to the power-of-attorney form Reed Hein asked Mr. and Mrs. Adolph to sign, Reed Hein had "the legal duty to act solely in the interests of [the Adolphs] and to avoid conflicts of interest," which includes keeping the Adolphs' property separate and distinct from any other property owned or controlled by Reed Hein.

14.     According to the power-of-attorney form Reed Hein asked Mr. and Mrs. Adolph to sign, Reed Hein assumed the role of Mr. and Mrs. Adolph's fiduciary and all fiduciary duties recognized under Washington State law.

15.     Reed Hein induced Mr. and Mrs. Adolph into a commercial relationship using materially false statements and omissions of material information.

16.     Reed Hein performed little or no work on Mr. and Mrs. Adolph's matter.

17.     Reed Hein ignored Mr. and Mrs. Adolph's reasonable requests for periodic updates.

18.     Reed Hein comingled Mr. and Mrs. Adolph's property with its own property.

19.     Reed Hein knowingly engaged in conflicts of Mr. and Mrs. Adolph's interests.

**COMPLAINT FOR DAMAGES - 5**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

20. Reed Hein immediately converted Mr. and Mrs. Adolph's funds into earned revenue before performing work.

21. Reed Hein failed to notify Mr. and Mrs. Adolph that it would be unable to process their file for greater than a year.

22. Reed Hein never "exited" Mr. and Mrs. Adolph from their timeshare agreement.

23. Reed Hein did not honor its money-back guarantee.

a. **Brandon Reed's Testimony Shows he and Trevor Hein Began Soliciting Customers in 2012 without Any Plan to Provide Services**

24. On August 21, 2011, Brandon Reed and Trevor Hein started ReedHein & Company on for the purpose of selling rain gutter protection systems.

25. In November 2011, Brandon Reed was operating a booth selling rain gutter protection systems in British Columbia, Canada. He observed a busy booth offering to help timeshare owners exit out of their agreements with developers, resorts, and other companies brokering timeshares ("timeshare companies"). Mr. Reed observed they had a "big sign" and "people were lining up." Mr. Reed observed the company running the booth charged an upfront fee without providing an immediate service, which he believed was not honest.

26. Mr. Reed nevertheless started a business that charged customers an upfront fee to provide timeshare exit services. Mr. Reed acknowledges he "knew nothing about timeshares" at the time. Asked why he began charging upfront fees for services he did not know how to provide, Brandon Reed had the following dialogue under oath:

> Q· Why would you collect a fee before you've done anything for
> the consumer?
> A· Yeah. One, that's how we did it in the beginning. I mean, that's
> how we -- You know, I've been asked that before, like why do we -
> - When I've been interviewed before in the past, we've, "Why do
> you charge an upfront fee?" Well, we just -- That's how we did it in
> the beginning. I don't even remember why we started – we started
> charging upfront fees, but we did.

27. On December 31, 2012, "[w]ithin one month" of observing the busy booth, Mr.

**COMPLAINT FOR DAMAGES - 6**

Reed and Mr. Hein started a company called "ReedHein Travel" in Bellevue, WA with the express purpose of selling timeshare exit services while simultaneously selling timeshares.

**b. Beginning in 2013 Defendant ReedHein & Associates Unfairly and With the Intent to Mislead, Promised Services It Did Not Provide or Know How to Provide**

28.     In 2013, ReedHein Travel changed its name to ReedHein & Associates doing business as Timeshare Exit Team ("TET"). After the experience at the Puyallup Fair Booth, Defendant Reed Hein created a website on which they falsely and misleadingly claimed customers could legally "ditch" their timeshares "forever."



Ditch Your Timeshare. Legally. Forever.

29.     Also, the website falsely and misleadingly claimed that Timeshare Exit Team works with timeshare companies and developers to "dissolve" its customers' contracts.



We help timeshare owners get rid of their timeshares. We are NOT a resale or donation company. We work with timeshare companies to dissolve your contract.

Done. Over with. Forever.

30.     None of that is true. From 2013-2015, Reed Hein provided few if any services. It did not negotiate with timeshare companies. It did not force timeshare companies to forego contracts. Reed Hein's initial strategy was to simply tell customers to stop paying their

**COMPLAINT FOR DAMAGES - 7**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

timeshares, which would induce the timeshare companies and developers to foreclose on the customer's product. At that point, Reed Hein would claim it "exited" the customers from their contract. When customers inevitably complained that they could have induced the foreclosures without Reed Hein's assistance, Reed Hein instructed its customer service representatives to make statements that avoid the issue: "they signed a contract with us and we achieved an exit." Customers complaining that Reed Hein offered no services became such a pervasive problem that Reed Hein adopted a chapter in its operations manual called: "I Could Have Just Done This on My Own, I want My Money Back."

31.     In addition to the foregoing false claims, Reed Hein began soliciting business with variations of the phrase "Safe, Legal, and Guaranteed" or "Safe. Legitimate. Guaranteed."

**Ad** · www.timeshareexitteam.com/ ▾    (877) 714-2857

## Timeshare Exit Team™ | Safe. Legitimate. Guaranteed.

Give Us a Call Now To Schedule Your Free Consultation! 100% Money Back Guarantee. The most trusted **Timeshare Exit** Company in the industry–Endorsed by Dave Ramsey. Nationally Endorsed. Services: **Exit** Preparation, **Exit** Strategy, **Exit** Management, **Exit** Completion.

32.     Asked under oath how the timeshare exit services were safe and legal as advertised, Brandon Reed was unable to explain:

> Q  Those are your advertising terms, aren't they?
>
> A  I believe so, yes.
>
> Q· Okay.· Well, given that these are the advertising terms that Timeshare Exit Team uses, I would expect that Timeshare Exit Team would know what the legal and safe and permanent ways of getting somebody out of their timeshare is. So please tell me what they are.
>
> A: I'm -- I'm not a lawyer, so our partners –
>
> Q.  We understand you're not a lawyer. You do not have to keep saying that…But you're running a business that is making these advertising claims. I want to hear from you, who is the president and owner of the business --

**COMPLAINT FOR DAMAGES - 8**

A  Yes.

Q  -- how it is you can make these claims. What is the basis for these claims?

A  Yeah. I'm going to just -- I can't -- Again, I don't know how else to say it. I'm not -- I'm not an attorney.

33.     Reed Hein instructs customers like Mr. and Mrs. Adolph not to communicate with developers at all, falsely telling them that doing so will extend the time required to dissolve their contracts. In reality, Reed Hein gives those instructions because communicating directly with the timeshare company might induce the timeshare company to allow the customer out of the contract for free, obviating the specter of a need for Reed Hein's fake services. Under oath, Reed Hein officers have given two reasons for that policy, both of which are unfair and deceptive, and neither of which is ever disclosed to the customer. In his deposition, Brandon Reed testified that Reed Hein discourages customers from speaking to timeshare companies or developers because the timeshare companies might share a negative perspective about Reed Hein:

Q· In the third paragraph, the one that starts, "If the timeshare contacts you for any reason"

A· Uhm-hm.

Q· -- "we suggest that you disregard those calls for now, as we do not want you to contact or converse with the timeshare for any reason, as it can undo and/or lengthen the exit process, unless otherwise told to do so…How -- How or why would the timeshare developer talking to its own customer exit them -- prolong the exit process?

A: Because the timeshare companies, the developers would -- again, hating what it is that we do, they – They would just -- They would actually say -- And we know this just because the customers have called on occasion or they've taken a call and are talking about -- You know, talking about us. "Oh, hey, we're working with, you know, Timeshare Exit Team."
        And it's like all of a sudden, you know, the customer is calling us and saying, "Oh, my gosh. I hear that you're a scam and blah, blah, blah."

**COMPLAINT FOR DAMAGES - 9**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

Q  Okay. So the reason is that because if they talk to the timeshare developer, the timeshare developer is going to say bad things about you?

A  They do, yes. It was because it was creating a customer service - It was creating problems in customer service. And when your customers are calling you and saying, "Hey, my timeshare just said this about you guys," it's just - Imagine having -- I mean, that's...

34.     Alternatively, former Reed Hein Chief Operating officer Thomas Parenteau testified the instructions were designed to prevent customers from obtaining an exit without Reed Hein, which he acknowledged to be a "good thing" for the customer:

A.  For a couple of different reasons. We have had experiences where the customer ends up with more than what they own, number one. And, number two, we have had also what I would call consumer confusion where the customer will call the developer and -- after they have retained – you know, they have hired us and all of a sudden, the developer will give them an exit to undermine our services. So that's happened as well.

Q.  Then the second scenario you described, the resort or the developer is offering the customer a way out of the timeshare; right?

A. Correct. Once their hear our name.

Q. What is so bad about that? Isn't that what you want?

A. Actually, yes, it is.

Q. All right. So why would you want to foreclose that possibility?

A. I think we just want to put it on paper that: Listen, if you call the developer, you're going to get confused because they're either going to upgrade you or they're going to let you out.

Q.  Okay.
     And nowhere in your advertisements or in the materials you give to your customers does it say "Don't call the timeshare resort or developer because they might offer you an exit"?

**COMPLAINT FOR DAMAGES - 10**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

A. No.
Q. Which you agree would be a good thing?
A. Mm-hm.
Q. Is that a "yes"?
A. Yes.

Q. So why would that be a justification for telling the customers not to call the timeshare resort or developer?

A. Because it creates customer confusion…Like I said, when they call the developer and as soon as the word "Timeshare Exit Team" is mentioned, the developer offers an exit.

c. **Reed Hein's Ongoing Deceptive Acts and Practices**

35.     **Misleading Inducement via False Claims on Website:** Since at least 2014, Reed Hein has posted a variety of false statements on its website in an attempt to deceive customers into purchasing its services. The website states that timeshare obligations are passed down to the customers' children after their death. It states that it "forces" timeshare companies to "take back" the timeshare obligation. It states that attorneys do not have the specialized knowledge that Reed Hein has in order to dissuade customers from hiring real attorneys. It prominently advertises a "risk free" service, owing to its "100% Money-Back Guarantee," without notifying customers that Reed Hein imposes restrictions on the guarantee it does not disclose in advance.

36.     **Misleading Inducement in Sales Presentation**: In addition to its false advertising and false claims that it can "force" timeshare companies to exit their contracts with timeshare owners, Reed Hein induces consumers into a relationship by misleadingly offering to let them meet with a "Client Advisor" about their claims. Client Advisors are salespeople trained in sales techniques and receive a commission. Reed Hein does not require them to know anything about the timeshare industry. They do not reject customers based on the customers' actual ability to exit timeshares. Client Advisors do not advise customers to do anything other than pay money to Reed Hein. They reiterate the false claim that Reed Hein can legally, safely, and permanently

**COMPLAINT FOR DAMAGES - 11**

get owners out of their timeshare contracts through Reed Hein's proprietary system regardless of the customer's circumstance.

37.     It also omits material information. It declines to notify customers when it has an adversarial relationship with the customers' timeshare company. It does not notify customers when it is being sued with the customers' timeshare. It declines to tell customers when the timeshare refuses to work with Reed Hein. Although Reed Hein advertises that attorneys cannot perform the work Reed Hein performs, it omits mentioning that nearly all of its work is performed through outside attorneys. Reed Hein omits telling customers that it imposes absurd restrictions on the money-back guarantee and refuses to refund their money so long as it subjectively believes that it has an "exit path" for the customer, even 3-4 years after the customer signs up.

38.     **Payments**: Reed Hein charges customers up to $58,000 for its alleged services. Despite being a fiduciary, Reed Hein does not charge that money based on the work it anticipates having to perform, but based upon a multiple of the client's future timeshare obligation, which Reed Hein exaggerates and inflates during its sales presentation. Mr. and Mrs. Adolph paid Reed Hein $14,486.00. Reed Hein accepts money from all customers, regardless of their circumstances or their legal right to "exit" their timeshare contracts. Reed Hein allows customers to pay in installments, but the contract it offers clients does not obligate it to provide any services until the installments are complete.

39.     **Unenforceable Contract:** After inducing a relationship under false auspices, Reed Hein asks clients to sign a master services agreement defining a variety of client's obligations while leaving its own obligations too vague to be enforced. According to Reed Hein, it need not honor its guarantee unless the customer fulfills vague contractual obligations the customer did not know they had, including an obligation to pay the timeshare company an indeterminate amount of money to be released. Reed Hein takes the position that the customer must pay the amount so long as Reed Hein determines the amount to be "reasonable" without regard to whether the customer agrees—a fact that it does not disclose to the customer. Since

**COMPLAINT FOR DAMAGES - 12**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

Reed Hein is unable to provide any of the services it advertises, it requires customers to enter into a separate attorney-client agreement with a third-party attorney in order to fulfill its contract, and refuses to pay any refunds if the customer does not want to enter into such an intimate relationship with an undisclosed third party. The agreement has changed over time, but Reed Hein's obligations under Mr. Adolph's agreement contained only one illusory obligation for Reed Hein: "Reed Hein shall work to secure a release from, transfer, cancellation or termination of the Owner's timeshare interest at Resort."

40.    **Misappropriation of funds**: After receiving money from clients, Reed Hein immediately treats it as earned revenue without regard to services rendered or the possibility that Reed Hein can even provide the services. Although Reed Hein claims to be an agent of the customers, it does not put their money into a trust or escrow account and immediately appropriates the money to itself. In 2019 Reed Hein took in approximately $35m in customer fees, all of which it immediately treated as earned revenue.

41.    **Deceptive and Materially Misleading Processes**: After accepting money, Reed Hein sends customers' claims through a variety of byzantine processes designed to deceive customers into thinking Reed Hein is earning its money and achieving results. The processes have taken a variety of forms since 2013. Initially, Reed Hein did not directly handle its customers claims, either telling customers to default or sending them to a third-party ("Vendors") for more processing. If the customer defaulted, the timeshare companies would often foreclose on their timeshare ownerships, which Reed Hein considered to be an "exit." The Vendors would achieve equally dubious exits in a variety of ways described below. Beginning in 2015, Reed Hein attempted to communicate directly with timeshare companies and developers with mixed results. Although Reed Hein claims it can "force" the timeshare companies to let customers exit timeshare contracts, Reed Hein's communications consist entirely of asking the timeshare companies to voluntarily release customers. Because Reed Hein cannot perform such negotiations without committing the unlicensed practice of law, Reed Hein hires attorney

**COMPLAINT FOR DAMAGES - 13**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Vendors to supposedly represent the customers, but the customers are not allowed to speak with the attorneys and often do not know their names. The vendors themselves are paid millions of dollars by Reed Hein and withhold information from their clients to protect Reed Hein. Attorneys have been forced to disclose thousands of pages of otherwise-privileged client communications because Reed Hein's interference in the relationship collapses the attorney-client privilege, which Reed Hein does not disclose to the affected customers or prospective customers.

42.     **False Updates**: Customers often go years without results, or even updates from Reed Hein. When customers reach out to Reed Hein for updates it occasionally responds. On those occasions, customer liaisons are instructed to give clients cookie-cutter updates that are generally untrue. The updates ordinarily suggest that Reed Hein has been working with the timeshare, even when it has absolutely no relationship with the timeshare or the relationship is so soured the timeshare refuses to work with Reed Hein. The updates usually say something to the effect of "we are working with your timeshare company to see what exactly they need to let you out," despite having made no communications to the timeshare whatsoever.

43.     **Lack of Results**: Reed Hein continues to advertise its ability to produce results, even though the purported exits are becoming more difficult and often impossible to obtain.

44.     **False Money-Back Guarantee:** Although Reed Hein ostensibly offers a money-back guarantee, the guarantee is illusory and almost never honored. Customers are only entitled to money back if Reed Hein is unable to obtain an exit, but whether Reed Hein is unable to obtain an exit is unilaterally determined by Reed Hein without any clear criteria to guide that determination. After years of processing, Reed Hein simply tells customers who demand their money back that more processing is necessary to achieve their exit. Consequently, Reed Hein has a backlog of <u>thousands</u> of pre-paid customers that it has never helped and never reimbursed.

45.     **Pyramid Scheme**: Reed Hein takes more customers than it exits, leading to a severe backlog of thousands of un-exited customers. Treating all payments as income-instantly-earned, Reed Hein does not maintain their money in trust or escrow. Instead it disburses it toward

**COMPLAINT FOR DAMAGES - 14**

operating costs or profit for Brandon Reed, Trevor Hein, and others. Reed Hein maintains an inadequate reserve and it would become instantly insolvent if its backlog of un-exited customers demanded its money back. Instead, Reed Hein relies entirely on an influx of new customers to fund its operations and the money-back guarantees.

46.     **False Exits**: When and if the processing ends, Reed Hein sends customers a letter claiming the customers "exited" their timeshare agreements. Reed Hein's exits often do not constitute a legally cognizable rescission of the timeshare contracts. Instead, Reed Hein has historically relied on timeshare company's reluctance to sue timeshare holders, although that has now changed. With the exception of exits voluntarily granted by timeshare companies, often after the customers are left to negotiate for themselves, Reed Hein's exits have no legal significance. They range from convoluted quitclaim deed schemes to plain falsehoods about whether the client exited their contract.

## 1.  Legally Invalid Exits

47.   Reed Hein initially claimed to customers it was able to "force" developers and timeshare companies to take back timeshares, but that is false. In his deposition, Reed Hein's Chief Operating Officer was unable to coherently explain how it "forced" timeshare companies to "take back" timeshare agreements:

> Q. So back to my question: In what ways has Reed Hein forced any resort to take any timeshare back?
>
> A. By the methods that we are moving inventory back and out of the customer's name.

Parenteau eventually acknowledged that the methods do not force the timeshare companies to do anything. The only successful exits occur with the consent of the resorts.

### A.  Notices of Resignation

48.     Reed Hein falsely claims that it can force timeshare companies to rescind the agreement with "notices of resignation." That is false because 1) the timeshare company's

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

decision to accept the notice is entirely voluntary and 2) timeshare companies no longer accept notices of resignation from Reed Hein's customers. A notice of resignation is something any customer can do. It is simply a letter sent to the timeshare company stating that the customer no longer wishes to participate in the program. The timeshare company has the option whether to rescind the agreement. While Reed Hein has had some minor success with that approach in the past, timeshare companies no longer agree to rescind contracts with Reed Hein customers.

## B. Unenforceable Quitclaim Deeds

49.     Reed Hein falsely tells customers it can exit them from their timeshares by executing and recording a quitclaim deed conveying the customer's timeshare interest back to the timeshare company. Reed Hein does that without the consent of the timeshare company and it has no legal enforceability. Again, Reed Hein simply relies on the timeshare company's reluctance to sue customers.

## C. Quitclaim Deed/Foreclosure Hybrid

50.     Reed Hein falsely tells customers it can exit them from timeshares by a combined quitclaim-foreclosure/notice of termination approach. Reed Hein pays a vendor to execute a quitclaim deed giving the customer's interest in the timeshare to a third party who then refuses to pay. Like the quitclaim deeds to the timeshare company, the quitclaim deeds to the third party are legally unenforceable. Reed Hein simply relies on the timeshare company's reluctance to take customers to court.

## D. Extortion of Customers

51.     Since nonconsensual quitclaim deeds are unenforceable and timeshare companies are becoming increasingly difficult, Reed Hein strong-arms its clients into signing illusory quitclaims under the threat they will lose their money-back guarantee if they do not. Reed Hein purports to locate third-parties who are willing to take the customer's interest in the timeshare. Reed Hein then has the customer execute and notarize transfer paperwork containing blank spaces for the transferees. If the customer refuses to sign the legally incognizable document,

**COMPLAINT FOR DAMAGES - 16**

Reed Hein claims that its duty to exit the customer is discharged and the customer has waived his or her money back guarantee.

### E.   False Claims of Exits

52.     Facing an enormous backlog of un-exited customers, Reed Hein resorts to telling customers outright lies. Reed Hein sends customers letters notifying them that Reed Hein received a confirmation from the timeshare company that it has agreed to exit their contract. Reed Hein then sends letters stating they have been "exited" under the terms of its service agreement. And takes no further action. Timeshare companies frequently continue to demand payments and have begun suing Reed Hein customers who believed, based on information from Reed Hein, that their timeshare obligations were rescinded. When the customer complains to Reed Hein, it claims that it received a "verbal confirmation" from the timeshare company.

