# EXHIBIT 8

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11  | BRIAN ADOLPH, individually and on behalf | Case No.
12  | of all others similarly situated; KERRI
    | ADOLPH, individually and on behalf of all | COMPLAINT FOR DAMAGES
    | others similarly situated;

13

14          Plaintiff,

15  v.

16  | REED HEIN & ASSOCIATES d/b/a
    | TIMESHARE EXIT TEAM; MAKAYMAX
17  | INC.; HEIN & SONS INDUSTRIES, INC.;
    | BRANDON REED, individually; and
18  | TREVOR HEIN, individually,

19          Defendants.

20

21          COME NOW PLAINTIFFS Brian and Kerri Adolph, individually and on behalf of all

22  others similarly situated, by and through their attorney Gregory Albert of Albert Law PLLC, and

23  brings this class action against the above captioned Defendants for negligent misrepresentation,

24  common law fraud, breach of contract, breach of fiduciary duty, unjust enrichment, and

25

**COMPLAINT FOR DAMAGES - 1**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

numerous violations of the Consumer Protection Act, RCW 19.86 *et seq.*, associated with unfair and deceptive conduct in the marketing and sale of timeshare "exit" services offered to consumers across the United States and Canada. Plaintiffs allege the following on information and belief:

## I.     INTRODUCTION

1.      Reed Hein and Associates, doing business as "Timeshare Exit Team," is a company that had defrauded tens of thousands of customers out of tens of millions of dollars. It falsely advertises it has "specialized knowledge" and a "proprietary process" that allows it to "force" developers and vacation resorts to release customers from unwanted timeshare obligations. Using deceptive statements and false advertisements, it solicits potential customers into meetings with "client advisors," who are paid commissions and uniformly advise clients to spend tens thousands of dollars for services Reed Hein does not know how to provide. The client advisors use scripts containing objectively false statements to induce clients into purchasing Reed Hein's services. The client advisors advise customers that 1) their children will inherit their allegedly perpetual timeshare obligation, 2) real lawyers are unable to perform the work Reed Hein performs, and 3) Reed Hein is the customers' "**ONLY HOPE**!" Reed Hein then convinces customers that it will act as their "fiduciary," but rather than put its clients' money in trust or escrow Reed Hein immediately treats the money as earned revenue and spends or disburses it. Reed Hein then "processes" its customers' claims through a variety of convoluted schemes designed to look like they have legal significance they do not have. At the end of the process, Reed Hein tells customers to stop paying their bills and sends customers a letter stating it "exited" them from their timeshare obligations. For the first five years, Reed Hein relied upon the fact that timeshare developers are reluctant to take legal action against customers.  However, developers have now begun interfering with Reed Hein's model, creating a backlog of tens of thousands of customers Reed Hein cannot even pretend to service. When the customers have sought refunds under Reed Hein's "100% Money-Back Guarantee), Reed Hein contrives a variety of reasons not

**COMPLAINT FOR DAMAGES - 2**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

to honor the guarantees, even after customers have waited 3-4 years for Reed Hein to provide services. Vacation resorts and developers have also begun targeting Reed Hein customers with lawsuits, which Reed Hein does not disclose to customers, despite claiming to be their agent. The only legally valid 'exits' Reed Hein customers ever achieve are exits they could, and often do, achieve on their own. The remainder receive nothing.

2. Brian and Kerri Adolph spent $14,486.00 on Reid Hein's illusory services without receiving any results.

## II. PARTIES

### a. Plaintiffs

3. Plaintiff Brian and Kerri Adolph are married. They are residents of the State of North Carolina.

### b. Defendants

4. Defendant **Brandon Reed** was, at all times material to this lawsuit, the co-founder, governor, operator or manager of Reed Hein & Associates. Brandon Reed is also a 60% owner of Reed Hein through a wholly-owned Washington corporation, Makaymax, Inc. In these roles, Brandon Reed directs, controls, participates in, and knowingly approves of the policies, activities, and practices alleged in the Complaint herein. Upon information and belief, Brandon Reed resides in Kirkland, Washington.

5. Defendant **Trevor Hein** was, from Reed Rein's creation through at least approximately July 2016, the co-founder, governor, operator or manager of Reed Hein. In these roles, Trevor Hein directed, controlled, participated in, and knowingly approved of the policies, activities, and practices alleged in the Complaint herein. Trevor Hein is, or was, a 40% owner of Reed Hein through a wholly-owned Delaware corporation, Hein & Sons Industries, Inc. Upon information and belief, Trevor Hein resides in British Columbia, Canada.

**COMPLAINT FOR DAMAGES - 3**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

6.      On information and belief, Defendant **Hein & Sons Industries, Inc.,** is a Delaware corporation incorporated on March 20, 2012. Hein & Sons Industries, Inc., is wholly-owned by Trevor Hein and has been operated by Trevor Hein since its formation as a holding company.

7.      Defendant **Reed Hein** is a limited liability company registered with the Washington Secretary of State. Brandon Reed and Trevor Hein are the registered governing persons of Reed Hein. Reed Hein's corporate office is located at 121 3rd Ave. Suite 200, Kirkland WA. Upon information and belief, Reed Hein's principal place of business is located at 220 120th Ave NE, Bellevue, WA 98005, and the company's former principal place of business was at 3400 188th St. SW #300, Lynnwood, WA 98037. Upon information and belief, Reed Hein & Associates operates under the trade names "Reed Hein," "Timeshare Exit Team," "TET," "TSET,"and "RHA," and formerly operated under the names "Reed Hein Travel" and "World Travel Seattle." Reed Hein's primary website is timeshareexitteam.com., but Reed Hein formerly maintained a separate reedhein.com website and maintains dozens of other web domains to redirect to timeshareexitteam.com. On information and belief, Reed Hein began operation in 2012.

## III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), codified in part at 28 U.S.C. §§ 1332 and 1453. This case involves a minimally diverse, nationwide prospective class of over 100 member that involves an amount-in-controversy exceeding $5 million.