### F.   "Mass Exits"

53.     After discovering Reed Hein's business model, timeshare companies have stopped negotiating with any Reed Hein customers and have begun suing Reed Hein customers for damages – a material fact that Reed Hein does not disclose to new customers. From 2020-2021, Reed Hein settled three lawsuits in which it had been the defendant against major timeshare developers. It then claimed that the settlement agreements were struck on behalf of the clients, thereby extinguishing the clients' rights to refunds. Although Reed Hein has a duty to avoid conflicts of interest, Reed Hein's own attorneys struck the settlement agreements in which they bargained away the clients' rights to refunds from Reed Hein. The agreements do little more than put the client in the same position he or she would be in if they never hired Reed Hein in the first place. The agreements state that the timeshare companies will lift restrictions they specifically impose *on Reed Hein customers*. It then allows the customers to access timeshare companies' own pre-existing exit programs, about which Reed Hein never previously notified its customers. The agreements state the timeshare companies can unilaterally dictate the amount a customer must pay to get out of their timeshare contract. They also exclude Reed Hein from participating

**COMPLAINT FOR DAMAGES - 17**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

in negotiations between the timeshare company and the customer—the lone service customers paid Reed Hein to provide. Often the timeshare company offers the customer out of the timeshare for the amount the customer has gone into arrears while the customer was waiting years for Reed Hein to get them out of their timeshare contract instead of refunding the customers' money. Furthermore, the agreements state that Reed Hein will "advise" its clients not to involve their lawyers in the negotiations. Based on that agreement, Reed Hein considers its duties fulfilled and keeps the customers' money.

## 2. Exits the Customers Could Achieve on Their Own

### A. Foreclosure or Termination

54.    Reed Hein's first strategy was to induce foreclosures or terminations. Despite stating that it can force timeshare companies to "take back" agreements, Reed Hein originally encouraged customers to default on their dues and maintenance fees in order to induce a foreclosure. Depending on the asset, the timeshare company either takes possession of the client's interest in the asset or notifies the customer that the timeshare company is terminating the contract. Then Reed Hein considers the foreclosure or notice to be an exit in satisfaction of its contract with the customer. Both outcomes can harm a customer's credit rating and create other negative financial consequences, but Reed Hein has traditionally relied on timeshare companies' unwillingness to suffer adversarial proceedings in court, where their high-pressure sales pitches might be scrutinized by a judge. At some point, Reed Hein realized it was exposing itself to claims of tortious interference with a business contract and began advising clients to continue paying their timeshare fees for Reed Hein's own benefit. In 2018, timeshare companies began suing Reed Hein for tortious interference and its customers for nonpayment. Reed Hein does not notify customers that they consider an adversarial foreclosure to be an "exit," nor do they notify customer that they might be sued, both of which are material information.

### B. Exit Programs Already Offered by the Timeshare Company

Having numerous employees with experience in the timeshare industry, Reed Hein is

**COMPLAINT FOR DAMAGES - 18**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

aware that many of the timeshare companies offer their own "exit" programs. Those programs generally require the customer to pay some fraction of their remaining mortgage or some multiple of their maintenance fees. Reed Hein charges customers tens of thousands of dollars promising that it will force the timeshare company to take back their timeshare and omits that it plans to run them through the pre-existing program the customers could already use on their own. Now that the timeshare companies are refusing to work with anyone identified as a Reed Hein customer, Reed Hein simply accepts the customers' money and then instructs them to use the program themselves.

### 3. Deceptive Claims Designed to Induce Reliance

#### A. Reed Hein Makes False Claims that Timeshare Obligations Can Be Passed to Children

55.     In Gretchen Morgensen's January 22, 2016 New York Times Article *The Timeshare Hardsell Comes Roaring Back*, Morgensen explained that the timeshare industry purposefully perpetuates the false claim that timeshare obligations and benefits can be passed down to buyers' children. Timeshare Exit Team intentionally contributes to that misunderstanding. As of the date of filing, the company's website includes the following false "answer" to the "frequently asked question" of whether an owner's heir will inherit his or her timeshare interest:

> 74% of timeshares have consumers in lifetime contracts, many of which have perpetuity commitments. While the issue of inheritance is a legal one for which you should seek legal counsel, Timeshare Exit Team understands that some timeshare interests might continue to burden an owner's heirs or estate after the owner's passing

In October 2014, the company used even less careful language following language:

> yes, your kids can inherit your timeshare when you pass away based on tenancy, whether they want it or not.

#### B. Reed Hein Acts as a Listing Company While Discouraging Clients from Using Listing Companies

56.     Reed Hein profited from the resale of customer's timeshares after discouraging customers to resell their so themselves, which they could have done without the additional expense of a Reed Hein agreement. Reed Hein stated in its marketing materials and its contracts that it is not a transfer or listing company. Reed Hein trained its employees to warn customers about the dangers of listing companies. It warned customers that their assets had no listing value, that listing companies would try to scam them, would collect high upfront fees, and that there was little chance of the timeshare reselling on the market. Reed Hein's sales scripts also criticize transfers to a third party as an exit method. However, the primary way in which Reed Hein customers exited their contracts was through the transferring or selling of their timeshares to third parties. Reed Hein engages in the same practices it discouraged, except that it collects fees upfront to do it.

## C. Reed Hein Creates a Hobson's Choice for Consumers So They Cannot Exit and Cannot Obtain a Refund

57.     Reed Hein tells its customers that they do not need to pay maintenance fees and other payments to their timeshare companies. However, transfer companies require Reed Hein's customers to be current on payments in order to make a transfer. If Reed Hein chooses to use a transfer company, it informs customers that they have 180 days to make their payments for a guaranteed exit. If they do not pay, they forfeit the money-back guarantee that Reed Hein advertised. However, customers opting for that method are required to sign a legally invalid "Exit Agreement Addendum." Under the addendum, Reed Hein and the transfer company have an unlimited amount of time to complete the exit while the timeshare obligations remain in the customer's name. That way, Reed Hein can force the property owners to maintain their property in perpetuity without ever receiving their money-back guarantee.

## D. After Promising to Negotiate Directly with Timeshare Companies, Reed Hein made Customers Negotiate Directly with the Timeshare Companies

58.     Facing an enormous backlog with no coherent plan to discharge its duties, Reed

**COMPLAINT FOR DAMAGES - 20**

Hein directs its customers to file complaints with the Better Business Bureau and state Attorneys General to prompt the timeshare companies to contact the customers. Reed Hein directs the customer to negotiate for their own exit using Reed Hein's talking points. Reed Hein directs them not to inform the timeshare company of its involvement. That method is contrary to Reed Hein's claims that it would "work directly" with resorts. In essence, customers pay thousands of dollars to Defendants to negotiate their own exits.

### E. Reed Hein Employees Do Not Possess the Expertise It Advertises

59.     Brandon Reed testified that he knew "nothing" about timeshares when he started Reed Hein. As early as December 2013, Defendants advertised that "[w]e are industry experts in relieving people of their timeshare commitments." Neither had any experience or training in performing timeshare exits, and they did not hire internal personnel who did. Brandon Reed has testified under oath in other litigation that Reed Hein's business model from inception was to outsource all exit work to third-party Vendors.

60.     Aside from calling timeshares and pretending to be lawyers, Defendants only began using internal processes to achieve exits in 2015, which was limited to contacting resorts about their internal voluntary surrender programs mentioned above, which the customers could have used for free. The employees making those contacts have no license to negotiate customers' rights either through a law license or a special dispensation, such as a real estate license.

### F. Defendants' Advertised Money-Back Guarantee Is Deceptive and Illusory

61.     Reed Hein looks for any way it can extinguish the customers' right to a refund, even by imposing caveats and qualifications on the money-back guarantee it never disclosed to customers. Although Reed Hein tells customers to expect to be released from their timeshare within 12-18 months, Reed Hein refuses to pay refunds so long as it subjectively concludes the customer still has "exit paths" and "avenues to exits" it still has not tried. Reed Hein has refused to pay refunds to customers on those bases three to four years after the customers engaged with

**COMPLAINT FOR DAMAGES - 21**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

Reed Hein, even when the customers have asked for refunds many times. Reed Hein refuses to pay clients refunds if they give Reed Hein "inaccurate information" which often amount to nothing more than Reed Hein twisting the clients' words to extinguish their refund.

62.     As a result, the "risk-free" Money-Back Guarantee guarantees nothing at all. Reed Hein has sole discretion to pay customers their money back, which it rarely does. Reed Hein only honors the 100% Money-Back Guarantee for customers who might bring negative attention to Reed Hein. Reed Hein has even conditioned refunds on customers taking down negative reviews or complaints online.

### G.   Reed Hein Creates the Deceptive Impression that Reed Hein is a Law Firm and Misrepresent that Reed Hein Performs "Consumer Protection"

63.     Reed Hein routinely advertises itself as a "consumer protection firm" and "consumer advocates" to create the false impression that Reed Hein will personally provide services through specialized legal means. Defendant's scripts and webpages routinely suggest that Reed Hein's attorneys work for the customers: "Our Attorneys – They are consumer advocate attorneys." Reedhein.com also stated that Defendants "represent consumers," who are referred to as "our firm's clients," and claim that Defendants' services included "preparing the strongest case for you." Reed Hein is either referring to its own in-house counsel, who do not represent clients, or counsel Reed Hein must pay to provide the services Reed Hein said it could personally provide. Reed Hein and Associates has no actual "associates." Reed Hein's attorneys represent Reed Hein.

### 3.   Material Omissions and Active Concealment of Material Facts

### G.   Reed Hein Declines to Notify Customers that Timeshare Companies Have Begun Suing Its Customers

64.     Timeshare companies have been unwilling to sue timeshare holders who default because it would expose their sales and negotiation tactics. Since 2013, Reed Hein's alleged

**COMPLAINT FOR DAMAGES - 22**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

"exits" merely consisted of legally invalid quitclaim deeds and other form of nonpayment, relying on the timeshare companies' unwillingness to file suit. As late as 2018, timeshare companies began filing suit against Reed Hein customers. Reed Hein does not disclose to future customers the possibility that they might be sued or the reality that its current customers are being sued.

### 4. Additional Unfair Acts and Practices

#### A. Reed Hein Falsely Asserts That Communications Between Reed Hein and its Customers Are Protected by Attorney-Client Privilege

65.     Reed Hein executes Power-of-Attorney agreements with their customers. Under those agreements, Reed Hein asserted that it "acts as an agent pursuant to the POA agreements when it hires law firms or transfers companies . . .  and when it communicates and interacts with the law firms on behalf of the Reed Hein customers." Reed Hein further asserted that "If Reed Hein decides to hire a law firm for a customer, Reed Hein and the law firms specifically intend to create a relationship under privileged material is freely exchanged. As such, the law firms, customers, and Reed Hein all intend that the attorney-client and work product privileges and protections apply to all three parties in this agency relationship – the law firms, the customers/clients, and Reed Hein."

66.     However, Reed Hein knows a federal court in 2018 held that the communications and work product between those entities were not subject to attorney-client privilege or the work product doctrine. After that ruling, Vendors for Reed Hein were required to disclose thousands of pages of communications that would have otherwise been privileged but for Reed Hein's interference with the attorney-client relationship. Reed Hein did not tell the customers that their private information had been disclosed to their own adversaries. Instead, Reed Hein continued to assert after the ruling that those communications and work product were subject to attorney-client privilege and work product privileges.

### B. Reed Hein Refuses to Disclose Other Material Developments

67.     In two separate cases before the middle district of Florida, Reed Hein and its

**COMPLAINT FOR DAMAGES - 23**

vendors were ordered to disclose thousands of documents that would have been privileged but for Reed Hein's interference with the attorney-client privilege. Reed Hein failed to disclose to the customers that their private information had been disclosed to an adversary.

68.     Reed Hein's law firm-vendors stopped taking referrals from Reed Hein in summer 2018. Reed Hein was unable to find another law firm to service customers until summer 2019—creating a massive backlog of customers. Mr. Reed falsely testified under oath that the customers had been told they were in a "holding pattern," although no such disclose was made.

## V.     CLASS ACTION ALLEGATIONS

69.     Plaintiffs bring this action pursuant to Civil Rule 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class for the maximum time period allowable by law:

> **Class 1:** all persons who received legally invalid exits from their timeshare agreements or were not exited from their timeshares at all ("**non-exits**").

> **Class 2**: all persons who had to obtain their own exits after paying Reed Hein to do so for them ("**self-exits**").

> **Class 3**: all persons who obtained 'harmful' exits by either paying additional money to the timeshare companies or suffering other negative repercussions ("**harmful exits**").

70.     The Class is so numerous that joinder of all members is impracticable.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

72.     Plaintiffs' claims are typical of the claims of each member of the Class.

73.     There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all the Class' members and that include, without limitation:

> a.     Whether Defendants misappropriated client funds in violation of their contracts, duties, and fiduciary duties

> b.     Whether Defendants induced customers into contracts with promises of being able

**COMPLAINT FOR DAMAGES - 24**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

to legally stop making payments on their timeshares;

c.  Whether Defendants asserted that their conversations with customers and legal counsel were privileged when they knew or should have known of a court order stating that those communications were not privileged;

d.  Whether the Defendants breached the implied covenant of good faith and fair dealing;

e.  Whether Defendants made materially false representations to Plaintiffs and the Class;

f.  Whether Defendants made materially false representations about their knowledge and experience in the timeshare industry;

g.  Whether Defendants failed to abide by the statutes and regulations for crediting organizations;

h.  Whether Defendants materially misled consumers in performance of debt adjustment services;

i.  Whether Defendants made material misrepresentations about the speed of exit services;

j.  Whether Defendants failed to provide exit services for Plaintiffs and the Class;

k.  Whether Defendants' business practices alleged herein are deceptive acts or practices;

l.  Whether Defendants breached their fiduciary duty to Plaintiffs and members of the Class;

m.  Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages;

n.  And whether Plaintiffs and the Class are entitled to declaratory, injunctive, and other equitable relief.

74.  Plaintiffs are members of Class 1 and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

75.  Class action status is warranted under CR 23(b)(1)(A) because the prosecution of

**COMPLAINT FOR DAMAGES - 25**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

76.     Class action status is warranted under CR 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

77.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

78.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

79.     **Class Counsel –** Plaintiffs have retained counsel who have been interviewing witnesses and researching these underlying issues for 18 months before filing suit. Counsel have already recovered greater than $300,000 from Reed Hein on behalf of Reed Hein customers in dozens of lawsuits and arbitrations. Counsel are experienced in plaintiffs' litigation and will represent the Class fairly, adequately, and zealously.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

80.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

81.     Every contract contains an implied covenant of good faith and fair dealing.

**COMPLAINT FOR DAMAGES - 26**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

82.     Through methods described above, Defendants induced customers into contracts unfairly and in bad faith by using false claims and promises.

83.     Defendants breached the terms of the spirit of its contracts with customers.

84.     As a direct, proximate, and legal result of the breaches, Plaintiffs and members of the Class have suffered damages in an amount to be proven at trial.

## COUNT TWO
## COMMON LAW FRAUD

85.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

86.     Through methods described above, Defendants induced customers to spend money on its services by making materially false representations and omitting material facts with the intent that the false statements and omitted facts be acted upon.

87.     Plaintiffs, including the Class, were ignorant of or would not be expected to know the truth of the material misrepresentations and material omissions.

88.     Plaintiffs relied on the truth of Defendants' misrepresentations and trusted that there were no material omissions.

89.     Plaintiffs suffered damages as a result of their reliance.

## COUNT THREE
## NEGLIGENT MISREPRESENTATION

90.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

91.     Through the methods described above, Defendants induced customers to spend money on its services by making negligent misrepresentations and negligently omitting material facts from the Plaintiffs.

92.     Plaintiffs relied on the truth of Defendants' misrepresentations and trusted that there were no material omissions.

93.     Plaintiffs suffered damages as a result of their reliance.

**COMPLAINT FOR DAMAGES - 27**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

## COUNT FOUR
## UNJUST ENRICHMENT/DISGORGEMENT

94.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

95.     Plaintiffs and Class have conferred a substantial benefit upon Defendants derived from the fees paid by Plaintiff and the Class.

96.     Those payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiff and members of the Class.

97.     As a result of Defendants' unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

98.     Plaintiff and the Class also seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful, and/or deceptive practices.

## COUNT FIVE
## VIOLATION OF CONSUMER PROTECTION ACT, RCW 19.86 *et. seq.*

99.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

100.    Plaintiffs can prevail on a claim for damages under the State Consumer Protection Act by establishing (1) an unfair or deceptive act or practice, (2) that occurred in the conduct of trade or commerce, (3) that has an impact on the public interest, (4) that results in injury to the plaintiffs in their business or property, and (5) causation. *Klem v. Washington Mut. Bank*, 176 Wash.2d 451 (1992).

101.    Defendants commits an unfair or deceptive act or practice by promising to hold customers funds separate and apart from company's funds, when the company in fact converted Plaintiffs' funds into its own funds.

102.    Because Defendants committed the unfair or deceptive acts or practices as part of

**COMPLAINT FOR DAMAGES - 28**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

a transaction, the acts or practice occurred in the conduct of trade or commerce.

103.    Because Defendants have presented the same power-of-attorney form to tens of thousands of customers, and because the company has in fact converted the funds of all those customers into its own funds, the company's unfair or deceptive act or practice as an impact on the public interest.

104.    Defendants engaged in the foregoing acts or practices constituting unfair or deceptive acts in trade or commerce.

105.    Defendants' practices outlined above affects the public interest and have the capacity to deceive a substantial number of consumers and are unfair or deceptive acts or practices in trade or commerce in violation of RCW 19.86.020.

106.    The unfair or deceptive act or practices have harmed Plaintiffs and the Class in their business or property.

107.    The unfair or deceptive practice act or practice proximately caused Plaintiffs' and the Class' injuries.

108.    This Court has authority to award treble damages, up to a maximum of $25,000, to any person who establishes that he or she was injured because of a violation of the State Consumer Protection Act. RCW 19.86.090.

109.    A person who establishes that he or she was injured because of a violation of the State Consumer Protection Act is entitled to the reasonable attorney fees and costs he or she incurred in bringing the suit. RCW 19.86.090.

110.    The Court should award treble damages to the Plaintiffs and each member of the Class.

## COUNT SIX
## BREACH OF FIDUCIARY DUTIES

111.    Defendants induced Plaintiffs, including the Class into fiduciary relationships by asking them for power of attorney and soliciting money for services not yet performed.

**COMPLAINT FOR DAMAGES - 29**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

112. Defendants received money from Plaintiffs and the Class for services not yet performed, but did not hold the money in trust or escrow.

113. Defendants immediately misappropriated the money as earned income.

114. Defendants breached its fiduciary duties to Plaintiffs and the Class.

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court grant the following relief:

115. Injunctive relief ordering Reed Hein to stop providing the services described herein.

116. Adjudication and decree that Reed Hein has engaged in the conduct complained herein.

117. Adjudication and decree that the conduct complained of herein constitutes unfair or deceptive acts or practices in violations of the Consumer Protection Act, Chapter 19.86 RCW.

118. That the Court make such orders pursuant to RCW 19.86.090 as it deems appropriate to provide that Plaintiffs have and recover from Defendants the costs of this action, including reasonable attorneys' fees.

119. That the Court order such other relief as it may deem just and proper to fully and effectively dissipate the effects of the conduct complained herein, or which may otherwise seem proper to the Court.

120. Monetary Relief, including Damages and Treble damages.

121. Attorney Fees and Costs.

122. Any other monetary and nonmonetary relief the Court deems just and proper.

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DATED this 9th day of October, 2021.