## IV.      FACTUAL ALLEGATIONS

9.      The following allegations are made based on evidence, the parties' own sworn testimony, information, and belief.

10.      Unless indicated otherwise, the following allegations have been ongoing at all times relevant hereto.

**COMPLAINT FOR DAMAGES - 4**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

11.     Reed Hein & Associates doing business as Timeshare Exit Team describes itself as a company that can "force" timeshare companies (resorts, timeshare brokers, etc.) to forego consumer's timeshare obligation ("timeshare exits"). The company claims to have helped tens of thousands of customers exit their timeshare contracts. In 2018, it claimed a revenue of $38 million and spent approximately $9 million in advertising.

12.     In September 2019, Brian and Kerri Adolph purchased a timeshare from Wyndham Resorts, potentially obligating them to pay approximately $510.82 per month in timeshare-mortgage payments for a period of ten years. The Adolphs sought to terminate or significantly reduce that obligation after hearing about Rein Hein's services through its extensive marketing campaign. Reid Hein's false advertising and unfair business practices described herein deceived the Adolphs into paying Reed Hein a fee. In March 2020, Mr. and Mrs. Adolph paid $14,486 to Reed Hein in exchange for the company's services.

13.     According to the power-of-attorney form Reed Hein asked Mr. and Mrs. Adolph to sign, Reed Hein had "the legal duty to act solely in the interests of [the Adolphs] and to avoid conflicts of interest," which includes keeping the Adolphs' property separate and distinct from any other property owned or controlled by Reed Hein.

14.     According to the power-of-attorney form Reed Hein asked Mr. and Mrs. Adolph to sign, Reed Hein assumed the role of Mr. and Mrs. Adolph's fiduciary and all fiduciary duties recognized under Washington State law.

15.     Reed Hein induced Mr. and Mrs. Adolph into a commercial relationship using materially false statements and omissions of material information.

16.     Reed Hein performed little or no work on Mr. and Mrs. Adolph's matter.

17.     Reed Hein ignored Mr. and Mrs. Adolph's reasonable requests for periodic updates.

18.     Reed Hein comingled Mr. and Mrs. Adolph's property with its own property.

19.     Reed Hein knowingly engaged in conflicts of Mr. and Mrs. Adolph's interests.

**COMPLAINT FOR DAMAGES - 5**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

20.     Reed Hein immediately converted Mr. and Mrs. Adolph's funds into earned revenue before performing work.

21.     Reed Hein failed to notify Mr. and Mrs. Adolph that it would be unable to process their file for greater than a year.

22.     Reed Hein never "exited" Mr. and Mrs. Adolph from their timeshare agreement.

23.     Reed Hein did not honor its money-back guarantee.

### a.     Brandon Reed's Testimony Shows he and Trevor Hein Began Soliciting Customers in 2012 without Any Plan to Provide Services

24.     On August 21, 2011, Brandon Reed and Trevor Hein started ReedHein & Company on for the purpose of selling rain gutter protection systems.

25.     In November 2011, Brandon Reed was operating a booth selling rain gutter protection systems in British Columbia, Canada. He observed a busy booth offering to help timeshare owners exit out of their agreements with developers, resorts, and other companies brokering timeshares ("timeshare companies"). Mr. Reed observed they had a "big sign" and "people were lining up." Mr. Reed observed the company running the booth charged an upfront fee without providing an immediate service, which he believed was not honest.

26.     Mr. Reed nevertheless started a business that charged customers an upfront fee to provide timeshare exit services. Mr. Reed acknowledges he "knew nothing about timeshares" at the time. Asked why he began charging upfront fees for services he did not know how to provide, Brandon Reed had the following dialogue under oath:

> Q· Why would you collect a fee before you've done anything for the consumer?
> A ·   Yeah. One, that's how we did it in the beginning. I mean, that's how we -- You know, I've been asked that before, like why do we -- When I've been interviewed before in the past, we've, "Why do you charge an upfront fee?" Well, we just -- That's how we did it in the beginning. I don't even remember why we started – we started charging upfront fees, but we did.

27.     On December 31, 2012, "[w]ithin one month" of observing the busy booth, Mr.

Reed and Mr. Hein started a company called "ReedHein Travel" in Bellevue, WA with the express purpose of selling timeshare exit services while simultaneously selling timeshares.

**b. Beginning in 2013 Defendant ReedHein & Associates Unfairly and With the Intent to Mislead, Promised Services It Did Not Provide or Know How to Provide**

28.     In 2013, ReedHein Travel changed its name to ReedHein & Associates doing business as Timeshare Exit Team ("TET"). After the experience at the Puyallup Fair Booth, Defendant Reed Hein created a website on which they falsely and misleadingly claimed customers could legally "ditch" their timeshares "forever."



29.     Also, the website falsely and misleadingly claimed that Timeshare Exit Team works with timeshare companies and developers to "dissolve" its customers' contracts.



30.     None of that is true. From 2013-2015, Reed Hein provided few if any services. It did not negotiate with timeshare companies. It did not force timeshare companies to forego contracts. Reed Hein's initial strategy was to simply tell customers to stop paying their

**COMPLAINT FOR DAMAGES - 7**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

timeshares, which would induce the timeshare companies and developers to foreclose on the customer's product. At that point, Reed Hein would claim it "exited" the customers from their contract. When customers inevitably complained that they could have induced the foreclosures without Reed Hein's assistance, Reed Hein instructed its customer service representatives to make statements that avoid the issue: "they signed a contract with us and we achieved an exit." Customers complaining that Reed Hein offered no services became such a pervasive problem that Reed Hein adopted a chapter in its operations manual called: "I Could Have Just Done This on My Own, I want My Money Back."

31.     In addition to the foregoing false claims, Reed Hein began soliciting business with variations of the phrase "Safe, Legal, and Guaranteed" or "Safe. Legitimate. Guaranteed."

**Ad** · www.timeshareexitteam.com/ ▼   (877) 714-2857

Timeshare Exit Team™ | Safe. Legitimate. Guaranteed.

Give Us a Call Now To Schedule Your Free Consultation! 100% Money Back Guarantee. The most trusted **Timeshare Exit** Company in the industry–Endorsed by Dave Ramsey. Nationally Endorsed. Services: **Exit** Preparation, **Exit** Strategy, **Exit** Management, **Exit** Completion.