ALBERT LAW PLLC

By: _____
Gregory Albert, WSBA#: 42673
3131 Western Ave., Suite 410
Seattle, WA 98121
Telephone: (206)-576-8044
Email: greg@albertlawpllc.com
*Attorney for Plaintiffs*

**COMPLAINT FOR DAMAGES - 31**

**EXHIBIT 23**

HON. BARBARA ROTHSTEIN

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                            AT SEATTLE

10

11   BRIAN ADOLPH, individually and on behalf        Case No. 2:21-cv-01378
     of all others similarly situated; KERRI
     ADOLPH, individually and on behalf of all       ORDER GRANTING
12   others similarly situated;                       STIPULATED MOTION
                                                      TO CERTIFY CLASS
13          Plaintiffs,

14   v.

15   REED HEIN & ASSOCIATES d/b/a
     TIMESHARE EXIT TEAM; MAKAYMAX
16   INC.; HEIN & SONS INDUSTRIES, INC.;
     BRANDON REED, individually; and
17   TREVOR HEIN, individually,

18          Defendants.

19

20

21          This matter came before the Court on the parties' Stipulated Motion to Certify Class.

22   Plaintiff is represented by Gregory Albert, Defendant Brandon Reed is represented by Daniel

23   Bugbee, and Defendants Reed Hein and Makaymax Inc. are represented by Jack Lovejoy.

     The Court considered the following:
24
     1.   Plaintiffs' Class Action Complaint;
25

2.      The parties' Stipulated Motion for Class Certification;

3.      Declaration of Gregory Albert, Declaration of Brandon Reed, Declaration of Daniel Bugbee, and Declaration of Brian Adolph.

The parties' Stipulated Motion to Certify Class is hereby GRANTED. The class shall be defined as: All persons who paid fees to Reed Hein for services to terminate their timeshare obligations, except those persons who received refunds of the fees that they paid. Certification of the class is appropriate because:

1.      The class is so numerous that joinder of all members is impracticable. The class consists of over 34,000 members, satisfying the requirements of Fed. R. Civ. P. 23(a)(1);

2.      There are questions of law or fact common to the class. All class members have claims under the Washington State Consumer Protection Act, and Plaintiffs allege Reed Hein subjected all members of the class to false or misleading statements and omissions on which the class members relied, satisfying the requirements of Fed. R. Civ. P. 23(a)(2);

3.      The claims of the representative party are typical of the claims of the class. Plaintiffs allege Reed Hein subjected all class members to false or misleading statements and omissions on which the class members relied, satisfying the requirements of Fed. R. Civ. P. 23(a)(3);

4.      Brian Adolph will fairly and adequately advocate the interests of the class. The plaintiff has no known conflicts of interests with the class and has previously engaged in litigation against Reed Hein, satisfying the requirements of Fed. R. Civ. P. 23(a)(4);

5.      Questions of law or fact common to the members of the class predominate over questions affecting only individual members. Plaintiffs allege Reed Hein subjected all class members to false and misleading statements and omissions on which the class members relied, satisfying the requirements of Fed. R. Civ. P. 23(b)(3);

6.   A class action is superior to other methods available for the fair and efficient adjudication of the controversy. The average class member has a small dollar claim and would be unlikely or unable to pursue their claims without certification of this class action, satisfying the requirements of Fed. R. Civ. P. 23(b)(3);

7.   Albert Law PLLC will fairly and adequately represent the interests of the class as class counsel.

8.   This action is manageable as a class action.

IT IS FURTHER ORDERED that Brian Adolph shall serve as class representative for the class certified herein.

IT IS FURTHER ORDERED that Gregory Albert, WSBA No. 42673, shall serve as class counsel for the class certified herein.

IT IS FURTHER ORDERED that within fourteen days of the date of this Order, the parties through their counsel shall meet and confer to determine the most cost-effective and efficient means to provide adequate notice to the class, and advise the Court of any such agreement. If no agreement is reached, the parties shall submit to this Court, no later than seven days thereafter, their proposed means of providing adequate notice to the class.

IT IS FURTHER ORDERED that the parties are to meet and confer on a proposed form of notice to be mailed to the class by Plaintiff and submit the same to the Court promptly after the date of this Order. If no such agreement is reached, the parties shall submit to this Court their proposed form of notice promptly thereafter.

With respect to the nature and form of notice, the Court shall then rule or schedule a hearing, as it deems necessary in its discretion.

IT IS SO ORDERED.

DATED this 25th day of October, 2022.


Barbara Jacobs Rothstein
U.S. District Court Judge

**EXHIBIT 24**

1
2
3
4
5
6
7
8

HONORABLE BARBARA J. ROTHSTEIN

9          UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
10                   AT SEATTLE

11   BRIAN ADOLPH, individually and on behalf       Case No. 2:21-cv-01378-BJR
     of all others similarly situated; KERRI
12   ADOLPH, individually and on behalf of all
     others similarly situated;                     **PLAINTIFFS' UNOPPOSED**
13                                                  **MOTION FOR 1) PRELIMINARY**
             Plaintiff,                             **APPROVAL OF CLASS ACTION**
14                                                  **SETTLEMENT, 2) DIRECTION OF**
     v.                                             **NOTICE TO CLASS MEMBERS,**
15                                                  **AND 3) A FAIRNESS HEARING**
     REEDHEIN & ASSOCIATES d/b/a                    **DATE**
16   TIMESHARE EXIT TEAM; MAKAYMAX
     INC.; HEIN & SONS INDUSTRIES, INC.;
17   BRANDON REED, individually; and
     TREVOR HEIN, individually,
18
             Defendants.
19

20
21
22
23
24
25

**MOTION FOR PRELIMINARY APPROVAL OF**                    ALBERT LAW PLLC
**CLASS ACTION SETTLEMENT - 1**                      3131 Western Avenue, Suite 410
**2:21-cv-01378-BJR**                                      Seattle, WA 98121
                                                      Phone: (206) 576-8044

## I.    RELIEF REQUESTED

Brian Adolph, on behalf of the class certified on October 25, 2022 (Dkt. #23), respectfully requests the Court grant the following relief:

### a.  Relief Requested: Preliminary Approval of Settlement Agreement

Brian Adolph respectfully moves this Court to grant preliminary approval for a class action settlement reached through arms-length negotiations on April 11, 2022 in order to avoid a cost-prohibitive litigation with little prospect of a financial recovery. The agreement stipulates to a judgment with a covenant not to execute for the full amount of damages claimed, $630,187,204, assigns the rights to two colorable insurance bad faith claims to the Class, and assigns the rights to other multi-million dollar claims to the Class. The settlement agreement also waives privileges between Reed Hein and its counsel, so that class members can obtain documents to use in lawsuits as other sources of recovery.

The Declaration of Gregory Albert provides a more in-depth analysis of why those terms are objectively superior to continued litigation. Albert Decl., ¶¶ 23-26. Reed Hein is insolvent, and Mr. Reed's remaining net worth is minimal. Albert Decl., ¶23. Mr. Reed has a fifty percent interest in Happy Hour Media Group LLC, which has $1,489,966.90 in equity but $1,624,028 in debt. *Id.* The only other substantial asset Mr. Reed has is an "overdue" account receivable for $623,730 for a loan to Trevor Hein that Mr. Hein has declined to repay. *Id.* If the parties continued litigation, any assets Brandon Reed could liquidate would likely be consumed by both parties' attorney fees and class action administration costs before being distributed to a 30,000-member class.

The foregoing settlement terms are the product of years of litigation and negotiations,

MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 2
2:21-cv-01378-BJR

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

culminating in a mediation with King County Judge (ret.) Laura Inveen that began on November 23, 2021. Albert Decl., ¶22. Brian Adolph has been litigating against Reed Hein since August, 2021. *Id.* at ¶21. Counsel for the Plaintiff Class has been litigating similar claims against Reed Hein since January 2020, including greater than forty arbitrations, fourteen evidentiary hearings, and thirteen favorable arbitration awards. Albert Decl., ¶49.

### b. Relief Requested: Direction of Notice to Class Members

Since there is no money changing hands as an immediate result of this settlement, the Class requests the Court allow counsel to employ a cost-effective staggered system of notice. First, Class Counsel will send emails to each Reed Hein customer using the email addresses maintained by Reed Hein. Albert Decl., ¶¶55-56. The emails will contain the proposed long-form notice and will contain a link to a website containing more information. The already-published website contains a long-form notice, case documents, an FAQ, and instructions on how to object or opt-out of the settlement. Ex. 6, Albert Decl. The emails will contain a "cookie" that notifies the sender when the customer clicks on the link to the website. Albert Decl., ¶56. Once the un-contacted customers can be determined, class action administration firm Simpluris, Inc. will mail each remaining customer a short-form notice, skip-trace the customers whose letters are "undeliverable," and send short-form notice to their new addresses. Albert Decl., ¶57. Each short-form notice will contain links to the website. The parties will thereafter notify the court on the success of those notice campaigns.

### c. Relief Requested: Set a Fairness Hearing

Plaintiff respectfully requests that the Court set a fairness hearing on or after March 1, 2023, which gives the parties adequate time to effect both methods of notice, provides class

**MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 3
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

members enough time to make decisions, and gives sufficient time to brief the Court before the fairness hearing.

## II.  EVIDENCE RELIED UPON

The Class relies upon the following evidence:

a. Declaration of Brandon Reed

b. Declaration of Gregory Albert containing the following attachments:

Ex. 1: April 11, 2022 Settlement Agreement;

Ex. 2: Proposed Covenant Judgment;

Ex. 3: Proposed Email Notification to Class Members;

Ex. 4: Proposed Long-Form Notice;

Ex. 5: Proposed Short-Form Notice;

Ex. 6: Screenshot from ReedHeinClass.com;

Ex. 7: Proposal from class action administration company Simpluris, Inc.;

Ex. 8: Deposition testimony from Trevor Hein;

Ex. 9: Insurance Carrier QBE's Reed Hein Policy (232 pages);

Exs. 10-14: QBE's Communications with Reed Hein;

Ex. 15: RSUI's D&O policy with Reed Hein;

Exs. 16-17: RSUI's Communications with Reed Hein;

Ex. 18: Arbitration Awards issued against Reed Hein.

**MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 4
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

### III.    STATEMENT OF FACTS

#### a.   Summary of Allegations Against Reed Hein

The Class alleges that Reed Hein and Associates have defrauded greater than 30,000 customers out of greater than $200,000,000. Dkt. No. 1 (Complaint). Since its founding, Reed Hein claimed to be a "consumer-advocacy firm" that was capable of "forcing" timeshare developers to "take back" a customer's timeshare. Reed Hein claimed to have a "proprietary timeshare-exit process" that included direct negotiation with timeshare developers. Finally, Reed Hein's "one-hundred-percent money-back guarantee" promised to refund a customer's fee if Reed Hein was unable to deliver a "timeshare exit." Reed Hein made each of those claims and omissions in mandatory sales meetings with prospective customers for the purposes of inducing those customers' reliance on the claims and omissions.

Reed Hein's claims were untrue. In fact, Reed Hein never had a meaningful plan to terminate any customer's timeshare obligations, and timeshare developers flatly refused to negotiate any customer's case with Reed Hein. In fact, hiring Reed Hein made it more difficult for customers to get out of their timeshare obligations because timeshare companies refused to negotiate with Reed Hein customers. Finally, Reed Hein's "one-hundred-percent money-back guarantee" was an empty promise: even when Reed Hein failed to deliver on its promise of a "timeshare exit," Reed Hein refused to refund customer fees, sometimes giving customers contrived *post-hoc* excuses and sometimes ignoring them altogether.

#### b.   Summary of Proceedings and Settlement Negotiations

Counsel for the Plaintiff Class has been litigating against Reed Hein since January 2020,

**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT - 5**
**2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

resulting in $613,861 in awards and settlements. Dkt. No. 21, ¶3. On August 2, 2021, Mr. Adolph filed his first claims against Reed Hein with the American Arbitration Association. Albert Decl., ¶21. When Reed Hein neglected to pay the arbitration fee, Mr. Adolph withdrew that action and filed the above-entitled action. *Id.* Mr. Adolph served Plaintiff's First Set of Interrogatories and Requests for Production on January 13, 2022. *Id.* Reed Hein responded on February 14, 2022 with greater-than 454 megabytes of responsive documents, including a spreadsheet of all Reed Hein customers' information. *Id.*

On September 18, 2021, Reed Hein, Brandon Reed, and Trevor Hein entered a consent decree for $22,000,000 with Washington State. *State v. Reed Hein & Associates et al.*, King County Superior Court Case No. 20-2-03141-1, Dkt. No. 300. According to the decree, the defendants in that lawsuit would not be required to pay more than $2,610,000 as long as they abided by the terms of the consent decree, which included ceasing their unfair and deceptive tactics and meeting certain payment deadlines. *Id.*

On November 23, 2021, the parties mediated the above-named action with retired King County Judge Laura Inveen at Hilyer Dispute Resolution. Albert Decl., ¶22. The parties continued negotiating through phone calls with Judge Inveen. *Id.* The parties negotiated all the terms contained in the final settlement agreement through Judge Inveen and executed a refined CR2A agreement on April 11, 2022. *Id.*

c.  **The Terms of the April 11, 2022 CR2A Agreement**

The April 11, 2022 CR2A Agreement contains the following terms (in summary):

1.  Reed Hein agrees to a judgment with a covenant not to execute in the full amount requested, trebled up to $25,000 with an interest rate of 12% annually (Ex. 1, Section

**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT - 6**
**2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

II, ¶1, Albert Decl.);

2. Reed Hein will produce contact information and the amount paid by each Reed Hein customer (*Id.* at ¶2);

3. Reed Hein will stipulate to class certification, any motions necessary to effect a judgment and recovery for the foregoing amount of damages (*Id.* at ¶3);

4. Reed Hein and Brandon Reed assigned all rights to all potential insurance bad faith claims to the Class (*Id.* at ¶4);

5. Reed Hein will give any truthful testimony necessary to effect class certification and third-party claims (*Id.* at ¶5);

6. Reed Hein assigns any claims against Trevor Hein to the Class (*Id.* at ¶6);

7. Reed Hein assigns any claims against Mitchell Sussman and Kenneth Privett to the Class and waives all privileges between Reed Hein and those law firms (*Id.* at ¶7);

8. Reed Hein assigns any claims against Ardent Law Group and its principals to the Class, waives any privileges it has with those persons; and will produce a document shown to Class Counsel during the November 2021 mediation containing Reed Hein's liability theories against Ardent Law Group and its principals (*Id.* at ¶¶8-9);

9. Reed Hein assigns any rights to claims against any timeshare developer to the Class (*Id.* at ¶10);

10. Reed Hein will stipulate to the reasonableness of the settlement and the covenant judgment, and will cooperate and give testimony to effect the agreement (*Id.* at ¶¶11-12);

11. Reed Hein will stipulate to every theory of liability identified in the Complaint (*Id.*

**MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 7
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

at ¶14);

12. Reed Hein will waive all privileges with the law firms who represented it in lawsuits with the timeshare companies in the Middle District of Florida, and will produce those firms' Reed Hein files (*Id.* at ¶15);

13. Reed Hein will fully respond to Plaintiffs' January 11, 2022 discovery requests (*Id.* at 16).

Ex. 1, Albert Decl.

According to the testimony of Gregory W. Albert and for the reasons given therein, accepting the foregoing terms of the agreement is preferable to continued litigation against Reed Hein and Brandon Reed because 1) Reed Hein is insolvent and unable to produce income and 2) Brandon Reed's remaining net worth would be consumed by further litigation, fees, and the costs of administering a class action settlement. Albert Decl., ¶¶23-24. Mr. Albert's declaration provides a thorough analysis explaining why this agreement is preferable to continued litigation. *Id.* at ¶23-27. In summary:

1. Each insurance bad faith claim is colorable and potentially worth $630,187,204 before trebling under IFCA. Albert Decl. ¶26(a)-(b). Although Reed Hein tendered the complaint to insurance carriers QBE and RSUI in October 2021, QBE ignored the tender for eleven months. *Id.* at ¶26(a)(i)-(v). RSUI refused to defend for reasons that do not appear applicable to this case. *Id.* at ¶26(b)(i)-(v).

2. The claims against Trevor Hein are potentially worth $10,000,000 for breach of contract and conversion. *Id.* at ¶26(d)(i). Mr. Hein has already testified that he borrowed $10,000,000 from Reed Hein and never paid it back, Ex. 8 at 254:22-255:1,

**MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 8
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Albert Decl.;

3. The claims against Ardent Law are worth approximately $8,000,000. Albert Decl., ¶26(e)(i). Mr. Reed will testify that he paid Ardent Law $8,000,000 because its principals told him it would file a mass-action against the timeshare company. Ex. 1, Section II, ¶9, Albert Decl.

4. The waiver of privileges, favorable testimony, and stipulations are have value to Class members seeking recovery from other parties. *Id.* at ¶26(f)(i)-(iii).

In contrast, continued litigation promises to demand thousands of hours of additional attorney time and costs without any realistic prospect of recovery. Albert Decl., ¶24.

### d. Denying the Motion Might Negate the Value of the Terms of the CR2A Terms

Since the Court stands in the shoes of the class members when evaluating a settlement agreement, it should be made aware that the value of the insurance bad faith claims will probably evaporate if the Court rejects this settlement. The parties arrived at the settlement agreement on April 11, 2022, after Reed Hein's insurance carrier, QBE, ignored Reed Hein's October 2021 tender and refused to defend Reed Hein for eleven months. However, once QBE became aware Reed Hein had assigned its bad faith claims to the Class, it changed its position and offered to defend the case in September 2022. If the Court rejects this settlement agreement, then the insurer may have another opportunity to defend the case and cure the damages it caused. In that case, the insurance bad faith claims will likely dissolve, leaving the Plaintiffs with little prospect of recovery. Therefore, the Class respectfully submits that it has an interest in seeing the settlement agreement approved.

**MOTION FOR PRELIMINARY APPROVAL OF**
**CLASS ACTION SETTLEMENT - 9**
**2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

# IV.    LEGAL ANALYSIS

## a.  Preliminary Approval is Appropriate

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class action claims. There are three steps to be taken by the Court in considering approval of a tentative class-action settlement: (i) the Court must preliminarily approve the proposed Settlement; (ii) members of the Class must be given notice of it; and (iii) a final hearing must be held, after which the Court must decide whether the tentative Settlement is fair, reasonable, and adequate. *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 at 320-21 (4th ed. 2004) ("MANUAL"). Approval of a proposed class-action settlement is a matter within the sound discretion of the district court. *E.g.*, *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Create-A-Card, Inc. v. INTUIT, Inc*., 2009 U.S. Dist. LEXIS 93989, at *7 (N.D. Cal. Sept. 22, 2009) (addressing final approval).

Preliminary approval does not require the Court to answer the ultimate question of whether a tentative settlement is fair, reasonable and adequate. That decision is instead made only at the final-approval stage, after notice of the Settlement has been given to the Class Members and they have had an opportunity to voice their views. *See* 5 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 23.83(1) at 23-336.2 to 23-339 (3d Ed. 2002). Preliminary approval is merely the prerequisite to giving notice so that members of a class have "a full and fair opportunity to consider the proposed [settlement] and develop a response." *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983).

Courts have consistently noted that the standard for preliminary approval is *less rigorous* than the analysis at final approval. Preliminary approval is appropriate as long as the tentative

**MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 10
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

settlement falls "within the range of possible judicial approval." A. Conte & H.B. Newberg, NEWBERG ON CLASS ACTIONS § 11.25 (4th ed. 2002) (quoting MANUAL FOR COMPLEX LITIGATION THIRD § 30.41 (1997)); MANUAL, § 21.632 at 321. Instead, courts employ a "threshold of plausibility" standard intended to identify conspicuous defects. *See, e.g.*, *Kakani v. Oracle Corp.*, 2007 U.S. Dist. LEXIS 47515, at *16 (N.D. Cal. June 19, 2007); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 337-38 (N.D. Ohio 2001). Unless the Court's initial examination "disclose[s] grounds to doubt its fairness or other obvious deficiencies," the Court should order that notice of a formal fairness hearing be given to settlement class members under Rule 23(e). *See* MANUAL, § 21.633 at 321-22.