32.     Asked under oath how the timeshare exit services were safe and legal as advertised, Brandon Reed was unable to explain:

> Q  Those are your advertising terms, aren't they?
>
> A  I believe so, yes.
>
> Q· Okay.· Well, given that these are the advertising terms that Timeshare Exit Team uses, I would expect that Timeshare Exit Team would know what the legal and safe and permanent ways of getting somebody out of their timeshare is. So please tell me what they are.
>
> A: I'm -- I'm not a lawyer, so our partners –
>
> Q.  We understand you're not a lawyer. You do not have to keep saying that…But you're running a business that is making these advertising claims. I want to hear from you, who is the president and owner of the business --

**COMPLAINT FOR DAMAGES - 8**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

1    A  Yes.

2    Q  -- how it is you can make these claims. What is the basis for
     these claims?

3
     A  Yeah. I'm going to just -- I can't -- Again, I don't know how else
4    to say it. I'm not -- I'm not an attorney.

5         33.    Reed Hein instructs customers like Mr. and Mrs. Adolph not to communicate with

6    developers at all, falsely telling them that doing so will extend the time required to dissolve their

7    contracts. In reality, Reed Hein gives those instructions because communicating directly with the

8    timeshare company might induce the timeshare company to allow the customer out of the contract

9    for free, obviating the specter of a need for Reed Hein's fake services. Under oath, Reed Hein

10   officers have given two reasons for that policy, both of which are unfair and deceptive, and

11   neither of which is ever disclosed to the customer. In his deposition, Brandon Reed testified that

12   Reed Hein discourages customers from speaking to timeshare companies or developers because

13   the timeshare companies might share a negative perspective about Reed Hein:

14        Q· In the third paragraph, the one that starts, "If the timeshare
          contacts you for any reason"

15        A· Uhm-hm.

16        Q· -- "we suggest that you disregard those calls for now, as we do
          not want you to contact or converse with the timeshare for any
17        reason, as it can undo and/or lengthen the exit process, unless
          otherwise told to do so…How -- How or why would the timeshare
18        developer talking to its own customer exit them -- prolong the exit
          process?
19
          A: Because the timeshare companies, the developers would --
20        again, hating what it is that we do, they – They would just -- They
          would actually say -- And we know this just because the customers
21        have called on occasion or they've taken a call and are talking
          about -- You know, talking about us. "Oh, hey, we're working
22        with, you know, Timeshare Exit Team."
               And it's like all of a sudden, you know, the customer is
23        calling us and saying, "Oh, my gosh. I hear that you're a scam and
          blah, blah, blah."
24

25

**COMPLAINT FOR DAMAGES - 9**

Q  Okay. So the reason is that because if they talk to the timeshare developer, the timeshare developer is going to say bad things about you?

A  They do, yes. It was because it was creating a customer service - It was creating problems in customer service. And when your customers are calling you and saying, "Hey, my timeshare just said this about you guys," it's just - Imagine having -- I mean, that's…

34.    Alternatively, former Reed Hein Chief Operating officer Thomas Parenteau testified the instructions were designed to prevent customers from obtaining an exit without Reed Hein, which he acknowledged to be a "good thing" for the customer:

A.  For a couple of different reasons. We have had experiences where the customer ends up with more than what they own, number one. And, number two, we have had also what I would call consumer confusion where the customer will call the developer and -- after they have retained – you know, they have hired us and all of a sudden, the developer will give them an exit to undermine our services. So that's happened as well.

Q.  Then the second scenario you described, the resort or the developer is offering the customer a way out of the timeshare; right?

A. Correct. Once their hear our name.

Q. What is so bad about that? Isn't that what you want?

A. Actually, yes, it is.

Q. All right. So why would you want to foreclose that possibility?

A. I think we just want to put it on paper that: Listen, if you call the developer, you're going to get confused because they're either going to upgrade you or they're going to let you out.

Q.  Okay.
   And nowhere in your advertisements or in the materials you give to your customers does it say "Don't call the timeshare resort or developer because they might offer you an exit"?

**COMPLAINT FOR DAMAGES - 10**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

A. No.
Q. Which you agree would be a good thing?
A. Mm-hm.
Q. Is that a "yes"?
A. Yes.

Q. So why would that be a justification for telling the customers not to call the timeshare resort or developer?

A. Because it creates customer confusion…Like I said, when they call the developer and as soon as the word "Timeshare Exit Team" is mentioned, the developer offers an exit.

c. **Reed Hein's Ongoing Deceptive Acts and Practices**

35. **Misleading Inducement via False Claims on Website:** Since at least 2014, Reed Hein has posted a variety of false statements on its website in an attempt to deceive customers into purchasing its services. The website states that timeshare obligations are passed down to the customers' children after their death. It states that it "forces" timeshare companies to "take back" the timeshare obligation. It states that attorneys do not have the specialized knowledge that Reed Hein has in order to dissuade customers from hiring real attorneys. It prominently advertises a "risk free" service, owing to its "100% Money-Back Guarantee," without notifying customers that Reed Hein imposes restrictions on the guarantee it does not disclose in advance.

36. **Misleading Inducement in Sales Presentation**: In addition to its false advertising and false claims that it can "force" timeshare companies to exit their contracts with timeshare owners, Reed Hein induces consumers into a relationship by misleadingly offering to let them meet with a "Client Advisor" about their claims. Client Advisors are salespeople trained in sales techniques and receive a commission. Reed Hein does not require them to know anything about the timeshare industry. <u>They do not reject customers based on the customers' actual ability to exit timeshares</u>. Client Advisors do not advise customers to do anything other than pay money to Reed Hein. They reiterate the false claim that Reed Hein can legally, safely, and permanently

**COMPLAINT FOR DAMAGES - 11**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

get owners out of their timeshare contracts through Reed Hein's proprietary system regardless of the customer's circumstance.