### 1. The proposed settlement is sufficiently fair, reasonable, and adequate for preliminary approval.

To determine whether a settlement is fair, adequate, and reasonable, "a district court must consider a number of factors, including: [1] the strength of plaintiffs' case, [2] the risk, expense, complexity, and likely duration of further litigation, [3] the risk of maintaining class action status throughout the trial, [4] the amount offered in settlement, [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant (not applicable); and [8] the reaction of the class members to the proposed settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (internal citation and quotation marks omitted).

On a preliminary-approval basis, the proposed settlement meets all the applicable factors.

### i. The strength of Plaintiffs' case justifies the amount offered in settlement.

**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT - 11**
**2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

The parties propose a judgment in the full amount of damages claimed in this case: $630,187,204. That figure was calculated by 1) trebling the damages for each Class Member who paid fewer-than $12,500 and 2) trebling all other Class Members up-to the $25,000 cap on treble damages imposed by the Washington State Consumer Protection Act. Albert Decl., ¶¶32-48.

The strength of the Class's case justifies the amount of the settlement. The settlement is for the full amount of damages requested, including treble damages. Ex. 1 at Section II, ¶1. Class Counsel has successfully litigated or settled 38 arbitrations making substantively similar claims based upon violations of the same statutes and common law. Albert Decl., ¶49. In the fourteen arbitration *hearings* Class Counsel has prosecuted, the claimants prevailed in every hearing but one. *Id.* The complaint in this case alleges all the same facts, causes of action, and theories cited by arbitrators in their numerous awards. Ex. 18, Albert Decl.

### ii. The risk, expense, complexity, and likely duration of further litigation

Reed Hein has repeatedly demonstrated a willingness to fight the Plaintiff's claims. Reed Hein retained skilled class-action defense counsel Corr Cronin, LLP, who simultaneously litigated against the State of Washington and Albert Law PLLC in their respective actions against Reed Hein. Defendants and their counsel did not settle with Washington State until after their original trial date and they litigated fourteen of Albert Law's client's claims to arbitration decisions. If the settlement agreement is not approved, QBE has offered to continue paying for Corr Cronin to defend Reed Hein in this action, at which point this case will resume a full litigation and probable trial.

**MOTION FOR PRELIMINARY APPROVAL OF**
**CLASS ACTION SETTLEMENT - 12**
**2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Even if Reed Hein was unable to continue paying for litigation, the possibility of a messy and expensive bankruptcy proceeding militates in favor of settlement. Should Reed Hein volunteer or be forced into bankruptcy, Brandon Reed's remaining assets would be liquidated and the proceeds would have to be shared with other creditors. The Class has an interest in ensuring that does not happen.

### iii.  The risk of maintaining class action status throughout the trial

The CR2A agreement stipulates to class action certification for the purposes of settlement. Ex. 1, Albert Decl. If the settlement proposal is rejected, Reed Hein and Brandon Reed may be able to withdraw the stipulation and move to de-certify the class. Furthermore, the Court certified the current class because all parties can plausibly allege treble damages through the Washington Consumer Protection Act. However, not all plaintiffs' cases have identical facts and causes of action. If the class is de-certified, the plaintiffs will be forced to separate into multiple classes due to the strengths and idiosyncrasies of the various plaintiffs' cases, then move for certification against opposition. For those reasons, the risk of being unable to maintain the current cohesive class is great, further meriting settlement.

### iv.  The extent of discovery completed and the stage of proceedings

The issues in this matter have been intensely litigated for years, resulting in the exchange of tens of thousands of pages of discovery documents and seventeen depositions and examinations taken in evidentiary hearings. Albert Decl., ¶49-53. In the current lawsuit Defendant answered 19 interrogatories and 15 requests for production, resulting in the production of 454 megabytes of documents. *Id.* at ¶21. In prior lawsuits *Gerald Siegrist v. Reed Hein* and *Phillip Isaacs v. Reed Hein*, Albert Law served Reed Hein 22 interrogatories and 42

requests for production, each, resulting in thousands of pages of production. Albert Decl., ¶50. Plaintiff has also obtained greater-than ten thousand pages of documents from the Washington State Attorney General through Washington State Public Records Act. Albert Decl., ¶¶51. Plaintiff has obtained twelve transcripts of Reed Hein officers' depositions via PACER. Albert Decl., ¶¶52-53. Plaintiff's counsel has spent approximately one thousand dollars in PACER charges just to download documents. *Id.* Plaintiff's counsel believes he already has sufficient documents to prevail at trial in this case.

### v. The experience and views of counsel

On October 25, 2022, this Court issued an order finding that Albert Law PLLC will fairly and adequately represent the interests of the class and ordered Gregory Albert to serve as Class Counsel. Dkt. No. 23, ¶¶7-8. Although Class Counsel would like to recover liquid assets and money from Brandon Reed and Reed Hein, Reed Hein is insolvent and Brandon Reed's remaining assets would be negligible for the Class, even before Defense counsel fees, Plaintiff's counsel fees, and costs are deducted. Given that this settlement agreement assigns two $600,000,000 claims to the Class, a one-percent chance of recovery on those claims is greater than ten times the value of Mr. Reed's remaining assets.

### vi. The reaction of the Class Members to the proposed settlement.

Notice has not been provided to class members yet so that factor cannot be evaluated currently. However, it may be noteworthy to the Court that Class Counsel has spoken to greater than 50 Reed Hein customers about the fact that Reed Hein is insolvent and will be unable pay refunds. Albert Decl., ¶54. Although disappointed, the customers are generally unsurprised and have endorsed whatever action can be taken to obtain some recovery. *Id*. It seems unlikely that

**MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 14
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

any class member would have an interest in abandoning the insurance bad faith claims in favor of Brandon Reed's remaining funds.

### 2. The Proposed Settlement Is the Result of Arm's-Length Litigation and Negotiations between Parties

In addition to the factors discussed heretofore, the Court must also be satisfied that "the settlement is not the product of collusion among the negotiating parties" when, as here, "the settlement agreement is negotiated prior to formal class certification." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011). Factors considered include whether (1) the settlement resulted from arm's-length negotiations between experienced, capable counsel; (2) the end result achieved; and (3) whether counsel are to receive a disproportionate distribution of the settlement under a "clear sailing" arrangement providing for the payment of attorney fees separate and apart from class funds where fees not awarded revert to defendants rather than to the class. *See City P'ship Co. v. Atlantic Acquisition Ltd. P'ship,* 100 F.3d 1041, 1043 (1st Cir. 1996) (a presumption of correctness attached to a class settlement reached in arm's-length negotiations between experienced, capable counsel); *See also Mars Steel Corp. v. Continental Ill. Nat'l Bank & Trust Co.,* 834 F.2d 677, 684 (7th Cir. 1987) ("[r]ather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation. . . . The proof of the pudding was indeed in the eating.").

The settlement agreement is the product of an arms-length mediation with a qualified mediator, greater-than two years of litigation, forty arbitrations, and fourteen evidentiary hearings. Albert Decl., ¶21; ¶49. There can be no disproportionate amount of fees to be paid to Class Counsel because the agreement does not include the exchange of any liquid or liquid-able assets or property. Neither Class Counsel nor class representative Brian Adolph will

**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT - 15**
**2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

receive any money until they successfully prosecute the assigned claims in additional actions, at which point the payment of attorney fees and class representative fees will be reviewed by the Court again in new approval proceedings.

   **b. The Court Should Order Notice Be Provided to the Class**

   Reasonable notice must be provided to Class Members to allow them an opportunity to object to the proposed Settlement. *See Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990). Rule 23(e) requires notice of a proposed settlement "in such manner as the court directs." In a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both the Fed. R. Civ. P. 23(c)(2) and 23(e). *See Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993) (stating that requirements of Rule 23(c)(2) are stricter than requirements of Rule 23(e) and arguably stricter than the due process clause). Under Rule 23(c)(2), notice to the Class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," although actual notice is not required. *See e.g. Amchem Prods. v. Windsor,* 521 U.S. 591, 617 (1997)*; Reppert v. Marvin Lumber & Cedar Co.,* 359 F.3d 53, 56 (1st Cir. 2004); *see also Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

   The MANUAL sets forth several elements of the "proper" content of notice. If those requirements are met, a notice satisfies Fed. R. Civ. P. 23(c)(2), Fed. R. Civ. P. 23(e) and due process, and binds all members of the Class. The Notice must:

   1. Describe the essential terms of the Settlement;

   2. Disclose any special benefits or incentives to the Class Representatives;

   3. Provide information regarding attorneys' fees;

4. Indicate the time and place of the hearing to consider approval of the

Settlement, and the method for objection to and/or opting out of the Settlement;

5. Explain the procedures for allocating and distributing Settlement funds; and

6. Prominently display the address of Class counsel and the procedure for

making inquiries.

MANUAL, ¶ 30.212 (3d ed. 1995); *see also*, *e.g.*, *Air Lines Stewards & Stewardesses Ass'n Local 550 v. American Airlines, Inc.*, 455 F.2d 101, 108 (7th Cir. 1972) (notice that provided summary of proceedings to date, notified of significance of judicial approval of settlement and informed of opportunity to object at the hearing satisfied due process).

The Class has drafted two forms of notice to provide the class members. Exs. 4-5, Albert Decl. The long-form notice contains all the foregoing requirements. Ex. 4, Albert Decl. The short form notice can be fit onto a postcard, which directs the reader to a website containing the long-form notice, "reedheinclass.com." Exs. 5-6, Albert Decl.

Plaintiff's counsel wants to hire Simpluris Inc. to help provide notice to the Class members. Albert Decl., ¶57. Simpluris Inc., is a class action administration firm. Simpluris proposes sending short-form notice mailers to customers, which directs them to a website containing the long-form notice. *Id.* Then they assess number of "undeliverables," use skip-tracing to find the new mailing addresses for those individuals, and "remail" the customers at the new address. *Id.* For those customers who cannot be remailed, the administrator locates email addresses and sends the notice again *via* email. Simpluris Inc.'s approach has been approved in the following cases: *Carroll, et al. v. Flexsteel Industries, Inc., et al.*, U.S. District Court, Northern District of Iowa, 2:21-CV-01005; *Rodriguez, et al. v. Cascade Collections*, U.S. District Court, District of Utah, 2:20-CV-00120; *Aceves, et al. v. Autozone, Inc.*, U.S.

District Court, Central District of California, 5:14-CV-02032, *Mendoza, et al. v. Aldi, Inc., et al.*, California Superior Court, Los Angeles Division, 19STCV21190 *McKillips, et al. v. City of Atlanta*, Georgia Superior Court, Fulton County, 2019CV322978.

**Two-Step Process:**

Since the settlement agreement transfers no money, the Plaintiffs respectfully requests that the Court allow Plaintiff's counsel to provide notice to Class members electronically before paying Simpluris to contact the remainder. In addition to being more cost-effective, the Class argues that email notification is more efficient because email addresses have proven more static than mailing addresses for Reed Hein customers, and Reed Hein has maintained email addresses for every customer. Albert Decl., ¶55.

Plaintiff proposes the following: within two weeks of the date of the Court's order directing notice, Class Counsel will send an email to each Reed Hein customer using the email addresses Reed Hein maintained for each client. Ex. 3, Albert Decl. The email will contain the full long-form notice and a link to a website, *reedheinclass.com*, for more information. *Id*. The website will contain links to another long-form notice, as well as a Frequently Asked Questions section, a copy of the complaint, and a copy of the class certification order.[1] Ex. 6, Albert Decl.; *See also* Ex. 4. The website, *reedheinclass.com*, will also inform each customer how to opt out of the class or lodge objections to the settlement. Each email will contain a "cookie" that will inform the sender whether the reader opened the email, as well as whether the recipient also clicked the link to visit the website. Albert Decl., ¶55. Class counsel will preserve all that metadata for the class-action administrator and the Court.

---

[1] *See* reedheinclass.com;

**MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT - 18 2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Plaintiff requests to retain the services of Simpluris, Inc. *after* assessing how many customers remain who did not receive electronic notice. Ex. 7, Albert Decl. Simpluris estimates the cost of providing notice to customers will be approximately one dollar per customer. *Id.* at 2. Included in that plan is a short-form notice sent to customers via postcard, skip-tracing for the approximate 10% of undeliverable postcards, and "remail" of notice to the skip-traced customers. *Id.* Simpluris estimates that skip-tracing is successful for 75% of customers. *Id.* Simpluris will then send new emails to the remaining customers.

One month after initially sending notice, Plaintiff will update the Court regarding how many customers did not receive letters or emails.

**One-Step Process:**

If the Court does not approve the more cost-effective two-step process, the Class respectfully requests the Court order that Simpluris serve all notice at the approximate rate of one dollar per customer. Simpluris anticipates that 10% of mailed notices will be undeliverable. *Id.* It estimates that 75% of those undeliverable addresses will be found through skip-tracing. It will then re-mail the postcards to the 75% of mailing addresses found. Then, it will send an email to the remainder, skip-trace email addresses that are not deliverable (estimated 70%), and re-email those notices to the new addresses. *Id.*

One month after initially sending notice, Plaintiff will update the Court regarding how many customers did not receive letters or emails.

**c. The Court Should Set Settlement Deadlines and Schedule a Fairness Hearing**

In connection with preliminary approval of the Settlement, the Court must set a final approval hearing date, dates for mailing the Notices, and deadlines for objecting to the

Settlement and filing papers in support of the Settlement. Plaintiffs propose the following schedule, which the parties believe will provide ample time and opportunity for Class Members to decide whether to request exclusion or object. The proposed schedule assumes that the Court timely approves the Settlement on a preliminary basis and approves the two-step notice process.

1.  Website: the website is already running at reedheinclass.com;

2.  Email Notice: the email notices shall be sent no later than fourteen days after the date of the order directing notice;

3.  Mail Notice: mail notice will be sent within 28 days of sending email notice;

4.  Report to Court: within 28 days of sending mail notice, Class Counsel will report back to the Court about the number of notice that have not been delivered;

5.  Fairness Hearing: Plaintiff respectfully requests that the Court schedule a fairness hearing to hear all objections to the proposal on or after March 1, 2023.

## V.    CONCLUSION

The Class respectfully requests the foregoing forms of relief: 1) preliminary approval of a settlement agreement containing no obvious defects, 2) the two-step or one-step process for serving notice to customers, and 3) a fairness hearing set on or after February 14, 2023.

**MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 20
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

1

2

3            DATED this 2nd day of December, 2022.

4

5            _____
             Gregory Albert, WSBA No. 42673
6            Albert Law PLLC
             3131 Western Ave, Ste 410
7            Seattle, WA 98121
             greg@albertlawpllc.com
8            (206) 576-8044
             *Attorney for Plaintiffs*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MOTION FOR PRELIMINARY APPROVAL OF**              ALBERT LAW PLLC
**CLASS ACTION SETTLEMENT - 21**                   3131 Western Avenue, Suite 410
**2:21-cv-01378-BJR**                                   Seattle, WA  98121
                                                   Phone: (206) 576-8044

**CERTIFICATE OF SERVICE**

The undersigned certifies under penalty of perjury under the laws of the State of Washington that, on the below date, I caused the foregoing document to be delivered to:

**TO:**        **Brandon Reed, Reed Hein & Associates, LLC, and Makaymax, Inc.**

c/o Daniel J. Bugbee
DBS Law
155 NE 100th St Ste 205
Seattle, WA 98125
(206) 489-3802
dbugbee@lawdbs.com
*Attorney for Defendant Brandon Reed*

c/o Steven W. Fogg
Jack M. Lovejoy
John T. Bender
Maia R. Robbins
Corr Cronin LLP
1015 Second Ave., Floor 10
Seattle, WA 98104
206-625-8600
jlovejoy@corrcronin.com
*Attorney for Defendants Reed Hein & Associates, LLC, and Makaymax, Inc.*

**Method(s) of Service:**

☐ Electronic Mail          ☐ U.S. Mail          ☐ Personal Service/ Messenger

☒ E-Service          ☐ Facsimile Transmission          ☐ Other:_____

Notes:

Service through ECF system

Dated this day, December 5, 2022 at Seattle, Washington.

Gregory Albert
Albert Law PLLC

**MOTION FOR PRELIMINARY APPROVAL OF
CLASS ACTION SETTLEMENT - 22
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

# EXHIBIT 24-1

HON. BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIAN ADOLPH, individually and on behalf
of all others similarly situated; KERRI
ADOLPH, individually and on behalf of all
others similarly situated;

     Plaintiff,

v.

REEDHEIN & ASSOCIATES d/b/a
TIMESHARE EXIT TEAM; MAKAYMAX
INC.; HEIN & SONS INDUSTRIES, INC.;
BRANDON REED, individually; and
TREVOR HEIN, individually,

     Defendants.

Case No. 2:21-cv-01378-BJR

[PROPOSED] ORDER GRANTING
PRELIMINARY APPROVAL OF
THE CLASS SETTLEMENT

WHEREAS, this matter has come before the Court pursuant to *Plaintiffs' Motion for Preliminary Approval of Class Settlement* (the "Motion");

WHEREAS, the Court finds that it has jurisdiction over the Actions and each of the parties for purposes of settlement and asserts jurisdiction over the Class Members for purposes of effectuating this settlement and releasing their claims; and

[PROPOSED] ORDER GRANTING PRELIMINARY   1
APPROVAL OF THE CLASS SETTLEMENT
Case No. 2:21-cv-01378-BJR

WHEREAS, this Court has considered all of the submissions related to the Motion and is otherwise fully advised;

IT IS HEREBY ORDERED AS FOLLOWS:

## PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

1. The terms of the Settlement Agreement dated April 12, 2022, attached to the Motion as Exhibit 1, are preliminary approved as fair, reasonable and adequate, are sufficient to warrant sending notice to the Class, do not improperly grant preferential treatment to any class members, and are subject to further consideration thereof at the Fairness Hearing referenced below. This Order incorporates herein the Agreement. Unless otherwise provided herein, the terms defined in the Agreement shall have the same meaning in this Order. The Agreement was entered into after extensive arm's length negotiations by experienced counsel. In making this determination, the Court has considered the current posture of this litigation and the risks and benefits to the Parties involved in both settlement of these claims and continuation of the litigation.

## NOTICE TO CLASS MEMBERS

2. The Court has considered the Class Notice attached as Exhibit 4 and 5 to the Declaration of Gregory W. Albert, and finds that the Class Notice and methodology as described in the Motion (a) meet the requirements of due process and Fed. R. Civ. P. 23(c) and (e); (b) constitutes the best notice practicable under the circumstances to all persons entitled to notice, and (c) satisfies the Constitutional requirements regarding notice. In addition, the forms of notice (a) apprise Class Members of the pendency of the Action, the terms of the proposed settlement, their rights and deadlines under the Settlement; (b) are written in simple terminology; (c) are readily understandable by Class Members; and (d) comply with the Federal Judicial Center's illustrative class action notices.

3. The Court approves the two-step process for providing notice identified in the Classes' motion. Class Counsel shall disseminate long-form notice to all Class Members by email within fourteen (14) days of the issuance of this Order. The emails sent to Class Members shall contain the full long-form notice and a link to the website, reedheinclass.com. Class Counsel shall preserve metadata showing which emails were opened for the Settlement Administrator and the Court. Within twenty-eight (28) days of sending the aforementioned emails, Class Counsel shall provide the names, email addresses, and mailing addresses of all Class Members who did not open their emails.

4. The Court appoints Simpluris, Inc. as Settlement Administrator. The Settlement Administrator shall follow the plan identified in Exhibit 7, Albert Declaration. After being provided the names and contact information for Class Members who did not open their emails, Simpluris shall mail the short-form notice via postcard to the remaining Class Members who did not receive notice of the Class Action. For all undeliverable postcards, the Settlement Administrator shall perform a skip-trace for those undeliverable addresses and remail the short-form notice to those skip-traced addresses.

5. Not later than 10 days before the date of the Fairness Hearing, the Class Action Settlement Administrator shall file with the Court (a) a list of those person who have opted out or excluded themselves from the Settlement; (b) the details outlining the scope, methods and results of the Class Notice.