37.     It also omits material information. It declines to notify customers when it has an adversarial relationship with the customers' timeshare company. It does not notify customers when it is being sued with the customers' timeshare. It declines to tell customers when the timeshare refuses to work with Reed Hein. Although Reed Hein advertises that attorneys cannot perform the work Reed Hein performs, it omits mentioning that nearly all of its work is performed through outside attorneys. Reed Hein omits telling customers that it imposes absurd restrictions on the money-back guarantee and refuses to refund their money so long as it subjectively believes that it has an "exit path" for the customer, even 3-4 years after the customer signs up.

38.     **Payments**: Reed Hein charges customers up to $58,000 for its alleged services. Despite being a fiduciary, Reed Hein does not charge that money based on the work it anticipates having to perform, but based upon a multiple of the client's future timeshare obligation, which Reed Hein exaggerates and inflates during its sales presentation. Mr. and Mrs. Adolph paid Reed Hein $14,486.00. Reed Hein accepts money from all customers, regardless of their circumstances or their legal right to "exit" their timeshare contracts. Reed Hein allows customers to pay in installments, but the contract it offers clients does not obligate it to provide any services until the installments are complete.

39.     **Unenforceable Contract:** After inducing a relationship under false auspices, Reed Hein asks clients to sign a master services agreement defining a variety of client's obligations while leaving its own obligations too vague to be enforced. According to Reed Hein, it need not honor its guarantee unless the customer fulfills vague contractual obligations the customer did not know they had, including an obligation to pay the timeshare company an indeterminate amount of money to be released. Reed Hein takes the position that the customer must pay the amount so long as Reed Hein determines the amount to be "reasonable" without regard to whether the customer agrees—a fact that it does not disclose to the customer. Since

**COMPLAINT FOR DAMAGES - 12**

Reed Hein is unable to provide any of the services it advertises, it requires customers to enter into a separate attorney-client agreement with a third-party attorney in order to fulfill its contract, and refuses to pay any refunds if the customer does not want to enter into such an intimate relationship with an undisclosed third party. The agreement has changed over time, but Reed Hein's obligations under Mr. Adolph's agreement contained only one illusory obligation for Reed Hein: "Reed Hein shall work to secure a release from, transfer, cancellation or termination of the Owner's timeshare interest at Resort."

40. **Misappropriation of funds**: After receiving money from clients, Reed Hein immediately treats it as earned revenue without regard to services rendered or the possibility that Reed Hein can even provide the services. Although Reed Hein claims to be an agent of the customers, it does not put their money into a trust or escrow account and immediately appropriates the money to itself. In 2019 Reed Hein took in approximately $35m in customer fees, all of which it immediately treated as earned revenue.

41. **Deceptive and Materially Misleading Processes**: After accepting money, Reed Hein sends customers' claims through a variety of byzantine processes designed to deceive customers into thinking Reed Hein is earning its money and achieving results. The processes have taken a variety of forms since 2013. Initially, Reed Hein did not directly handle its customers claims, either telling customers to default or sending them to a third-party ("Vendors") for more processing. If the customer defaulted, the timeshare companies would often foreclose on their timeshare ownerships, which Reed Hein considered to be an "exit." The Vendors would achieve equally dubious exits in a variety of ways described below. Beginning in 2015, Reed Hein attempted to communicate directly with timeshare companies and developers with mixed results. Although Reed Hein claims it can "force" the timeshare companies to let customers exit timeshare contracts, Reed Hein's communications consist entirely of asking the timeshare companies to voluntarily release customers. Because Reed Hein cannot perform such negotiations without committing the unlicensed practice of law, Reed Hein hires attorney

COMPLAINT FOR DAMAGES - 13

1    Vendors to supposedly represent the customers, but the customers are not allowed to speak with

2    the attorneys and often do not know their names. The vendors themselves are paid millions of

3    dollars by Reed Hein and withhold information from their clients to protect Reed Hein. Attorneys

4    have been forced to disclose thousands of pages of otherwise-privileged client communications

5    because Reed Hein's interference in the relationship collapses the attorney-client privilege,

6    which Reed Hein does not disclose to the affected customers or prospective customers.

7         42.    **False Updates**: Customers often go years without results, or even updates from

8    Reed Hein. When customers reach out to Reed Hein for updates it occasionally responds. On

9    those occasions, customer liaisons are instructed to give clients cookie-cutter updates that are

10   generally untrue. The updates ordinarily suggest that Reed Hein has been working with the

11   timeshare, even when it has absolutely no relationship with the timeshare or the relationship is

12   so soured the timeshare refuses to work with Reed Hein. The updates usually say something to

13   the effect of "we are working with your timeshare company to see what exactly they need to let

     you out," despite having made no communications to the timeshare whatsoever.

14        43.    **Lack of Results**: Reed Hein continues to advertise its ability to produce results,

15   even though the purported exits are becoming more difficult and often impossible to obtain.

16        44.    **False Money-Back Guarantee:** Although Reed Hein ostensibly offers a money-

17   back guarantee, the guarantee is illusory and almost never honored. Customers are only entitled

18   to money back if Reed Hein is unable to obtain an exit, but whether Reed Hein is unable to obtain

19   an exit is unilaterally determined by Reed Hein without any clear criteria to guide that

20   determination. After years of processing, Reed Hein simply tells customers who demand their

21   money back that more processing is necessary to achieve their exit. Consequently, Reed Hein

22   has a backlog of <u>thousands</u> of pre-paid customers that it has never helped and never reimbursed.

23        45.    **Pyramid Scheme**: Reed Hein takes more customers than it exits, leading to a

24   severe backlog of thousands of un-exited customers. Treating all payments as income-instantly-

25   earned, Reed Hein does not maintain their money in trust or escrow. Instead it disburses it toward

**COMPLAINT FOR DAMAGES - 14**

operating costs or profit for Brandon Reed, Trevor Hein, and others. Reed Hein maintains an inadequate reserve and it would become instantly insolvent if its backlog of un-exited customers demanded its money back. Instead, Reed Hein relies entirely on an influx of new customers to fund its operations and the money-back guarantees.