## REQUEST FOR EXLCUSION FROM THE CLASS

6. Class Members who wish to be excluded from the Class must mail a written request for exclusion to the Class Action Settlement Administrator postmarked no later than 30 days prior to the Fairness Hearing. Any request for exclusion must be signed by the potential

[PROPOSED] ORDER GRANTING PRELIMINARY    3
APPROVAL OF THE CLASS SETTLEMENT
Case No. 2:21-cv-01378-BJR

Class Member and contain the following information: name, address, and telephone number of the Class Member.

7.   Potential Class Members who timely and validly exclude themselves from the Class shall not be bound by the Agreement, the Settlement, or the Final Order and Final Judgment. If a potential Class Member files a request for exclusion, they may not assert an objection to the Settlement. The Class Action Settlement Administrator shall provide copies of any request for exclusion to Class Counsel and Defendant's Counsel within 10 days of receipt of any such request for exclusion.

8.   Any potential Class Member that does not properly and timely exclude themselves from the Class shall remain a Class Member and shall be bound by all the terms and provisions of the Settlement and the Final Order and Final Judgment, whether or not such Class Member objected to the Settlement or submits a Claim Form(s).

## OBJECTIONS

9.   Any Class Member who has not requested exclusion and who wishes to object to the Settlement must deliver to Class Counsel and Reed Hein's counsel, identified below, a written statement of his/her/its objection. The objection must be postmarked no later than 30 days prior to the Fairness Hearing. To be considered by the Court, any objection must be in writing and include the following information: a statement of objection to the settlement in *Brian Adolph et al. v. Reed Hein & Associates et al.*, Case No. 2:21-cv-01378-BJR; the name, address, and telephone number of the objecting Class member; the specific reasons why the Class member objects to the settlement (including any legal support); any evidence or other information the objecting Class Member intends to rely on; a statement whether the objecting Class Member intends to appear at the Fairness

Hearing; and the Class Member's signature. No objection that fails to satisfy these requirements and any other requirements found in the Notice shall be considered by the Court.

| Class Counsel | Reed Hein's Counsel | Court Clerk |
|---|---|---|
| Gregory W. Albert<br>Albert Law PLLC<br>3131 Western Ave, Ste 410<br>Seattle, WA 98121 | Jack Lovejoy<br>Corr Cronin LLP<br>1015 Second Ave., Fl. 10<br>Seattle, WA 98104 | U.S. District Court<br>Clerk's Office<br>700 Stewart St., Ste. 2310<br>Seattle, WA 98101 |

**FAIRNESS HEARING**

10. The Fairness Hearing will be held on _____ before this Court, at the United States District Court, Western District of Washington, 700 Stewart Street, Seattle, WA 98101, to consider whether the Settlement should be finally approved as fair, reasonable, and adequate.

11. On or before _____, Class Counsel shall file with the Court any memoranda or other materials in support of final approval of the Settlement.

12. Any Class Member who has not excluded themselves from the Class may appear at the Fairness Hearing in person or by counsel (at their own expense) and may be heard, to the extend allowed by the Court, either in support of or in opposition to the Settlement. However, no Class Member shall be heard at the Fairness Hearing unless such person files a "Notice of Intent to Appear in *Brian Adolph et al. v. Reed Hein & Associates et al.*, Case No. 2:21-cv-01378-BJR" with the Clerk of Court on or before _____ and delivers the same to Class Counsel and Defendants' counsel so that it is received by _____. In the notice, the Class Member must include their name, address, telephone

[PROPOSED] ORDER GRANTING PRELIMINARY   5
APPROVAL OF THE CLASS SETTLEMENT
Case No. 2:21-cv-01378-BJR

number, and a signature. Class Members who intend to object at the Fairness Hearing must also have followed the procedure for objection in writing as set in Paragraph 9 of this Order.

13. The date and time of the Fairness Hearing shall be subject to adjournment by the Court without further notice to the Class Members other than that which may be posted at the Court or on the Court's website.

14. Any Class Member may hire an attorney at their own expense to appear in the action. Such attorney shall serve a Notice of Appearance on Class Counsel so that it is received on or before _____ and file it with the Court within ten days of service on Class Counsel.

15. Upon final approval of the Settlement, all Class Members who do not timely and validly exclude themselves from the Class shall be forever enjoined and barred from asserting any of the matters, claims or causes of action released pursuant to the Agreement against any of the Released Parties, and any such Class Member shall be deemed to have forever released any and all such matters, claims, and causes of action as provided for in the Agreement.

**CONFIDENTIALITY**

16. Any information received by the Class Action Settlement Administrator or any other person in connection with the Settlement that pertains to personal information regarding a particular Class Member (other than objections or requests for exclusion) shall not be disclosed to any other person or entity other than Class Counsel, Defendants, Defendants' Counsel, the Court, and as otherwise provided in the Agreement.

**OTHER PROVISIONS**

17. The Parties are authorized to take all necessary and appropriate steps to establish the means necessary to implement the Agreement, including modifying the notice to better conform with this order, if necessary.

18. The deadlines set forth in this Order, including, but not limited to, adjourning the Fairness Hearing, may be extended by Order of the Court, for good cause shown, without further notice to the Class members – except that notice of any such extensions shall be included on the Settlement website *reedheinclass.com*.

19. Class Counsel and Reed Hein's counsel are hereby authorized to use all reasonable procedures in connection with approval and administration of the Settlement that are not materially inconsistent with this Order of the Agreement.

20. This Court shall maintain continuing jurisdiction over these settlement proceedings to assure the effectuation thereof for the benefit of the Class.


SO ORDERED this ___ day of _____, 2022.


_____

Honorable Barbara Rothstein
Judge of the United States District Court

1

2

3

4

5    Approved as to form:

6    ____/s/ Gregory Albert_____
     Gregory Albert, WSBA No. 42673
7    Albert Law PLLC
     3131 Western Ave, Ste 410
8    Seattle, WA 98121
     greg@albertlawpllc.com
9    (206) 576-8044
     *Attorney for Class*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 25**

HON. BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIAN ADOLPH, individually and on behalf
of all others similarly situated; KERRI
ADOLPH, individually and on behalf of all
others similarly situated;

     Plaintiff,

v.

REEDHEIN & ASSOCIATES d/b/a
TIMESHARE EXIT TEAM; MAKAYMAX
INC.; HEIN & SONS INDUSTRIES, INC.;
BRANDON REED, individually; and
TREVOR HEIN, individually,

     Defendants.

Case No. 2:21-cv-01378-BJR

DECLARATION OF
GREGORY ALBERT IN SUPPORT
OF MOTION FOR PRELIMINARY
SETTLEMENT APPROVAL

     My name is Gregory W. Albert. My Washington State Bar Association number is 42573. I am over the age of eighteen years and make this declaration under penalty of perjury.

DECLARATION OF GREGORY ALBERT        1

Case No. 2:21-cv-01378-BJR

**Attachments**

1. Attached as Exhibit 1 is the April 11, 2022 Settlement Agreement.

2. Attached as Exhibit 2 is the Proposed Covenant Judgment.

3. Attached as Exhibit 3 is the Proposed Email Notification.

4. Attached as Exhibit 4 is the Proposed Long-Form Notice.

5. Attached as Exhibit 5 is the Proposed Short-Form Notice.

6. Attached as Exhibit 6 is a screenshot from *ReedHeinClass.com*.

7. Attached as Exhibit 7 is a proposal from Simpluris, Inc.

8. Attached as Exhibit 8 is deposition testimony from Trevor Hein stating that Hein & Sons received $10,000,000 from Reed Hein it never repaid.

9. Attached as Exhibit 9 is QBE's Claims-Made Insurance Policy.

10. Attached as Exhibit 10 is QBE's October 19, 2021 response to Reed Hein's October tender.

11. Attached as Exhibit 11 is Reed Hein's second tender to QBE, sent on December 1, 2021.

12. Attached as Exhibit 12 is Panda Kroll's email following up with QBE.

13. Attached as Exhibit 13 is QBE's first follow-up email sent on September 2, 2022.

14. Attached as Exhibit 14 is QBE's September 22, 2022 letter stating that it would provide a defense for Reed Hein because it discovered one of the exemptions was excluded from the policy.

15. Attached as Exhibit 15 is RSUI's D&O policy with Reed Hein.

16. Attached as Exhibit 16 is RSUI's denial letter for the *Siegrist* and *Isaacs* complaints.

17. Attached as Exhibit 16 is RSUI's denial letter for the *Siegrist* and *Isaacs* tenders.

18. Attached as Exhibit 17 is RSUI's January 4, 2022 letter denying a defense for the *Adolph* case.

DECLARATION OF GREGORY ALBERT          2

Case No. 2:21-cv-01378-BJR

19. Attached as Exhibit 18 is a compilation of thirteen arbitration awards issued against Reed Hein.

## Litigation and Negotiation History

20. I represent proposed class representative Brian Adolph in the above-entitled litigation ("this case"). The Defendants are Reed Hein, Brandon Reed, and Makaymax. Hein & Sons and Trevor Hein were dismissed from the suit.

21. On August 2, 2021, I filed a demand for arbitration with the American Arbitration Association on behalf of Mr. Adolph. Shortly thereafter, the AAA notified me that Reed Hein would not pay the arbitration fee. On October 9, 2021, Mr. Adolph and I filed a complaint in the above-named case in lieu of arbitration. On January 13, 2022, my office sent Reed Hein and Brandon Reed nineteen interrogatories and fifteen requests for production, seeking tens of thousands of pages of documents to supplement the documents we already obtained through arbitrations. On February 14, 2022, Reed Hein began producing responses and responsive documents, which amounted to more than 454 megabytes of documents, including lists of each Reed Hein customer, associated data, and the amount that each customer paid.

22. On November 23, 2021, the parties mediated a resolution of the claims in this case with Washington State Superior Court Judge (ret.) Laura Inveen at Hilyer Dispute Resolution. During that negotiation, counsel for both sides discussed terms that were ultimately included in the CR2A agreement the parties signed on April 11, 2022 ("the CR2A agreement"). **Attached as Exhibit 1** is that agreement. The parties adjourned the mediation session with the understanding that Judge Inveen would continue to

DECLARATION OF GREGORY ALBERT          3

Case No. 2:21-cv-01378-BJR

mediate the case over the phone and the parties would continue to negotiate a resolution to the claims. I do not remember precisely when the viability of an insurance bad faith claim arose, but I remember the parties discussed, over a phone call brokered by Judge Inveen, Reed Hein assigning those claims to the class as a settlement term.

23.  Counsel for Reed Hein and Brandon Reed have shown me Brandon Reed's and Reed Hein's finances on several occasions. All those disclosures have been consistent. As Brandon Reed claims in his declaration, Reed Hein appears to be insolvent and will never again be a going concern. Reed Decl., ¶4. The disclosures I have seen show that Brandon Reed sold fifty percent of Happy Hour Media Group LLC to another party, ostensibly to fund the payment required by the September 21, 2021 consent decree in the State of Washington's case against Reed Hein. The disclosures showed that Mr. Reed has a fifty percent interest in Happy Hour Media Group LLC, which has $1,489,966.90 in equity and $1,624,028 in debt. Mr. Reed's disclosures also stated that he owns an account receivable from Trevor Hein of greater than $623,730 which Mr. Reed is legally entitled to collect on. However, Mr. Reed's counsel informed me that Mr. Reed attempted to collect on that account in order to pay the State of Washington, but was unable to get Mr. Hein to pay that money.

24.  Based on what I have seen and the following analysis, the terms of the CR2A agreement have much more value than continuing to litigate against Brandon Reed and Reed Hein. The proposed class has greater than 34,000 members, each of whom spent between $4,000 and $72,000 on Reed Hein's illusory services. Even without litigation costs and the costs of administering settlement distributions, Mr. Reed's account receivable of $623,730 spread across a 34,000-member class amounts an average of $18.35 per customer before deducting attorney fees, costs, and class action administration.

DECLARATION OF GREGORY ALBERT          4

Case No. 2:21-cv-01378-BJR

25. In contrast, the settlement agreement assigns the following to the proposed class:

a.   Two viable insurance bad faith claims, each potentially worth greater than $600m (Ex. 1, Section II(4));

b.   All claims Brandon Reed and Reed Hein have against the law firms of Mitchell Sussman and Kenneth Privett (Ex. 1, Section II(7));

c.   All claims Brandon Reed and Reed Hein have against Trevor Hein, Hein & Sons, and any entity owned in which Trevor Hein has any interest (Ex. 1, Section II(6);

d.   All claims against Ardent Law Group, potentially worth $8,000,000 (Ex. 1, Section II(8));

e.   All claims against any timeshare company (Ex. 1, Section II(10));

f.   All legal malpractice claims against any attorney representing Reed Hein (Ex. 1. Section (II)(7);

g.   Furthermore, the settlement agreement provides a variety of stipulations that will assist the same class in recovering its losses through other suits against well-funded parties:

   i.   Waiver of all privileged communications with Mitchell Sussman, Kenneth Privett, and Ardent Law Group (Ex. 1 Section II(7));

ii.   Waiver of all privileged communications with Reed Hein's Counsel in cases brought by the Timeshare Companies in the United States District Court for the Middle District of Florida (Ex. 1, Section. 15);

iii.   Release of a document drafted by Reed Hein's counsel and presented to Plaintiff's counsel during mediation outlining Reed Hein's approximately $8,000,000 claim against Ardent Law Group (Ex. 1. Section II(9));

iv.   Testimony from Brandon Reed stating that Ardent Law Group induced their reliance by making promises it had no intention of keeping (Ex. 1., Section II(9));

v.   Stipulations and testimony from Brandon Reed supporting each CR 11-qualified theory raised by the Plaintiffs (Ex. 1., Section II(12);

vi.   A stipulation to each theory of liability identified in the complaint (Ex. 1, Section II(14);

vii.   A declaration identifying each customer and their contact information (Ex. 1, Section II(2);

h.   Finally, the CR2A Agreement stipulates to any motion necessary to facilitate the settlement, class certification, settlement approval and a covenant judgment.

**Analysis of the Value of the Settlement Terms**

26. The foregoing terms of the CR2A agreement provide value to the proposed class that continued litigation does not for the following reasons:

    **a. Insurance Bad Faith Claim Against QBE:**

        i.    Based on the discovery responses provided to me, Reed Hein had a commercial insurance policy with QBE insurance company covering Reed Hein on a claims-made basis for claims made between May 16, 2021 and May 16, 2022. **Attached as Exhibit 9** is the insurance policy. Reed Hein tendered the complaint in this case to QBE in mid-October, 2021. On October 19, 2021, QBE sent an email to Panda Kroll, general counsel for Reed Hein, acknowledging the tender and stating that it was "undertaking a coverage investigation to see if the general liability policy for Reed Hein will trigger a duty to defend or provide indemnity coverage." **Attached as Exhibit 10** is that October 19, 2021 email. It is undisputed that Ms. Kroll did not hear back.

        ii.    Based on the discovery responses provided to me, on December 1, 2021, Reed Hein tendered the Complaint to QBE again through its insurance broker. **Attached as Exhibit 11** is that email. It is undisputed Ms. Kroll did not hear back. On December 9, 2021, Ms. Kroll wrote to QBE asking, "[c]an you please confirm that you are also completing QBE's coverage review for the civil suit, *Adolph v. Reed Hein & Associates LLC*?" **Attached as Exhibit 12** is that email. QBE responded the same day, stating, "Panda, QBE is reviewing coverage for Adolph v. Reed Hein." *Id*. It is undisputed that Ms. Kroll did not hear back.

DECLARATION OF GREGORY ALBERT      7

Case No. 2:21-cv-01378-BJR

iii.   On April 11, 2021, after months of mediation and negotiation the parties executed a CR2A agreement stating that Reed Hein would execute a judgment with a covenant not to execute in exchange for all bad faith claims Reed Hein had against any insurer.

iv.   Reed Hein and Ms. Kroll did not hear back from QBE until September 2, 2022, in which QBE wrote, "Hi Panda, Do you have time for a call this week? Let me know when's best for you." **Attached as Exhibit 13** is that email.

v.   On September 22, 2022, QBE finally sent a letter stating that it would provide a defense for the Adolph claims. **Attached as Exhibit 14** is that letter. In that letter, QBE seemed to say it was defending the case because an exclusion that was inadvertently left out of the policy opened the possibility that that would have otherwise defeated coverage, "[a]lthough we believe that coverage also was not intended to be provided under the 2021-22 Primary Policy because an exclusion appears to inadvertently have been left off that policy, we nevertheless will agree to defend Reed Hein in the Underlying Lawsuit…"

vi.   In *Rushforth Const. v Wesco Ins.*, 2018 WL 1610222 (W.D. Wash. 2018) (Coughenour, J.), the Western District of Washington found a delay of thirteen months between the time of tender and offer to defend under reservation of rights was bad faith as a matter of law. In *Truck Ins. v. Van Port, Inc.* 147 Wn.2d 751, 58 P.3d 276 (2002), the Washington State Supreme Court included the fact that an insurer waited a year from the time of tender to deny coverage in a finding of bad faith as a matter of law. *Truck Ins. Exch. v. Van Port, Inc.*, 147 Wn.2d 751, 764, 58 P.3d 276, 283 (2002).

DECLARATION OF GREGORY ALBERT          8

Case No. 2:21-cv-01378-BJR

vii.  In this case, QBE waited eleven months to initiate communications with Reed Hein, even though Reed Hein tendered the policy twice and followed up with QBE. QBE did not ask Reed Hein for more information, gather evidence or documents of any kind, or make its coverage determination—or even its defense determination—until Reed Hein was forced to sign a CR2A agreement for lack of defense. Based on Washington case law, I believe there is a strong possibility that coverage by estoppel would apply. If so, QBE could be liable for greater than $630,000,000 of damages, before additional trebling under Washington's Insurance Fair Conduct Act.

viii.  For those reasons, I assess that the possibility of obtaining an insurance bad faith award (and possibly a full recovery) against QBE is more valuable than trying to squeeze an insolvent company and a CEO whose remaining money would be spread between its lawyers, plaintiffs' lawyers, class action administrators, and the large class.

**b. Insurance Bad Faith Claim Against RSUI**

i.  Reed Hein had a D&O liability insurance policy held by RSUI covering "wrongful acts" on a claims-made basis from May 16, 2020 to May 16, 2022. **Attached as Exhibit 15** is a copy of that policy.

ii.  In order to understand the bad faith claim assigned to Adolph against RSUI it is important to understand two other cases. On April 15, 2021, counsel for Mr. Adolph filed two other actions against Reed Hein in Snohomish County Superior Court: *Isaacs v. Reed Hein,* Case No. 21-2-01761-31 and *Siegrist v.*

*Reed Hein*, Case No. 21-2-01757-31. Each case was removed to federal court and then remanded back to Washington State Superior Court. *See Gerald Siegrist et al. v. Reed Hein et al.,* W.D. Wash. Case No. C21-588 MJP, Dkt. No. 15 (consolidated with *Phillip Isaacs et al. v. Reed Hein et al.*, Case No. C21-589 MJP).

iii.    Reed Hein tendered the Siegrist and Isaacs claims to RSUI on August 19, 2021. On September 15, 2021, RSUI responded by stating that it would not indemnify nor defend Reed Hein under the policy because a) Reed Hein tendered the policy after the 60-day window to tender a new claim had already lapsed and b) the acts and omissions occurred before the policy period began, invoking a "Prior Acts Exclusion." RSUI was correct that both Siegrist and Isaacs had already been defrauded before the coverage period, having signed up with Reed Hein in 2015. **Attached as Exhibit 16** is RSUI's denial letter for the *Siegrist* and *Isaacs* complaints.

iv.    On October 9, 2021, Plaintiffs' counsel filed the instant Adolph case. Reed Hein tendered it to RSUI. Unlike Siegrist or Isaacs, Adolph signed up with Reed Hein during the coverage period and all the acts and omissions occurred during the coverage period. Also, unlike Siegrist and Isaacs, Reed Hein tendered the Adolph complaint within a week, on October 15, 2021.

v.    On January 4, 2022, RSUI responded with a letter merely stating that it was consolidating the Adolph claim with Siegrist and Isaacs and therefore denying Reed Hein a defense for the same reasons as those cases. **Attached as Exhibit 17** is a copy of that letter. However, Reed Hein met the 60-day tender

requirement in the Adolphs' case and the Adolphs' experience with Reed Hein occurred entirely during the coverage period.

vi.   The duty to defend is broader than the duty to indemnify. *Xia v. ProBuilders Specialty Ins. Co*., 188 Wn.2d 171, 182, 400 P.3d 1234, 1240 (2017). The duty of an insurer to indemnify exists only if the insurance policy actually covers the insured's liability, "whereas the duty to defend arises when a policy could *conceivably* cover allegations in the complaint." *Id.* (italics in original). "[I]f there is any reasonable interpretation of the facts or the law that could result in coverage, the insurer must defend." *Id.* Where coverage is debatable, an insurer may elect to file a declaratory judgment to seek a court determination as to whether the insured is entitled to coverage. *Mutual of Enumclaw Ins. Co. v. Dan Paulson Const., Inc*., 161 Wn.2d 903, 169 P.3d 1 (2007).

vii.  The only reasons RSUI provided for denying Reed Hein a defense in this case are (1) that it was consolidating the case with others in which Reed Hein had failed to tender within 60 days and (2) that all acts and omissions occurred before the policy period. In the Adolph case, neither of those apply. In order to prove the bad faith claim, we must prove that it was legally conceivable that the RSUI policy provided indemnification for the claims. In order to defend against the claim, RSUI would have to show it was *inconceivable* it had any duty to indemnify the loss.

viii. For those reasons, I assess that the possibility of obtaining an insurance bad faith award against RSUI, including a possible full recovery, is more valuable than trying to squeeze an insolvent company and a CEO whose remaining money

would be spread thin between its lawyers, Plaintiffs' lawyers, class action administrators, and the large class.