46. **False Exits**: When and if the processing ends, Reed Hein sends customers a letter claiming the customers "exited" their timeshare agreements. Reed Hein's exits often do not constitute a legally cognizable rescission of the timeshare contracts. Instead, Reed Hein has historically relied on timeshare company's reluctance to sue timeshare holders, although that has now changed. With the exception of exits voluntarily granted by timeshare companies, often after the customers are left to negotiate for themselves, Reed Hein's exits have no legal significance. They range from convoluted quitclaim deed schemes to plain falsehoods about whether the client exited their contract.

## 1. Legally Invalid Exits

47. Reed Hein initially claimed to customers it was able to "force" developers and timeshare companies to take back timeshares, but that is false. In his deposition, Reed Hein's Chief Operating Officer was unable to coherently explain how it "forced" timeshare companies to "take back" timeshare agreements:

> Q. So back to my question: In what ways has Reed Hein forced any resort to take any timeshare back?
>
> A. By the methods that we are moving inventory back and out of the customer's name.

Parenteau eventually acknowledged that the methods do not force the timeshare companies to do anything. The only successful exits occur with the consent of the resorts.

## A. Notices of Resignation

48. Reed Hein falsely claims that it can force timeshare companies to rescind the agreement with "notices of resignation." That is false because 1) the timeshare company's

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

decision to accept the notice is entirely voluntary and 2) timeshare companies no longer accept notices of resignation from Reed Hein's customers. A notice of resignation is something any customer can do. It is simply a letter sent to the timeshare company stating that the customer no longer wishes to participate in the program. The timeshare company has the option whether to rescind the agreement. While Reed Hein has had some minor success with that approach in the past, timeshare companies no longer agree to rescind contracts with Reed Hein customers.

### B. Unenforceable Quitclaim Deeds

49.      Reed Hein falsely tells customers it can exit them from their timeshares by executing and recording a quitclaim deed conveying the customer's timeshare interest back to the timeshare company. Reed Hein does that without the consent of the timeshare company and it has no legal enforceability. Again, Reed Hein simply relies on the timeshare company's reluctance to sue customers.

### C. Quitclaim Deed/Foreclosure Hybrid

50.      Reed Hein falsely tells customers it can exit them from timeshares by a combined quitclaim-foreclosure/notice of termination approach. Reed Hein pays a vendor to execute a quitclaim deed giving the customer's interest in the timeshare to a third party who then refuses to pay. Like the quitclaim deeds to the timeshare company, the quitclaim deeds to the third party are legally unenforceable. Reed Hein simply relies on the timeshare company's reluctance to take customers to court.

### D. Extortion of Customers

51.      Since nonconsensual quitclaim deeds are unenforceable and timeshare companies are becoming increasingly difficult, Reed Hein strong-arms its clients into signing illusory quitclaims under the threat they will lose their money-back guarantee if they do not. Reed Hein purports to locate third-parties who are willing to take the customer's interest in the timeshare. Reed Hein then has the customer execute and notarize transfer paperwork containing blank spaces for the transferees. If the customer refuses to sign the legally incognizable document,

**COMPLAINT FOR DAMAGES - 16**

Reed Hein claims that its duty to exit the customer is discharged and the customer has waived his or her money back guarantee.

### E.  False Claims of Exits

52.     Facing an enormous backlog of un-exited customers, Reed Hein resorts to telling customers outright lies. Reed Hein sends customers letters notifying them that Reed Hein received a confirmation from the timeshare company that it has agreed to exit their contract. Reed Hein then sends letters stating they have been "exited" under the terms of its service agreement. And takes no further action. Timeshare companies frequently continue to demand payments and have begun suing Reed Hein customers who believed, based on information from Reed Hein, that their timeshare obligations were rescinded. When the customer complains to Reed Hein, it claims that it received a "verbal confirmation" from the timeshare company.

### F.  "Mass Exits"

53.     After discovering Reed Hein's business model, timeshare companies have stopped negotiating with any Reed Hein customers and have begun suing Reed Hein customers for damages – a material fact that Reed Hein does not disclose to new customers. From 2020-2021, Reed Hein settled three lawsuits in which it had been the defendant against major timeshare developers. It then claimed that the settlement agreements were struck on behalf of the clients, thereby extinguishing the clients' rights to refunds. Although Reed Hein has a duty to avoid conflicts of interest, Reed Hein's own attorneys struck the settlement agreements in which they bargained away the clients' rights to refunds from Reed Hein. The agreements do little more than put the client in the same position he or she would be in if they never hired Reed Hein in the first place. The agreements state that the timeshare companies will lift restrictions they specifically impose *on Reed Hein customers*. It then allows the customers to access timeshare companies' own pre-existing exit programs, about which Reed Hein never previously notified its customers. The agreements state the timeshare companies can unilaterally dictate the amount a customer must pay to get out of their timeshare contract. They also exclude Reed Hein from participating

**COMPLAINT FOR DAMAGES - 17**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

in negotiations between the timeshare company and the customer—the lone service customers paid Reed Hein to provide. Often the timeshare company offers the customer out of the timeshare for the amount the customer has gone into arrears while the customer was waiting years for Reed Hein to get them out of their timeshare contract instead of refunding the customers' money. Furthermore, the agreements state that Reed Hein will "advise" its clients not to involve their lawyers in the negotiations. Based on that agreement, Reed Hein considers its duties fulfilled and keeps the customers' money.

### 2. Exits the Customers Could Achieve on Their Own

### A. Foreclosure or Termination

54.     Reed Hein's first strategy was to induce foreclosures or terminations. Despite stating that it can force timeshare companies to "take back" agreements, Reed Hein originally encouraged customers to default on their dues and maintenance fees in order to induce a foreclosure. Depending on the asset, the timeshare company either takes possession of the client's interest in the asset or notifies the customer that the timeshare company is terminating the contract. Then Reed Hein considers the foreclosure or notice to be an exit in satisfaction of its contract with the customer. Both outcomes can harm a customer's credit rating and create other negative financial consequences, but Reed Hein has traditionally relied on timeshare companies' unwillingness to suffer adversarial proceedings in court, where their high-pressure sales pitches might be scrutinized by a judge. At some point, Reed Hein realized it was exposing itself to claims of tortious interference with a business contract and began advising clients to continue paying their timeshare fees for Reed Hein's own benefit. In 2018, timeshare companies began suing Reed Hein for tortious interference and its customers for nonpayment. Reed Hein does not notify customers that they consider an adversarial foreclosure to be an "exit," nor do they notify customer that they might be sued, both of which are material information.