### c. Claims Against Mitchell Sussman and Kenneth Privett

i.  Mitchell Sussman and Kenneth Privett were Reed Hein "vendors" who promised to provide services for Reed Hein customers in exchange for compensation. Mitchell Sussman worked with Reed Hein from 2012 to 2015. During that time, Mr. Sussman deceived Reed Hein and its customers by claiming to have a proprietary process to rid customers of their timeshares. Mr. Sussman would then drag the customers through an extra-legal process and record unenforceable deeds to make the customers and Reed Hein believe that he was providing legal services. Mr. Sussman's methods were found to be unfair and deceptive trade practices by the United States District Court for the Middle District of Florida. *Westgate Resorts, Ltd. et al. v. Mitchell Reed Sussman et al.*, Case No. 6:17-cv-1467-Orl-37DCI (M.D Fla.), Dkt. No. 230. Mr. Sussman executed a contract explicitly stating that Reed Hein was his client, so suing Mr. Sussman under Reed Hein's rights might be more fruitful than suing him on behalf of the affected class. After Mr. Sussman's relationship with Reed Hein ended, Kenneth Privett replaced him as one of Reed Hein's counsel and adopted his tactics.

ii.  Value: I am not yet able to calculate the value of the Sussman and Privett claims. Reed Hein no longer has staff who can research the payments made and no longer has paid counsel to respond to discovery. However, I know each vendor serviced hundreds, if not thousands, of clients. Reed Hein paid Mr. Sussman $500 for each customer who did not have a mortgage with their timeshare

company, $1000 for each customer who did have a mortgage that was less than $10,000, and 10% of the mortgage amount for each customer with a mortgage over $10,000. It paid Kenneth Privett a flat fee of $1,200 for each customer exited.

**d.  Claims Against Trevor Hein and Hein & Sons**

i.   Trevor Hein took approximately $10,000,000 from Reed Hein in what he subsequently characterized under oath as a "loan." During a January 26, 2021 deposition of Trevor Hein in the case *State of Washington v. Reed Hein et al.*, the State asked Trevor Hein "How much money was recharacterized as a loan for you?" Ex. 8 at 254:22. Trevor Hein responded that "It was about $10 million." *Id.* at 254:23. The State further inquired whether he had ever repaid the loan, to which Mr. Hein stated "no." *Id.* at 254:24-25. Mr. Hein testified in January 2021 that he did not see it as a loan because it was a distribution. However, he acquiesced in Reed Hein categorizing it as a "loan," and received the money through Hein & Sons, which has no distribution rights. After extensive negotiations between Reed Hein and Trevor Hein, it is clear that Trevor Hein has no intention of paying back the money and Reed Hein is too insolvent to prosecute claims against him. Instead, class counsel can prosecute claims against him on behalf of Reed Hein, which would have an ultimate value greater than Brandon Reed and Reed Hein's current net worth.

**e.  Claims Against Ardent Law Group**

i.   Ardent Law Group is the last vendor to work with Reed Hein. Under the terms of the CR2A agreement, Reed Hein's CEO will testify the owner of Ardent told him that he was going to help Reed Hein discharge its duties to customers by

filing a mass-action lawsuit naming them as plaintiffs in exchange for payment. The CEO will testify that he paid Ardent $8,000,000 to do that. I have spent considerable time observing Ardent, representing former Ardent clients, and reading its employees' deposition transcripts. Based on my experience with Ardent, I believe there was never a plan to file a mass-action lawsuit, nor did it ever file such a suit. I believe the principals of Ardent essentially schemed to take Reed Hein's last $8,000,000 of customer money without any real plan to help the customers. Instead, it mostly wrote letters to timeshare companies asking for the clients to be released, most of which were ignored when the timeshare companies discovered its association with Reed Hein. It is my assessment that the claim for approximately $8,000,000 assigned to the class is more valuable than the economically-prohibitive amount I could obtain from a verdict against Reed Hein and Brandon Reed.

f. **Other Forms of Relief: Waivers, Testimony, Stipulations**

i. In addition to the foregoing, I assess that there is great value to the class in the other forms of relief requested. Although we are prosecuting this action against Reed Hein, we also plan to prosecute actions on behalf of class members against a variety of other actors with enough solvency to cover the value of the claims. Plaintiffs' litigation strategy against other entities are currently privileged work product. If the Court seeks further information on Plaintiffs' litigation strategy, Plaintiffs will submit to the Court a declaration ex-parte containing such information for the Court to read *in camera*. For that reason, Brandon Reed's cooperation and testimony regarding their behavior and promises is extremely valuable. Reed Hein has agreed to waive all privileged information maintained by its various attorneys over the years with the exception of communications

with Corr Cronin, LLP. Without giving away too much strategy, I assess Reed Hein's waiver of privilege will be very helpful in prosecuting actions *on behalf of the customers* against Kenneth Privett, Mitchell Sussman, and another well-financed organization.

ii.    Reed Hein's release of a document drafted to assess the value of claims against Ardent will not only be helpful in prosecuting Reed Hein's claim against Ardent, but will also help the class members' claims against Ardent. The testimony of Brandon Reed stating that Ardent Law Group induced his reliance by making claims it had no intention of keeping will also serve both sets of claims.

iii.   Finally, stipulation to all the claims made in the complaint, stipulation to every non-frivolous theory raised by the Class, and agreement to execute all motions necessary to secure settlement will not only facilitate resolution of this case, but will also serve as evidence in future cases against future defendants on behalf of the same class.

27. It is my sincere assessment that this agreement bears more value to the class than continuing to litigate against Reed Hein and Brandon Reed. There are two insurance bad faith claims with a potential value of greater-than $620,000,000, which could potentially be trebled by IFCA. Even a one-percent chance of recovery in either claim is more valuable than Reed Hein and Brandon Reed's net worth. The agreement also includes fraud and Consumer Protection Act claims against Ardent that I believe to be viable based on my extensive knowledge of Ardent. There are additional claims against Reed Hein's previous business associates and vendors with a more amorphous but

DECLARATION OF GREGORY ALBERT          15

Case No. 2:21-cv-01378-BJR

potentially greater value than the net value of Reed Hein and Brandon Reed. Finally, the CR2A agreement promises disclosures, testimony, and stipulations that, based on my extensive knowledge of the industry, that will help the class recover even more money from other actors.

## Damages Calculation

28. **Attached to this declaration as Exhibit 2** is a true and accurate copy of the Proposed Confession of Judgment and Covenant Not to Execute.

29. Based on documents provided to me in discovery, I calculate that Reed Hein owes damages — including treble damages under the Consumer Protection Act — to the class of Reed Hein customers in the amount of **$630,187,204**.

30. The Washington State Consumer Protection Act includes a cap on each class member's treble-damages award. The cap is $25,000.

31. A diligent search of Reed Hein's customer records and financial records has revealed the following:

    a. From the time of Reed Hein's founding through today, Reed Hein had a total of 34,636 customers.

    b. From the time of Reed Hein's founding through today, Reed Hein charged its customers fees that total $222,386,028.

32. Of Reed Hein's 34,636 customers, each of 32,675 customers paid a total fee of less than or equal to $12,500. Within this declaration, I describe the 32,675 customers as "lower-paying customers."

DECLARATION OF GREGORY ALBERT                16

Case No. 2:21-cv-01378-BJR

33. The 32,675 lower-paying customers paid fees to Reed Hein that total $183,061,076.

34. Of Reed Hein's 34,636 customers, each of 1,961 customers paid a total fee of more than $12,500. Within this declaration, I describe the 1,961 customers as "higher-paying customers."

35. The 1,961 higher-paying customers paid fees to Reed Hein that total $39,324,952.

36. From the time of Reed Hein's founding through today, Reed Hein has issued 596 refunds of fees paid by customers.

37. Of the 596 refunds, 584 refunds were in amounts less than $12,500. Within this declaration, I refer to the 584 refunds as "smaller refunds."

38. The 584 smaller refunds add up to $2,244,370.

39. Of the 596 refunds, 12 refunds were in amounts of more than $12,500. Within this declaration, I refer to the 12 refunds as "larger refunds."

40. The 12 larger refunds add up to $312,866.

41. To calculate the total damages that Reed Hein owes to the Class of Reed Hein customers, I made the following calculations:

    a.  I calculated the total pre-refund damages that Reed Hein owes to lower-paying customers. *See* Paragraph 42.

DECLARATION OF GREGORY ALBERT     17

Case No. 2:21-cv-01378-BJR

b.  I calculated the total pre-refund damages that Reed Hein owes to higher-paying customers. *See* Paragraph 43.

c.  I calculated the total pre-refund damages that Reed Hein owes to all Reed Hein customers. *See* Paragraph 44.

d.  I calculated the offset arising from the smaller refunds that Reed Hein has issued. *See* Paragraph 45.

e.  I calculated the offset arising from the larger refunds that Reed Hein has issued. *See* Paragraph 46.

f.  I calculated the offset arising from all refunds that Reed Hein has issued. *See* Paragraph 47.

g.  I calculated the total damages that Reed Hein owes to the class of Reed Hein customers. My calculation resulted in this figure: **$630,187,204**. *See* Paragraph 48.

42. I calculated the pre-refund damages that Reed Hein owes to lower-paying customers. I made the calculation as follows:

a.  32,675 lower-paying customers paid fees that total $183,061,076.

b.  I multiplied the total fees paid by lower-paying customers by three.

c.  I multiplied $183,061,076 by three. My calculation resulted in this figure: $549,183,228.

43. I calculated the pre-refund damages that Reed Hein owes to higher-paying customers. I made the calculation as follows:

a.  1,961 higher-paying customers paid fees that total $39,324,952.

b.  I multiplied the number of higher-paying customers by the Consumer Protection Act's statutory cap on treble damages.

c.  I multiplied 1,961 by $25,000, which yielded the following product: $49,025,000.

DECLARATION OF GREGORY ALBERT          18

Case No. 2:21-cv-01378-BJR

d.  I added the total fees paid by higher-paying customers and treble damages, capped at $25,000 per customer.

e.  I added $39,324,952 to $49,025,000. My calculation resulted in this figure: $88,349,952.

44. I calculated the total pre-refund damages that Reed Hein owes to all Reed Hein customers. I made the calculation as follows:

a.  I added total damages that Reed Hein owes to lower-paying customers, as described in Paragraph 42 and total damages that Reed Hein owes to higher-paying customers, as described in Paragraph 43.

b.  I added $549,183,228 and $88,349,952. My calculation resulted in this figure: $637,533,180.

45. I calculated the offset arising from smaller refunds. I made the calculation as follows:

a.  Reed Hein issued 584 smaller refunds, in the total amount of $2,244,370.

b.  I multiplied the total amount of the smaller refunds by three.

c.  I multiplied $2,244,370 by three. My calculation resulted in this figure: $6,733,110.

46. I calculated the offset arising from larger refunds. I made the calculation as follows:

a.  Reed Hein issued 12 larger refunds, in the total amount of $312,866.

b.  I multiplied the number of larger refunds, by the Consumer Protection Act's cap on treble damages.

c.  I multiplied 12 by $25,000, which resulted in a product of $300,000.

d.  I added $312,866 and $300,000. My calculation resulted in this figure: $612,866.

DECLARATION OF GREGORY ALBERT          19

Case No. 2:21-cv-01378-BJR

47. I calculated the offset arising from all refunds that Reed Hein has issued. I made the calculation as follows:

   a. I added the offset arising from smaller refunds, as described in Paragraph 45, and the offset arising from larger refunds, as described in Paragraph 46.

   b. I added $6,733,110 and $612,866. My calculation resulted in this figure: $7,345,976.

48. I calculated the total damages that Reed Hein owes to the class of Reed Hein customers. My calculation included treble damages under the Consumer Protection Act. My calculation also included an offset for refunds that Reed Hein has issued. I made the calculation as follows:

   a. I reduced the total pre-refund damages that Reed Hein owes to all Reed Hein customers, as described in Paragraph 44, by the offset arising from all refunds that Reed Hein has issued to customers, as described in Paragraph 47.

   b. I reduced $637,533,180 by $7,345,976. My calculation resulted in this figure: **$630,187,204**.

### Prior Litigation Against Reed Hein

49. On January 2020, Albert Law PLLC filed its first case against Reed Hein, *Gordon and Cheryl Edgin v. Reed Hein & Associates*, King County Superior Court Case No. 20-2-0029401. Reed Hein filed a motion to dismiss because of Reed Hein's inclusion of an arbitration agreement in its contract, and the Court dismissed the case without prejudice to refile with the American Arbitration Association. Due to the inclusion of an arbitration agreement in most of Reed Hein's customers' contracts, including the majority of our clients' contracts, our office primarily filed claims with the American Arbitration Association. By the time we filed the current lawsuit, our office had filed over forty arbitrations with the American Arbitration Association. Between January

DECLARATION OF GREGORY ALBERT          20

Case No. 2:21-cv-01378-BJR

2020 and February 2022, our office had brought fourteen arbitrations to evidentiary hearings and received successful final awards for thirteen of them. Our office had also settled twenty-five arbitration cases with Reed Hein. By October 2021, Reed Hein indicated they would no longer settle and ceased paying out on the arbitration awards issued against them.

50. Our office also filed two additional lawsuits against Reed Hein in Washington State Superior Court for two Reed Hein customers who did not sign arbitration agreements. *See Gerald Siegrist et al. v. Reed Hein & Associates et al.*, Snohomish County Superior Court Case No. 21-2-01757-31; *Phillip Isaacs et al. v. Reed Hein & Associates et al.*, Snohomish County Superior Court Case No. 21-2-01761-31. In each of those two cases, our office served on Reed Hein 22 interrogatories and 42 requests for production. Reed Hein provided Albert Law thousands of pages of discovery pursuant to those requests.

51. Our office has also made numerous requests under the Public Records Act for documents filed in *State v. Reed Hein & Associates et al.*, King County Superior Court Case No. 20-2-03141-1, resulting in production of over ten thousand pages of discovery. That discovery was in addition to the more limited discovery provided by Reed Hein pursuant to our arbitration cases and three depositions we performed pursuant to those arbitrations.

52. Our office has done considerable research on lawsuits filed against Reed Hein by timeshare companies. Those cases include *Diamond Resorts International, Inc. et al. v. Reed Hein & Associates et al.*, 2:17-cv-03007-APG-VCF (D. Nev. 2017), *Welk Resort Group, Inc. et al v. Reed Hein & Associates, LLC et al.*, 3:17-cv-01499-L-AGS (S.D. Cal. 2017), *Orange Lake Country Club, Inc. et al. v. Reed Hein & Associates, LLC et*

*al.*, 6:17-cv-01542-WWB-DCI (M.D. Fla. 2017), *Westgate Resort Ltd. et al. v. Reed Hein & Associates et al.*, 6:18-cv-01088-GAP-DCI (M.D. Fla. 2018), and *Wyndham Vacation Ownership, Inc. et al. v. Reed Hein & Associates, LLC et al.*, 6:18-cv-02171-GAP-DCI (M.D. Fla. 2018).

53. In addition to numerous other documents from those lawsuits located using PACER, our office has accumulated twelve transcripts of Reed Hein officers' depositions taken pursuant to the above referenced timeshare lawsuits. The length of those depositions were extensive, in total consisting of thousands of pages of deposition transcripts. The deponents were among Reed Hein's most knowledgeable and culpable, including CEO and founder of Reed Hein Brandon Reed, Reed Hein's former COO Thomas Parenteau, and Reed Hein's former Executive Vice President Scott Loughran. We have spent over one thousand dollars on PACER fees alone in order to accumulate those documents.

54. Since learning of Reed Hein's insolvency sometime around October 2021, numerous Reed Hein customers have contacted me seeking legal redress from Reed Hein. I have also contacted many of my current and previous clients who had claims against Reed Hein. Altogether members of my firm have spoken with over fifty Reed Hein customers about Reed Hein's insolvency and its inability to pay out refunds and honor awards issued against them. Most Reed Hein customers I have spoken with about Reed Hein's insolvency were not surprised by the discovery and have endorsed any course of action which could foreseeably lead to the recovery of at least some of their funds paid to Reed Hein.

**Notification to Class Members**

55. Reed Hein's customer relations management logs contained, among other things, the names, addresses, and emails of every Reed Hein customer. Reed Hein has provided Albert Law with that contact information, and Albert Law has the ability to contact every customer who shared their email or mailing address to Reed Hein. Our office has found that Reed Hein customers, as well as our clients generally, are more likely to move than change their email address, making an email address a more reliable form of contact than a mailing address.

56. Albert Law intends to notify the class by sending out an email to every Reed Hein customer with an email listed in the Reed Hein's customer relations management log. Each email will contain a file, known as a "cookie," that will be downloaded by the email recipient once they open the email. Albert Law will receive notification once this file is downloaded, which will indicate that the Reed Hein customer has received the email and opened it. Albert Law will also know if the user has clicked the link to the class action website. Any metadata received, such as notification that the user has opened the email or clicked on the link, will be preserved for the administrator or Court to access.

57. Albert Law wants to hire Simpluris, Inc. as the class action administrator. After sending the notification emails, the class action administrator Simpluris, Inc. will attempt to contact the remaining class members. Albert Law intends that Simpluris will physically mail each remaining class action member a copy of the short-form notice. Simpluris will then collect all undeliverable or returned mail, perform a search for the remaining class members' current address, and mail another short-form notice to the class members current address.

DECLARATION OF GREGORY ALBERT          23

Case No. 2:21-cv-01378-BJR

Signed this 2nd day of December, 2022 in Seattle, WA.

_____

Gregory W. Albert

**EXHIBIT 26**

DocuSign Envelope ID: 19288B79-1956-4649-8D81-D15CAAADE86D

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

| | |
|---|---|
| BRIAN ADOLPH, individually and on behalf of all others similarly situated; KERRI ADOLPH, individually and on behalf of all others similarly situated; | Case No. 2:21-cv-01378-BJR |
| Plaintiff, | DECLARATION OF BRANDON REED |
| v. | |
| REEDHEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM; MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually; and TREVOR HEIN, individually, | |
| Defendants. | |

11

12

13

14

15

16

17

18

19

20

I, Brandon Reed, hereby declare as follows:

21

   1.  I am over the age of 18 and competent to testify to the matters set forth herein. I

22

make this declaration based on my own personal knowledge. I am the Chief Executive Officer

23

of Reed Hein & Associates LLC dba Timeshare Exit Team ("Reed Hein").