### B. Exit Programs Already Offered by the Timeshare Company

Having numerous employees with experience in the timeshare industry, Reed Hein is

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

aware that many of the timeshare companies offer their own "exit" programs. Those programs generally require the customer to pay some fraction of their remaining mortgage or some multiple of their maintenance fees. Reed Hein charges customers tens of thousands of dollars promising that it will force the timeshare company to take back their timeshare and omits that it plans to run them through the pre-existing program the customers could already use on their own. Now that the timeshare companies are refusing to work with anyone identified as a Reed Hein customer, Reed Hein simply accepts the customers' money and then instructs them to use the program themselves.

### 3. Deceptive Claims Designed to Induce Reliance

#### A. Reed Hein Makes False Claims that Timeshare Obligations Can Be Passed to Children

55.    In Gretchen Morgensen's January 22, 2016 New York Times Article *The Timeshare Hardsell Comes Roaring Back*, Morgensen explained that the timeshare industry purposefully perpetuates the false claim that timeshare obligations and benefits can be passed down to buyers' children. Timeshare Exit Team intentionally contributes to that misunderstanding. As of the date of filing, the company's website includes the following false "answer" to the "frequently asked question" of whether an owner's heir will inherit his or her timeshare interest:

> 74% of timeshares have consumers in lifetime contracts, many of which have perpetuity commitments. While the issue of inheritance is a legal one for which you should seek legal counsel, Timeshare Exit Team understands that some timeshare interests might continue to burden an owner's heirs or estate after the owner's passing

In October 2014, the company used even less careful language following language:

> yes, your kids can inherit your timeshare when you pass away based on tenancy, whether they want it or not.

#### B. Reed Hein Acts as a Listing Company While Discouraging Clients from Using Listing Companies

**COMPLAINT FOR DAMAGES - 19**

56.     Reed Hein profited from the resale of customer's timeshares after discouraging customers to resell their so themselves, which they could have done without the additional expense of a Reed Hein agreement. Reed Hein stated in its marketing materials and its contracts that it is not a transfer or listing company. Reed Hein trained its employees to warn customers about the dangers of listing companies. It warned customers that their assets had no listing value, that listing companies would try to scam them, would collect high upfront fees, and that there was little chance of the timeshare reselling on the market. Reed Hein's sales scripts also criticize transfers to a third party as an exit method. However, the primary way in which Reed Hein customers exited their contracts was through the transferring or selling of their timeshares to third parties. Reed Hein engages in the same practices it discouraged, except that it collects fees upfront to do it.

### C. Reed Hein Creates a Hobson's Choice for Consumers So They Cannot Exit and Cannot Obtain a Refund

57.     Reed Hein tells its customers that they do not need to pay maintenance fees and other payments to their timeshare companies. However, transfer companies require Reed Hein's customers to be current on payments in order to make a transfer. If Reed Hein chooses to use a transfer company, it informs customers that they have 180 days to make their payments for a guaranteed exit. If they do not pay, they forfeit the money-back guarantee that Reed Hein advertised. However, customers opting for that method are required to sign a legally invalid "Exit Agreement Addendum." Under the addendum, Reed Hein and the transfer company have an unlimited amount of time to complete the exit while the timeshare obligations remain in the customer's name. That way, Reed Hein can force the property owners to maintain their property in perpetuity without ever receiving their money-back guarantee.

### D. After Promising to Negotiate Directly with Timeshare Companies, Reed Hein made Customers Negotiate Directly with the Timeshare Companies

58.     Facing an enormous backlog with no coherent plan to discharge its duties, Reed

**COMPLAINT FOR DAMAGES - 20**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

Hein directs its customers to file complaints with the Better Business Bureau and state Attorneys General to prompt the timeshare companies to contact the customers. Reed Hein directs the customer to negotiate for their own exit using Reed Hein's talking points. Reed Hein directs them not to inform the timeshare company of its involvement. That method is contrary to Reed Hein's claims that it would "work directly" with resorts. In essence, customers pay thousands of dollars to Defendants to negotiate their own exits.

### E. Reed Hein Employees Do Not Possess the Expertise It Advertises

59.     Brandon Reed testified that he knew "nothing" about timeshares when he started Reed Hein. As early as December 2013, Defendants advertised that "[w]e are industry experts in relieving people of their timeshare commitments." Neither had any experience or training in performing timeshare exits, and they did not hire internal personnel who did. Brandon Reed has testified under oath in other litigation that Reed Hein's business model from inception was to outsource all exit work to third-party Vendors.

60.     Aside from calling timeshares and pretending to be lawyers, Defendants only began using internal processes to achieve exits in 2015, which was limited to contacting resorts about their internal voluntary surrender programs mentioned above, which the customers could have used for free. The employees making those contacts have no license to negotiate customers' rights either through a law license or a special dispensation, such as a real estate license.

### F. Defendants' Advertised Money-Back Guarantee Is Deceptive and Illusory

61.     Reed Hein looks for any way it can extinguish the customers' right to a refund, even by imposing caveats and qualifications on the money-back guarantee it never disclosed to customers. Although Reed Hein tells customers to expect to be released from their timeshare within 12-18 months, Reed Hein refuses to pay refunds so long as it subjectively concludes the customer still has "exit paths" and "avenues to exits" it still has not tried. Reed Hein has refused to pay refunds to customers on those bases three to four years after the customers engaged with

**COMPLAINT FOR DAMAGES - 21**

Reed Hein, even when the customers have asked for refunds many times. Reed Hein refuses to pay clients refunds if they give Reed Hein "inaccurate information" which often amount to nothing more than Reed Hein twisting the clients' words to extinguish their refund.