24

   2.  The following comprise substantially all of my assets:

25

DECLARATION OF BRANDON REED - 1

a) A 50% ownership interest in Happy Hour Media Group LLC. A true and correct copy of a current balance sheet for this entity is attached as Exhibit A.

b) An ownership interest in Reed Hein. This company has no assets other than those assigned pursuant to my settlement with the Plaintiffs and has no remaining business activities.

c) Various ownership interests in other business entities that no longer have operations or material assets.

d) A Chase Bank account. The account balance is currently less than $10,000.00.

e) A Robin Hood brokerage account. The account balance is currently less than $500.00.

f) I have liquidated my 401(k) retirement account, and it has no remaining funds.

g) An overdue account receivable from a loan I made to a Canadian Company with a current balance of approximately $850,000.00 Canadian or $623,730.00 US.

h) The following vehicles: 1970 Ford F100, 2021 Ford Bronco.

i) I own no real estate.

*I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.*

Signed this 1st day of October, 2022 in Seattle, WA.



_____

Brandon Reed

DECLARATION OF BRANDON REED - 2

**EXHIBIT 27**

HON. BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIAN ADOLPH, individually and on behalf
of all others similarly situated; KERRI
ADOLPH, individually and on behalf of all
others similarly situated;

     Plaintiff,

v.

REEDHEIN & ASSOCIATES d/b/a
TIMESHARE EXIT TEAM; MAKAYMAX
INC.; HEIN & SONS INDUSTRIES, INC.;
BRANDON REED, individually; and
TREVOR HEIN, individually,

     Defendants.

Case No. 2:21-cv-01378-BJR

ORDER GRANTING
PRELIMINARY APPROVAL OF
THE CLASS SETTLEMENT

WHEREAS, this matter has come before the Court pursuant to *Plaintiffs' Motion for Preliminary Approval of Class Settlement* (the "Motion");

WHEREAS, the Court finds that it has jurisdiction over the Actions and each of the parties for purposes of settlement and asserts jurisdiction over the Class Members for purposes of effectuating this settlement and releasing their claims; and

WHEREAS, this Court has considered all of the submissions related to the Motion and

is otherwise fully advised;

    IT IS HEREBY ORDERED AS FOLLOWS:

### PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

1. The terms of the Settlement Agreement dated April 12, 2022, attached to the Motion as Exhibit 1, are preliminary approved as fair, reasonable and adequate, are sufficient to warrant sending notice to the Class, do not improperly grant preferential treatment to any class members, and are subject to further consideration thereof at the Fairness Hearing referenced below. This Order incorporates herein the Agreement. Unless otherwise provided herein, the terms defined in the Agreement shall have the same meaning in this Order. The Agreement was entered into after extensive arm's length negotiations by experienced counsel. In making this determination, the Court has considered the current posture of this litigation and the risks and benefits to the Parties involved in both settlement of these claims and continuation of the litigation.

### NOTICE TO CLASS MEMBERS

2. The Court has considered the Class Notice attached as Exhibit 4 and 5 to the Declaration of Gregory W. Albert, and finds that the Class Notice and methodology as described in the Motion (a) meet the requirements of due process and Fed. R. Civ. P. 23(c) and (e); (b) constitutes the best notice practicable under the circumstances to all persons entitled to notice, and (c) satisfies the Constitutional requirements regarding notice. In addition, the forms of notice (a) apprise Class Members of the pendency of the Action, the terms of the proposed settlement, their rights and deadlines under the Settlement; (b) are written in simple terminology; (c) are readily understandable by Class Members; and (d) comply with the Federal Judicial Center's illustrative class action notices.

3. The Court approves the two-step process for providing notice identified in the Classes' motion. Class Counsel shall disseminate long-form notice to all Class Members by email

within fourteen (14) days of the issuance of this Order. The emails sent to Class Members shall contain the full long-form notice and a link to the website, reedheinclass.com. Class Counsel shall preserve metadata showing which emails were opened for the Settlement Administrator and the Court. Within twenty-eight (28) days of sending the aforementioned emails, Class Counsel shall provide the names, email addresses, and mailing addresses of all Class Members who did not open their emails.

4. The Court appoints Simpluris, Inc. as Settlement Administrator. The Settlement Administrator shall follow the plan identified in Exhibit 7, Albert Declaration. After being provided the names and contact information for Class Members who did not open their emails, Simpluris shall mail the short-form notice via postcard to the remaining Class Members who did not receive notice of the Class Action. For all undeliverable postcards, the Settlement Administrator shall perform a skip-trace for those undeliverable addresses and remail the short-form notice to those skip-traced addresses.

5. Not later than 10 days before the date of the Fairness Hearing, the Class Action Settlement Administrator shall file with the Court (a) a list of those person who have opted out or excluded themselves from the Settlement; (b) the details outlining the scope, methods and results of the Class Notice.

## REQUEST FOR EXLCUSION FROM THE CLASS

6. Class Members who wish to be excluded from the Class must mail a written request for exclusion to the Class Action Settlement Administrator postmarked no later than 30 days prior to the Fairness Hearing. Any request for exclusion must be signed by the potential Class Member and contain the following information: name, address, and telephone number of the Class Member.

7. Potential Class Members who timely and validly exclude themselves from the Class shall not be bound by the Agreement, the Settlement, or the Final Order and Final Judgment. If a potential Class Member files a request for exclusion, they may not assert an objection

to the Settlement. The Class Action Settlement Administrator shall provide copies of any request for exclusion to Class Counsel and Defendant's Counsel within 10 days of receipt of any such request for exclusion.

8. Any potential Class Member that does not properly and timely exclude themselves from the Class shall remain a Class Member and shall be bound by all the terms and provisions of the Settlement and the Final Order and Final Judgment, whether or not such Class Member objected to the Settlement or submits a Claim Form(s).

## OBJECTIONS

9. Any Class Member who has not requested exclusion and who wishes to object to the Settlement must deliver to Class Counsel and Reed Hein's counsel, identified below, a written statement of his/her/its objection. The objection must be postmarked no later than 30 days prior to the Fairness Hearing. To be considered by the Court, any objection must be in writing and include the following information: a statement of objection to the settlement in *Brian Adolph et al. v. Reed Hein & Associates et al.*, Case No. 2:21-cv-01378-BJR; the name, address, and telephone number of the objecting Class member; the specific reasons why the Class member objects to the settlement (including any legal support); any evidence or other information the objecting Class Member intends to rely on; a statement whether the objecting Class Member intends to appear at the Fairness Hearing; and the Class Member's signature. No objection that fails to satisfy these requirements and any other requirements found in the Notice shall be considered by the Court.

| Class Counsel | Reed Hein's Counsel | Court Clerk |
|---|---|---|
| Gregory W. Albert<br>Albert Law PLLC<br>3131 Western Ave, Ste 410<br>Seattle, WA 98121 | Jack Lovejoy<br>Corr Cronin LLP<br>1015 Second Ave., Fl. 10<br>Seattle, WA 98104 | U.S. District Court<br>Clerk's Office<br>700 Stewart St., Ste.<br>2310<br>Seattle, WA 98101 |

## FAIRNESS HEARING

10. The Fairness Hearing will be held on March 21, 2023 at 1:00pm before this Court, at the United States District Court, Western District of Washington, 700 Stewart Street, Seattle, WA 98101, to consider whether the Settlement should be finally approved as fair, reasonable, and adequate.

11. On or before March 13, 2023, Class Counsel shall file with the Court any memoranda or other materials in support of final approval of the Settlement.

12. Any Class Member who has not excluded themselves from the Class may appear at the Fairness Hearing in person or by counsel (at their own expense) and may be heard, to the extend allowed by the Court, either in support of or in opposition to the Settlement. However, no Class Member shall be heard at the Fairness Hearing unless such person files a "Notice of Intent to Appear in *Brian Adolph et al. v. Reed Hein & Associates et al.*, Case No. 2:21-cv-01378-BJR" with the Clerk of Court on or before March 8, 2023 and delivers the same to Class Counsel and Defendants' counsel so that it is received by March 8, 2023. In the notice, the Class Member must include their name, address, telephone number, and a signature. Class Members who intend to object at the Fairness Hearing must also have followed the procedure for objection in writing as set in Paragraph 9 of this Order.

13. The date and time of the Fairness Hearing shall be subject to adjournment by the Court without further notice to the Class Members other than that which may be posted at the Court or on the Court's website.

5

14. Any Class Member may hire an attorney at their own expense to appear in the action. Such attorney shall serve a Notice of Appearance on Class Counsel so that it is received on or before March 8, 2023 and file it with the Court within ten days of service on Class Counsel.

15. Upon final approval of the Settlement, all Class Members who do not timely and validly exclude themselves from the Class shall be forever enjoined and barred from asserting any of the matters, claims or causes of action released pursuant to the Agreement against any of the Released Parties, and any such Class Member shall be deemed to have forever released any and all such matters, claims, and causes of action as provided for in the Agreement.

## CONFIDENTIALITY

16. Any information received by the Class Action Settlement Administrator or any other person in connection with the Settlement that pertains to personal information regarding a particular Class Member (other than objections or requests for exclusion) shall not be disclosed to any other person or entity other than Class Counsel, Defendants, Defendants' Counsel, the Court, and as otherwise provided in the Agreement.

## OTHER PROVISIONS

17. The Parties are authorized to take all necessary and appropriate steps to establish the means necessary to implement the Agreement, including modifying the notice to better conform with this order, if necessary.

18. The deadlines set forth in this Order, including, but not limited to, adjourning the Fairness Hearing, may be extended by Order of the Court, for good cause shown, without further notice to the Class members – except that notice of any such extensions shall be included on the Settlement website *reedheinclass.com*.

19. Class Counsel and Reed Hein's counsel are hereby authorized to use all reasonable procedures in connection with approval and administration of the Settlement that are not materially inconsistent with this Order of the Agreement.

20. This Court shall maintain continuing jurisdiction over these settlement proceedings to assure the effectuation thereof for the benefit of the Class.

SO ORDERED this 30th day of December, 2022.


_____
Barbara Jacobs Rothstein
U.S. District Court Judge


Approved as to form:

____/s/ Gregory Albert_____
Gregory Albert, WSBA No. 42673
Albert Law PLLC
3131 Western Ave, Ste 410
Seattle, WA 98121
greg@albertlawpllc.com
(206) 576-8044
*Attorney for Class*

**EXHIBIT 38**

HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRIAN ADOLPH, individually and on behalf of all others similarly situated; KERRI ADOLPH, individually and on behalf of all others similarly situated; <br><br> Plaintiff, <br><br> v. <br><br> REEDHEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM; MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually; and TREVOR HEIN, individually, <br><br> Defendants. | Case No. 2:21-cv-01378-BJR <br><br><br><br> **DECLARATION OF AMY LECHNER OF SIMPLURIS REGARDING NOTICE** |

I, AMY LECHNER, declare as follows:

1.        I am employed as a Senior Project Manager by Simpluris, Inc. ("Simpluris"), the claims administrator in the above-entitled action. Our corporate office address is 3194-C Airport Loop Dr., Costa Mesa, CA 92626. I am over twenty-one years of age and authorized to make this declaration on behalf of Simpluris and myself. I have personal knowledge of the information set forth herein.

**DECLARATION - 1**
**2:21-cv-01378-BJR**

2.      Simpluris is a class action administrator located in Costa Mesa, California. Established in 2007, Simpluris has administered over 8,000 cases nationwide, with class sizes ranging from a few hundred to over one million class members. Representative cases include: Myart v. AutoZone, Inc. and Aceves v. Autozone, Inc. (US District Court, CA Central Division) (208,050 class members), Diaz v. SeaWorld (Superior Court of the State of California) (1,281,123 class members), and Woods v. Vector Marketing (US District Court, Northern District of California) (194,500 class members).

3.      Simpluris was approved by Counsel for both Parties and appointed by the Court in the Order Granting Preliminary Approval of the Class Settlement ("Preliminary Approval Order") entered on December 30, 2022, to provide limited settlement administration services in this settlement. In this capacity, Simpluris was charged with the following:

a.   Printing and mailing a short-form notice via postcard ("Postcard Notice") to Settlement Class Members identified by counsel for the Parties as having not received email notice of the Class Action;

b.   Receiving and processing Settlement Class Members' requests for exclusion from the proposed settlement;

c.   Providing counsel for the Parties with weekly status reports; and

d.   Other tasks as the Parties mutually agree or the Court orders Simpluris to perform.

## MAILED NOTICE

4.      Pursuant to the Preliminary Approval Order, Simpluris formatted the Postcard Notice to be sent by mail to the Settlement Class Members.

5.      The Notices advised Settlement Class Members of their right to make a claim, request exclusion from the settlement, object to the settlement, or do nothing, and the implications of each such action. The Notices advised Settlement Class members of

//

**DECLARATION - 2**
**2:21-cv-01378-BJR**

applicable deadlines and other events, including the Final Approval Hearing, and how Settlement Class members could obtain additional information.

6.      On February 10, 2023, Class Counsel provided Simpluris with a list containing 27,014 records, which was identified as Settlement Class Members who had not already received email notice. The list contained names, emails, and mailing addresses.

7.      Upon receipt of the Class List, Simpluris "scrubbed" the data to identify addresses that could be used for mailing, and ensure it was in proper format for distributing the Postcard Notice via U.S. Mail. Simpluris identified a total of 15,519 mailing addresses to be used in the Postcard Notice mailing "Mailing List."

8.      In an effort to ensure that the Notice would be delivered to class members, Simpluris compared the address data against the United States Postal Service ("USPS") National Change of Address ("NCOA") database and updated the data to a Settlement-specific database with the changes received from NCOA.

9.      On March 17, 2023, Simpluris mailed the Postcard Notice to the 15,519 Settlement Class Members on the Mailing List. Attached hereto as **Exhibits A** is a true and correct copy of the Postcard Notice.

10.      As of the date of this Declaration, 1,021 Postcard Notices were returned by the USPS. For the Postcard Notices returned without a forwarding address, Simpluris performed an advanced address search (i.e. skip trace) on all of these addresses by using Accurint, a reputable research tool owned by Lexis-Nexis. Simpluris used the Class Member's name and previous address to locate a more current address. Of the 1,021 returned Postcard Notices, 871 were re-mailed to either a newfound address or with forwarding addresses provided by USPS. The remaining 150 Postcard Notices were undeliverable because no other address was available.

//

//

**DECLARATION - 3**
**2:21-cv-01378-BJR**

## REQUESTS FOR EXCLUSION AND OBJECTIONS

11.     The postmark deadline for Settlement Class Members to submit a request for exclusion ("Opt Out") from the proposed Settlement or object to the proposed Settlement was May 3, 2023.

12.     As of May 8, 2023, Simpluris has received thirty-six (36) timely Opt Outs from Settlement Class Members. Attached hereto as **Exhibit B** are true and correct copies of the Opt Outs, identified as follows:

| SIMID | First Name | Last Name | Received Date | Postmarked Date |
|-------|------------|-----------|---------------|-----------------|
| 865 | John | Edwards | 05/04/2023 | 05/02/2023 |
| 916 | William H | Hoover | 03/31/2023 | 03/27/2023 |
| 1307 | Rudolf | Kilpert | 04/12/2023 | 04/09/2023 |
| 2062 | Joseph | Daghe | 04/03/2023 | 03/31/2023 |
| 2251 | Albert | Krause | 04/24/2023 | 04/17/2023 |
| 3945 | Betty | Lusk | 04/13/2023 | 04/10/2023 |
| 4959 | Lea | Paveling | 04/19/2023 | 04/15/2023 |
| 5039 | Ko | Tangen | 03/29/2023 | 03/27/2023 |
| 5900 | Jeannie | Gilroy | 04/22/2023 | 04/20/2023 |
| 8019 | Robert | Chamberlin | 04/04/2023 | 03/31/2023 |
| 8535 | Hartvig | Lund | 03/28/2023 | 03/25/2023 |
| 8686 | Ann | Roberts | 05/01/2023 | 04/29/2023 |
| 8936 | Judy | Breunig | 04/08/2023 | 04/04/2023 |
| 9826 | Richard | Burstiner | 03/27/2023 | 03/24/2023 |
| 10565 | Erik | Solita | 04/03/2023 | 03/31/2023 |
| 10991 | Victor | Slade | 04/26/2023 | 04/22/2023 |
| 11227 | Annette | Freda | 04/11/2023 | 04/07/2023 |
| 11241 | James | Junk | 04/05/2023 | 04/01/2023 |
| 11845 | Kent | Sager | 04/01/2023 | 03/29/2023 |
| 13359 | Brian | Cress | 04/18/2023 | 04/12/2023 |
| 13897 | Linda | Lewis | 04/11/2023 | 04/05/2023 |
| 14124 | Philip | Beiriger | 04/04/2023 | 03/31/2023 |
| 15521 | Lee | Emery | 01/25/2023 | 01/20/2023 |
| 15522 | Kevin | Pressler | 02/14/2023 | 02/08/2023 |
| 15523 | Christine | Pressler | 02/14/2023 | 02/08/2023 |
| 15524 | Ivan | Ronayne | 02/06/2023 | 02/06/2023 |
| 15525 | Laura | Gray | 02/21/2023 | 02/18/2023 |
| 15526 | Daniel R | Dumke | 01/20/2023 | 01/18/2023 |
| 15527 | Everdien | Ronayne | 02/06/2023 | 02/06/2023 |
| 15528 | Jemil | Metti | 01/25/2023 | 01/18/2023 |
| 15529 | William | Moreland | 02/06/2023 | 02/06/2023 |
| 15530 | Eileen | Moreland | 02/06/2023 | 02/06/2023 |
| 15531 | Dawn | Schmidt | 02/14/2023 | 02/14/2023 |

**DECLARATION - 4**
**2:21-cv-01378-BJR**

| 15532 | Stephen | Honea | 01/23/2023 | 01/17/2023 |
| 15534 | Kathryn | Honea | 01/23/2023 | 01/17/2023 |
| 15535 | Connie | Medeiros | 02/17/2023 | 02/14/2023 |

13.     As of the date of this Declaration, Simpluris has received zero (0) objections to the proposed Settlement from Settlement Class Members.

**ADMINISTRATION COSTS**

14.     Simpluris' total costs for services in connection with the administration of this Settlement, including fees incurred and anticipated future costs for completion of the administration, will be $19,697.00.

I declare under penalty of perjury that the above is true and correct and that this Declaration was executed this 9th day of May, 2023, in Philadelphia, Pennsylvania.

*Amy Lechner*
AMY LECHNER

**DECLARATION - 5**
**2:21-cv-01378-BJR**

# EXHIBIT 43

HONORABLE BARBARA J. ROTHSTEIN

1
2
3
4
5
6
7
8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
9

10    BRIAN ADOLPH, individually and on behalf          Case No. 2:21-cv-01378-BJR
      of all others similarly situated; KERRI
11    ADOLPH, individually and on behalf of all
      others similarly situated;                        **ORDER GRANTING FINAL
12                                                       APPROVAL OF CLASS ACTION
              Plaintiff,                                 SETTLEMENT**
13
      v.
14
      REEDHEIN & ASSOCIATES d/b/a
15    TIMESHARE EXIT TEAM; MAKAYMAX
      INC.; HEIN & SONS INDUSTRIES, INC.;
16    BRANDON REED, individually; and
      TREVOR HEIN, individually,
17
              Defendants.
18

19

20           WHEREAS, this matter has come before the Court pursuant to *Plaintiffs' Motion for*

21    *Final Approval of Class Settlement* (the "Motion");

22           WHEREAS, the Court finds that it has jurisdiction over the Actions and each of the

23    parties for purposes of settlement and asserts jurisdiction over the Class Members for

24    purposes of effectuating this settlement and releasing their claims; and

25

**ORDER GRANTING**
**FINAL APPROVAL OF SETTLEMENT - 1**
**2:21-cv-01378-BJR**

WHEREAS, this Court has considered all of the submissions related to the Motion and is otherwise fully advised;

IT IS HEREBY ORDERED AS FOLLOWS:

## FINAL APPROVAL OF SETTLEMENT AGREEMENT

1. The terms of the Settlement Agreement dated April 12, 2022, attached to the Declaration of Tallman H. Trask IV as Exhibit 1, are approved as fair, reasonable, enforceable, and adequate. To reach that decision, the Court considered the factors described in *Officers for Justice v. Civil Service Comm's*, 688 F.2d 615 (9th Cir. 1982) and insurance bad faith claims under Washington law as described in *Rushforth Construction Co., Inc. v. Wesco Ins. Co.*, No. C17-1063, 2018 WL 1610222 (W.D.W.A. 2018) and *Truck Ins. Exch. v. VanPort Homes, Inc.*, 58 P.3d 276 (Wash. 2002). The Court has considered the posture of this litigation, the value of the assigned claims, and the risks and benefits to the Parties involved in both settlement of these claims and continuation of the litigation. The settlement agreement contains two insurance bad faith claims, a claim against Trevor Hein, and claims against third-party law firms who provided services to Reed Hein. The Court also finds that the Settlement Agreement was entered into after extensive arm's length negotiations by experienced counsel. The Settlement Agreement was not the product of collusion among the negotiating parties. The Court finds that an analysis of the foregoing factors supports the Settlement Agreement as fair, reasonable, and adequate.