62. As a result, the "risk-free" Money-Back Guarantee guarantees nothing at all. Reed Hein has sole discretion to pay customers their money back, which it rarely does. Reed Hein only honors the 100% Money-Back Guarantee for customers who might bring negative attention to Reed Hein. Reed Hein has even conditioned refunds on customers taking down negative reviews or complaints online.

### G. Reed Hein Creates the Deceptive Impression that Reed Hein is a Law Firm and Misrepresent that Reed Hein Performs "Consumer Protection"

63. Reed Hein routinely advertises itself as a "consumer protection firm" and "consumer advocates" to create the false impression that Reed Hein will personally provide services through specialized legal means. Defendant's scripts and webpages routinely suggest that Reed Hein's attorneys work for the customers: "Our Attorneys – They are consumer advocate attorneys." Reedhein.com also stated that Defendants "represent consumers," who are referred to as "our firm's clients," and claim that Defendants' services included "preparing the strongest case for you." Reed Hein is either referring to its own in-house counsel, who do not represent clients, or counsel Reed Hein must pay to provide the services Reed Hein said it could personally provide. Reed Hein and Associates has no actual "associates." Reed Hein's attorneys represent Reed Hein.

### 3. Material Omissions and Active Concealment of Material Facts

### G. Reed Hein Declines to Notify Customers that Timeshare Companies Have Begun Suing Its Customers

64. Timeshare companies have been unwilling to sue timeshare holders who default because it would expose their sales and negotiation tactics. Since 2013, Reed Hein's alleged

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

"exits" merely consisted of legally invalid quitclaim deeds and other form of nonpayment, relying on the timeshare companies' unwillingness to file suit. As late as 2018, timeshare companies began filing suit against Reed Hein customers. Reed Hein does not disclose to future customers the possibility that they might be sued or the reality that its current customers are being sued.

### 4. Additional Unfair Acts and Practices

#### A. Reed Hein Falsely Asserts That Communications Between Reed Hein and its Customers Are Protected by Attorney-Client Privilege

65. Reed Hein executes Power-of-Attorney agreements with their customers. Under those agreements, Reed Hein asserted that it "acts as an agent pursuant to the POA agreements when it hires law firms or transfers companies . . . and when it communicates and interacts with the law firms on behalf of the Reed Hein customers." Reed Hein further asserted that "If Reed Hein decides to hire a law firm for a customer, Reed Hein and the law firms specifically intend to create a relationship under privileged material is freely exchanged. As such, the law firms, customers, and Reed Hein all intend that the attorney-client and work product privileges and protections apply to all three parties in this agency relationship – the law firms, the customers/clients, and Reed Hein."

66. However, Reed Hein knows a federal court in 2018 held that the communications and work product between those entities were not subject to attorney-client privilege or the work product doctrine. After that ruling, Vendors for Reed Hein were required to disclose thousands of pages of communications that would have otherwise been privileged but for Reed Hein's interference with the attorney-client relationship. Reed Hein did not tell the customers that their private information had been disclosed to their own adversaries. Instead, Reed Hein continued to assert after the ruling that those communications and work product were subject to attorney-client privilege and work product privileges.

#### B. Reed Hein Refuses to Disclose Other Material Developments

67. In two separate cases before the middle district of Florida, Reed Hein and its

**COMPLAINT FOR DAMAGES - 23**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

vendors were ordered to disclose thousands of documents that would have been privileged but for Reed Hein's interference with the attorney-client privilege. Reed Hein failed to disclose to the customers that their private information had been disclosed to an adversary.

68.     Reed Hein's law firm-vendors stopped taking referrals from Reed Hein in summer 2018. Reed Hein was unable to find another law firm to service customers until summer 2019—creating a massive backlog of customers. Mr. Reed falsely testified under oath that the customers had been told they were in a "holding pattern," although no such disclose was made.

## V.     CLASS ACTION ALLEGATIONS

69.     Plaintiffs bring this action pursuant to Civil Rule 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class for the maximum time period allowable by law:

> **Class 1:** all persons who received legally invalid exits from their timeshare agreements or were not exited from their timeshares at all ("**non-exits**").

> **Class 2**: all persons who had to obtain their own exits after paying Reed Hein to do so for them ("**self-exits**").

> **Class 3**: all persons who obtained 'harmful' exits by either paying additional money to the timeshare companies or suffering other negative repercussions ("**harmful exits**").

70.     The Class is so numerous that joinder of all members is impracticable.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

72.     Plaintiffs' claims are typical of the claims of each member of the Class.

73.     There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all the Class' members and that include, without limitation:

> a.  Whether Defendants misappropriated client funds in violation of their contracts, duties, and fiduciary duties

> b.  Whether Defendants induced customers into contracts with promises of being able

**COMPLAINT FOR DAMAGES - 24**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

to legally stop making payments on their timeshares;

c. Whether Defendants asserted that their conversations with customers and legal counsel were privileged when they knew or should have known of a court order stating that those communications were not privileged;

d. Whether the Defendants breached the implied covenant of good faith and fair dealing;

e. Whether Defendants made materially false representations to Plaintiffs and the Class;

f. Whether Defendants made materially false representations about their knowledge and experience in the timeshare industry;

g. Whether Defendants failed to abide by the statutes and regulations for crediting organizations;

h. Whether Defendants materially misled consumers in performance of debt adjustment services;

i. Whether Defendants made material misrepresentations about the speed of exit services;

j. Whether Defendants failed to provide exit services for Plaintiffs and the Class;

k. Whether Defendants' business practices alleged herein are deceptive acts or practices;

l. Whether Defendants breached their fiduciary duty to Plaintiffs and members of the Class;

m. Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages;

n. And whether Plaintiffs and the Class are entitled to declaratory, injunctive, and other equitable relief.

74.     Plaintiffs are members of Class 1 and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

75.     Class action status is warranted under CR 23(b)(1)(A) because the prosecution of

**COMPLAINT FOR DAMAGES - 25**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

76.     Class action status is warranted under CR 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

77.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

78.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

79.     **Class Counsel –** Plaintiffs have retained counsel who have been interviewing witnesses and researching these underlying issues for 18 months before filing suit. Counsel have already recovered greater than $300,000 from Reed Hein on behalf of Reed Hein customers in dozens of lawsuits and arbitrations. Counsel are experienced in plaintiffs' litigation and will represent the Class fairly, adequately, and zealously.