2. The notice campaign accorded with the notice program approved by the Court on December 30, 2022. The notice campaign satisfied the requirements of Fed. R. Civ. P. 23 and Due Process.

**EXCLUSION OF CLASS MEMBERS**

1. The Court will exclude from the class all members who provided a request for exclusion. These excluded Class Members are the 36 customers who sent requests to opt-out to Simpluris.

2. The following Class Members, identified by name and address, have provided valid exclusion requests and are excluded from the Settlement Agreement:

   a. John Edwards, 10608 Pookey Way, Upper Marlboro, MD 20774

   b. William H. Hoover, 12337 Highway 175, Masnfield, LA 71052

   c. Rudolf Kilpert, 60 Hansen Rd., Unit 58, Mississauga, ON L5B 2P6, Canada

   d. Joseph Daghe, 23630 E. Mineral Pl., Aurora, CO 80016

   e. Albert Krause, 307 W. Welton Ave., Temple, TX 76501

   f. Betty Lusk, 846 San Fernando Ln., New Braunfels, TX 78132

   g. Lea Paveling, 98 Falconer Dr., Unit 19, Mississauga, ON L5N 1Y2, Canada

   h. Ko Tangen, 332 C St., Apt. 43, Chula Vista, CA 91910

   i. Jeanine Gilroy, 14646 124th Pl. NE, Woodinville, WA 98072

   j. Robert Chamberlin, 8345 Big Bend Blvd., St. Louis, MO 63119

   k. Hartvig Lund, 23299 Pelican Bass Ln., Pelican Rapids, MN 56572

   l. Ann Roberts, 408-4900 Cartier St., Vancouver, BC V6M 4H2, Canada

   m. Judy Breunig, 3830 Keck Ave., Evansville, IN 47715

   n. Richard Burnstiner, 948 Markham Ct., El Dorado Hills, CA 95762

   o. Erik Solita, 2411 34th Ct., Kenosha, WI 53144

   p. Victor Slade, 307 Evans Estate Dr., Cary, NC 27513

   q. Annette Freda, 105-72 Flatlands 9 St., Brooklyn, NY 11236

   r. James Junk, 133 Sasse Rd., Cabot, PA 16023

   s. Kent Sager, 5071 W. Frenchglen Dr., Eagle, ID 83616

   t. Brian Cress, 2049 Wyndham Hills Dr., Holt, MI 48842

**ORDER GRANTING**
**FINAL APPROVAL OF SETTLEMENT - 3**
**2:21-cv-01378-BJR**

u.   Linda Lewis, 41 Old Ware Rd., Phenix City, AL 36869

v.   Philip Beiriger, 1224 Madison Ave., Dyer, IN 46311

w.   Lee Emery, 11043 SW Summerfield Dr., Apt. 2, Tigard, OR 97224

x.   Kevin Pressler, 13725 25th Ave. SE, Mill Creek, WA 98012

y.   Christine Pressler, 13725 25th Ave. SE, Mill Creek, WA 98012

z.   Ivan Ronayne, 14 Ashdale Ave., Ottawa, ON K2C 3H1, Canada

aa.  Laura Gray, 842 Bunker Hill St., Apt. 3a, Charlestown, MA 02129

bb.  Daniel Dumke, 331 Calle Felicidad, San Clemente, CA 92672

cc.  Everdien Ronayne, 14 Ashdale Ave., Ottawa, ON K2C 3H1, Canada

dd.  Jemil Metti, 770 West River Dr., Commerce Township, MI 48382

ee.  William Moreland, 890 Deans Lane, Box 248, Seeley's Bay, ON K0H 2N0, Canada

ff.  Eileen Moreland, 890 Deans Lane, Box 248, Seeley's Bay, ON K0H 2N0, Canada

gg.  Dawn Schmidt, 2957 40th Ave. NE, Tacoma, WA 98422

hh.  Stephen Honea, 25 N. Kriklyn Ave., Upper Darby, PA 19082

ii.  Kathryn Honea, 25 N. Kriklyn Ave., Upper Darby, PA 19082

jj.  Connie Medeiros, 620 Arbor Rd., Mississauga, ON L5G 2J9, Canada

## ENTRY OF CONFESSION OF JUDGMENT

1.  The Confession of Judgment with Covenant Not to Execute, attached to the Declaration of Tallman H. Trask IV as Exhibit 2, shall be signed and entered into the record.

**ORDER GRANTING**
**FINAL APPROVAL OF SETTLEMENT - 4**
**2:21-cv-01378-BJR**

1       DATED this 19th day of May, 2023.

2

3

4                                Barbara Jacobs Rothstein

5                                U.S. District Court Judge

6

7

8

9

10  Approved as to form:

11

    _____/s/ Gregory Albert_____
12  Gregory Albert, WSBA No. 42673
    Albert Law PLLC
13  3131 Western Ave, Ste 410
    Seattle, WA 98121
14  greg@albertlawpllc.com
    (206) 576-8044
15  *Attorney for Class*
    (206) 576-8044
16  *Attorney for Plaintiffs*

17

18

19

20

21

22

23

24

25

**ORDER GRANTING
FINAL APPROVAL OF SETTLEMENT - 5
2:21-cv-01378-BJR**

# EXHIBIT 44

HON. BARBARA J. ROTHSTEIN

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

BRIAN ADOLPH, individually and on behalf
of all others similarly situated; KERRI
ADOLPH, individually and on behalf of all
others similarly situated;

     Plaintiff,

v.

REEDHEIN & ASSOCIATES d/b/a
TIMESHARE EXIT TEAM; MAKAYMAX
INC.; HEIN & SONS INDUSTRIES, INC.;
BRANDON REED, individually; and
TREVOR HEIN, individually,

     Defendants.

Case No. 2:21-cv-01378-BJR

**PRAECIPE TO ENTER
JUDGMENT**

     Plaintiffs Brian Adolph and Kerri Adolph request the Clerk enter the judgment as
approved by the Court and pursuant to the Court's May 19, 2023 Order Granting Final
Approval of Class Action Settlement (Dkt. 43), which approved the judgment and directed it
be signed and entered into the record. The approved judgment is included as Exhibit 1.

**PRAECIPE TO ENTER JUDGMENT - 1
2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

1

2

3

4

5

6

7 DATED this 5th day of June, 2023.

8

_____
9 Gregory Albert, WSBA No. 42673
Albert Law PLLC
10 3131 Western Ave, Ste 410
Seattle, WA 98121
11 greg@albertlawpllc.com
(206) 576-8044
12 *Attorney for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

**PRAECIPE TO ENTER JUDGMENT - 2**
**2:21-cv-01378-BJR**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

# EXHIBIT 45

HON. BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BRIAN ADOLPH, individually and on behalf of all others similarly situated; KERRI ADOLPH, individually and on behalf of all others similarly situated;

     Plaintiff,

v.

REEDHEIN & ASSOCIATES d/b/a TIMESHARE EXIT TEAM; MAKAYMAX INC.; HEIN & SONS INDUSTRIES, INC.; BRANDON REED, individually; and TREVOR HEIN, individually,

     Defendants.

Case No. 2:21-cv-01378-BJR

CONFESSION OF JUDGMENT AND JUDGMENT WITH COVENANT NOT TO EXECUTE

## I.    PARTIES

    The parties to this Agreement are Brian Adolph and Kerri Adolph, both individually and on behalf of all others similarly situated (hereinafter "Plaintiff Class"), ReedHein & Associates (hereinafter "ReedHein"), Makaymax, Inc. (hereinafter "Makaymax"), and

**CONFESSION OF JUDGMENT - 1**

Brandon Reed (hereinafter "Reed"). ReedHein, Makaymax, and Reed are collectively referred to as "Defendant Parties."

## II.    PURPOSE OF THE AGREEMENT

The purpose of this Agreement is to secure a judgment against Defendants ReedHein, Makaymax, and Brandon Reed for the benefit of the Plaintiff Class and to protect the assets, earnings and individual liability of Defendant Parties from claims by the Plaintiff Class that might result in a substantial excess verdict. This Agreement is made pursuant to the CR2A agreement executed between the parties on April 11, 2022.

## III.    RECITALS

The Adolphs filed this action against the Defendant Parties on behalf of the Plaintiff Class. The Plaintiff Class alleges that the undersigned Defendant Parties committed acts and omissions that sound in tort and statutory violations. The Plaintiff Class alleges that it suffered greater than $200,000,000 in damages as a result of those acts and omissions. Its allegations were tested in fourteen arbitrations adjudicated before the American Arbitration Association. The arbitrations have resulted in awards of actual damages, treble damages, attorney fees, and costs. Including treble damages, the Plaintiff Class claims $630,187,204 in damages.

The Defendant Parties tendered the Adolph complaint to their insurers in October and December 2021. The insurers did not provide a defense. Without a defense, the Defendant Parties executed a CR2A settlement agreement on April 11, 2022. The CR2A agreement requires that the parties execute a (covenant) confession of judgment for the full amount of damages claimed. This confession of judgment is executed pursuant to that agreement.

**CONFESSION OF JUDGMENT - 2**

## IV. TERMS AND CONDITIONS

### A. This Document Does Not Constitute a Release

Reed Hein and Associates, Makaymax, and Brandon Reed agree that the terms and conditions of this agreement do not constitute a release of the Plaintiff Class's claims against them. Rather, Reed Hein and Associates, Makaymax, and Brandon Reed acknowledge they shall be deemed parties against whom judgment is taken.

### B. Assignments

The Defendant Parties assign all rights to claims that can be made on their own behalf for breach of fiduciary duty, breach of insurance contract, breach of good faith, and any other claims arising under the common law, the Washington Insurance Fair Conduct Act, and any other potential claims, against any insurance carrier to Brian Adolph in his individual and representative capacities, and to any additional representatives of any additional classes that are certified by the Court. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes is/are certified, and the rights can be transferred to the new class representatives in their representative capacities.

The Defendant Parties and Brandon Reed assign all rights to any claims of any kind that can be made on their own behalf against Mitchell Sussman, Kenneth Privett, and Schroeder Goldmark Bender, any principals of the same, and any entities in which the foregoing have any interest, no matter how derivative, to Brian Adolph in his individual and representative capacities and to any other class representatives for any other classes that are certified by the Court. Reed Hein and Associates and Brandon Reed will waive any privileges and will make available any communications with the foregoing, even if those communications included one of the attorneys named above. Provided further, to the extend this provision calls for the assignment of any legal malpractice claim and that legal

**CONFESSION OF JUDGMENT - 3**

malpractice claim ins not assignable, than the assignment of claims will be partially void, only to the extent that it will not include non-assignable claims; the remainder of the assignment, as well as the remainder of this agreement, will remain in full force and effect. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes is/are certified, and the rights can be transferred to the new class representatives in their representative capacities.

The Defendant Parties assign all rights to any claims of any kind that can be made on its own behalf against Ardent Law Group, Granite Spire Law Group, any owners or former owners of the same, and any entities in which the foregoing have any interests, no matter how derivative, to Brian Adolph in his individual and representative capacities, and to any additional representatives of any additional classes that are certified by the Court. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes is/are certified, and the rights can be transferred to the new class representatives in their representative capacities. Reed Hein will make available all communications with the foregoing, provided that Defendant Parties are not waving any privilege in connection with Corr Cronin or any other attorney other than those named above, even if those communications included one of the attorneys named above.

The Defendant Parties hereby assign all rights to any claims of any kind that can be made on their behalf against Trevor Hein, Hein and Sons, or any entity owned by Trevor Hein or in which Trevor Hein has any interest, include derivative interests, to Brian Adolph in his individual and representative capacities, and to any additional calls representatives of any additional classes that are certified by the Court. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes

**CONFESSION OF JUDGMENT - 4**

is/are certified, and the rights can be transferred to the new class representatives in their representative capacities.

The Defendant Parties hereby assign all rights to any claims of any kind that can be made on their own behalf against any timeshare developer or timeshare company, any owners or former owners of the same, and any entities in which the foregoing have any interests, no matter how derivative, to Brian Adolph in his individual and representative capacities, and to any additional calls representatives of any additional classes that are certified by the Court. In the event that more than one class proves necessary, that the rights herein will be held in trust by Gregory W. Albert (Albert Law PLLC), until such a time as a new class representatives are chosen, the class or classes is/are certified, and the rights can be transferred to the new class representatives in their representative capacities.

**C.     Stipulated Judgment**

Reed Hein and Associates, Makaymax, and Brandon Reed agree that pursuant to the CR2A Stipulations and Settlement Agreement between the Defendant Parties and the Brian Adolph in his personal and representative capacities, and subject to the limitations set forth herein, judgment may be taken against them in the sum of $630,187,204 in favor of the Plaintiff Class, which shall bear interest at the rate of 12% per annum simple interest from the date of execution of this Stipulated Judgment.

**D.     Covenant Not to Execute or Enforce Judgment**

In consideration of the above covenants and settlement, plaintiff Brian Adolph in his individual and representative capacities hereby agrees, covenants, and warrants that he will never execute upon or attempt to enforce any judgment against the assets of the Defendant Parties beyond the insurance assets, legal claims, and other claims or assets referenced and described above in Term B. The assets of Defendant Brandon Reed may not be used to

**CONFESSION OF JUDGMENT - 5**

satisfy this judgment and this judgment may not be recorded against or used as a lien on any assets of Brandon Reed.

Rather, plaintiff Brian Adolph and the Plaintiff Class shall execute upon and enforce this judgment only against: (1) insurance carriers who are liable for the damages, including insurance agents, to the assigned claims, policies of insurance, and remedies identified in this Agreement; (2) Mitchell Sussman, Kenneth Privett, and Schroeder Goldmark Bender, any principals of the same, and any entities in which the foregoing have any interest, to the extent claims against those parties are assigned to the Plaintiff Class by this Agreement; (3) Ardent Law Group, Granite Spire Law Group, any owners or former owners of the same, and any entities in which the foregoing have any interests, to the extent claims against those parties are assigned to the Plaintiff Class by the Agreement; (4) Trevor Hein, Hein and Sons, or any entity owned by Trevor Hein or in which Trevor Hein has any interest, including derivative interests, to the extent claims against those parties have been assigned to the Plaintiff Class by this agreement; and (5) against any timeshare developer or timeshare company, any owners or former owners of the same, and any entities in which the foregoing have any interests, to the extent those claims have been assigned to Plaintiff Class by this Agreement.

**E.** **Covenant to Enter Full Satisfaction of Judgment in Favor of ReedHein, Makaymax, and Brandon Reed**

Plaintiff Brian Adolph agrees, in his individual and representative capacities, to execute and file a full satisfaction of judgment in favor of Defendant Parties upon final resolution of the assigned claims. Plaintiff Brian Adolph agrees, upon request and through Class Consul Gregory W. Albert of Albert Law PLLC, to issue written confirmation to any third-party designated by Defendant Parties that the Plaintiff Class shall not execute on this judgment beyond the insurance assets, legal claims, and other claims or assets referenced

**CONFESSION OF JUDGMENT - 6**

and described above in Term B.

**F.    Warranty of Authority**

The parties and attorneys listed below hereby warrant that they have the authority to enter into this agreement and that they do so with the full knowledge of the consequences in an attempt to commit themselves to the obligations set forth above.

**G.    Execution of Document**

The parties agree that this Agreement may be executed in counterpart and by faxed signature pages.

**CONFESSION OF JUDGMENT - 7**

**JUDGMENT SUMMARY**

The Court hereby enters judgment in this matter. The Clerk shall enter the following information in the Clerk's execution docket:

| | | |
|---|---|---|
| 1. | Judgment Creditor: | Adolph Class<br>c/o Albert Law, PLLC<br>3131 Western Ave., Ste. 410<br>Seattle, WA 98121 |
| 2. | Judgment Creditor's Lawyer: | Gregory Albert<br>Albert Law, PLLC<br>3131 Western Ave., Ste. 410<br>Seattle, WA 98121 |
| 3. | Judgment Debtors: | Reed Hein & Associates, LLC<br>Brandon Reed<br>121 Third Ave., Ste. 200<br>Kirkland, WA 98033 |
| 4. | Judgment Debtor's Lawyer: | None |
| 5. | Principal Amount of Judgment: | $630,187,204 |
| 6. | Award of Attorney Fees: | _____ |
| 7. | Costs: | _____ |
| 8. | Total Judgment: | $630,187,204 |
| 9. | Interest to Date on Judgment: | 0 |
| 10. | Post-Judgment Interest: | 12% per annum |

Interest shall begin to accrue on this judgment on the date of entry of this judgment at 12% per annum.

**CONFESSION OF JUDGMENT - 8**

## CONFESSION AND STIPULATION OF JUDGMENT

Defendant Brandon Reed, individually and on behalf of Reed Hein & Associates and Makaymax confesses judgment in favor of plaintiffs in the principal amount of $630,187,204, plus attorneys fees and costs, with interest on all judgment amounts at 12% per annum from date of entry. The confession judgment is for $630,187,204.

I, Brandon Reed, verify under oath that the above confession of judgment with covenant not to execute is authorized by me and that the acts set forth above are true to the best of my knowledge and belief.

DECLARED UNDER PENALTY OF PERJURY OF THE LAWS OF THE STATE OF WASHINGTON AT _____, WASHINGTON THIS _____ DAY OF September, 2022.


_____

Brandon Reed




_____

Notary Public


Plaintiff class assents to entry of the above confession of judgment with covenant not to execute authorized by defendant Brandon Reed, and agrees not to execute on the unsatisfied portion of the judgment prior to pending completion of settlement.

**CONFESSION OF JUDGMENT - 9**

DECLARED UNDER PENALTY OF PERJURY OF THE LAWS OF THE STATE OF WASHINGTON AT _____, WASHINGTON THIS _____ DAY OF September, 2022.

_____

Brian Adolph, Class Representative

_____

Gregory Albert, Class Counsel

**CONFESSION OF JUDGMENT - 10**

# JUDGMENT AND COVENANT NOT TO EXECUTE

THIS MATTER having come before the Court for entry of judgment upon confession of judgment of the parties, with a covenant not to execute on the judgment prior to completion of settlement, it is therefore ORDERED, ADJUDGED AND DECREED as follows:

1.    Plaintiff is granted judgment against defendants Brandon Reed, Reed Hein & Associates and Makaymax Inc. in the sum of $630,187,204 principal, with interest on all unpaid amounts at 12% per annum from date of entry until satisfied in full.

2.    Plaintiff shall hereafter take no action to collect on the above judgment against defendants Brandon Reed, Reed Hein & Associates and Makaymax Inc.


DATED this 15th day of June, 2023.



_____
Barbara Jacobs Rothstein
U.S. District Court Judge




Presented by:


_____
Gregory Albert, WSBA No. 42673
Albert Law PLLC
3131 Western Ave, Ste 410
Seattle, WA 98121
greg@albertlawpllc.com
206-576-8044


**CONFESSION OF JUDGMENT - 11**