## VI.   CLAIMS FOR RELIEF

### COUNT ONE
### BREACH OF CONTRACT INCLUDING BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

80.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

81.     Every contract contains an implied covenant of good faith and fair dealing.

**COMPLAINT FOR DAMAGES - 26**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

82.     Through methods described above, Defendants induced customers into contracts unfairly and in bad faith by using false claims and promises.

83.     Defendants breached the terms of the spirit of its contracts with customers.

84.     As a direct, proximate, and legal result of the breaches, Plaintiffs and members of the Class have suffered damages in an amount to be proven at trial.

## COUNT TWO
## COMMON LAW FRAUD

85.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

86.     Through methods described above, Defendants induced customers to spend money on its services by making materially false representations and omitting material facts with the intent that the false statements and omitted facts be acted upon.

87.     Plaintiffs, including the Class, were ignorant of or would not be expected to know the truth of the material misrepresentations and material omissions.

88.     Plaintiffs relied on the truth of Defendants' misrepresentations and trusted that there were no material omissions.

89.     Plaintiffs suffered damages as a result of their reliance.

## COUNT THREE
## NEGLIGENT MISREPRESENTATION

90.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

91.     Through the methods described above, Defendants induced customers to spend money on its services by making negligent misrepresentations and negligently omitting material facts from the Plaintiffs.

92.     Plaintiffs relied on the truth of Defendants' misrepresentations and trusted that there were no material omissions.

93.     Plaintiffs suffered damages as a result of their reliance.

**COMPLAINT FOR DAMAGES - 27**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

## COUNT FOUR
## UNJUST ENRICHMENT/DISGORGEMENT

94.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

95.     Plaintiffs and Class have conferred a substantial benefit upon Defendants derived from the fees paid by Plaintiff and the Class.

96.     Those payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiff and members of the Class.

97.     As a result of Defendants' unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

98.     Plaintiff and the Class also seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful, and/or deceptive practices.

## COUNT FIVE
## VIOLATION OF CONSUMER PROTECTION ACT, RCW 19.86 *et. seq.*

99.     Plaintiffs re-allege the facts in this complaint as if set forth more fully herein.

100.    Plaintiffs can prevail on a claim for damages under the State Consumer Protection Act by establishing (1) an unfair or deceptive act or practice, (2) that occurred in the conduct of trade or commerce, (3) that has an impact on the public interest, (4) that results in injury to the plaintiffs in their business or property, and (5) causation. *Klem v. Washington Mut. Bank*, 176 Wash.2d 451 (1992).

101.    Defendants commits an unfair or deceptive act or practice by promising to hold customers funds separate and apart from company's funds, when the company in fact converted Plaintiffs' funds into its own funds.

102.    Because Defendants committed the unfair or deceptive acts or practices as part of

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

a transaction, the acts or practice occurred in the conduct of trade or commerce.

103.    Because Defendants have presented the same power-of-attorney form to tens of thousands of customers, and because the company has in fact converted the funds of all those customers into its own funds, the company's unfair or deceptive act or practice as an impact on the public interest.

104.    Defendants engaged in the foregoing acts or practices constituting unfair or deceptive acts in trade or commerce.

105.    Defendants' practices outlined above affects the public interest and have the capacity to deceive a substantial number of consumers and are unfair or deceptive acts or practices in trade or commerce in violation of RCW 19.86.020.

106.    The unfair or deceptive act or practices have harmed Plaintiffs and the Class in their business or property.

107.    The unfair or deceptive practice act or practice proximately caused Plaintiffs' and the Class' injuries.

108.    This Court has authority to award treble damages, up to a maximum of $25,000, to any person who establishes that he or she was injured because of a violation of the State Consumer Protection Act. RCW 19.86.090.

109.    A person who establishes that he or she was injured because of a violation of the State Consumer Protection Act is entitled to the reasonable attorney fees and costs he or she incurred in bringing the suit. RCW 19.86.090.

110.    The Court should award treble damages to the Plaintiffs and each member of the Class.

### COUNT SIX
### BREACH OF FIDUCIARY DUTIES

111.    Defendants induced Plaintiffs, including the Class into fiduciary relationships by asking them for power of attorney and soliciting money for services not yet performed.

**COMPLAINT FOR DAMAGES - 29**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044

112.     Defendants received money from Plaintiffs and the Class for services not yet performed, but did not hold the money in trust or escrow.

113.     Defendants immediately misappropriated the money as earned income.

114.     Defendants breached its fiduciary duties to Plaintiffs and the Class.

## VII.     PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court grant the following relief:

115.     Injunctive relief ordering Reed Hein to stop providing the services described herein.

116.     Adjudication and decree that Reed Hein has engaged in the conduct complained herein.

117.     Adjudication and decree that the conduct complained of herein constitutes unfair or deceptive acts or practices in violations of the Consumer Protection Act, Chapter 19.86 RCW.

118.     That the Court make such orders pursuant to RCW 19.86.090 as it deems appropriate to provide that Plaintiffs have and recover from Defendants the costs of this action, including reasonable attorneys' fees.

119.     That the Court order such other relief as it may deem just and proper to fully and effectively dissipate the effects of the conduct complained herein, or which may otherwise seem proper to the Court.

120.     Monetary Relief, including Damages and Treble damages.

121.     Attorney Fees and Costs.

122.     Any other monetary and nonmonetary relief the Court deems just and proper.

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA  98121
Phone: (206) 576-8044

DATED this 9th day of October, 2021.

ALBERT LAW PLLC

By: _[signature]_
Gregory Albert, WSBA#: 42673
3131 Western Ave., Suite 410
Seattle, WA 98121
Telephone: (206)-576-8044
Email: greg@albertlawpllc.com
*Attorney for Plaintiffs*

**COMPLAINT FOR DAMAGES - 31**

ALBERT LAW PLLC
3131 Western Avenue, Suite 410
Seattle, WA 98121
Phone: (206) 576-8044