UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ANNA PATRICK, et al., | CASE NO. C23-0630JLR |
| Plaintiffs, | ORDER |
| v. | |
| DAVID L. RAMSEY, III, et al., | |
| Defendants. | |

## I.  INTRODUCTION

Before the court are two motions: (1) Defendants David L. Ramsey, III and The Lampo Group, LLC's ("Lampo," and together with Mr. Ramsey, the "Lampo Defendants") motion to compel arbitration and to stay this case pending arbitration (MTC (Dkt. # 82); Lampo Reply (Dkt. # 97)); and (2) the Lampo Defendants' motion to stay these proceedings pending the court's ruling on the motion to compel (MTS (Dkt. # 88)). Defendant Happy Hour Media Group LLC ("Happy Hour," and together with the Lampo Defendants, "Defendants") joins in both motions. (MTC Joinder (Dkt. # 84); MTC

ORDER - 1

Joinder Reply (Dkt. # 99); MTS Joinder (Dkt. # 94).)  Plaintiffs[1] oppose the Lampo Defendants' motions and Happy Hour's joinders thereto.  (MTC Resp. (Dkt. # 90); MTC Joinder Resp. (Dkt. # 92); MTS Resp. (Dkt. # 100).)  The court has considered the motions, the parties' submissions in support of and in opposition to the motions, the relevant portions of the record, and the governing law.  Being fully advised,[2] the court DENIES the Lampo Defendants' motion to compel arbitration and DENIES the Lampo Defendants' motion to stay as moot.[3]

## II.    BACKGROUND

The court set forth the factual and procedural background of this case in its prior orders.  (*See* 10/12/23 Order (Dkt. # 35); 12/5/23 Order (Dkt. # 53); 2/23/24 Order (Dkt. # 74).)  Therefore, the court focuses below on the background pertinent to the Lampo Defendants' motion to compel arbitration.

Plaintiffs are individuals who signed contracts with and paid money to non-party Reed Hein & Associates ("Reed Hein") for assistance in "exiting" their obligations with respect to timeshares they owned at various resort properties.  (Am. Compl. (Dkt. # 55) ¶¶ 16-66 (alleging facts regarding each of the named Plaintiffs).)  Plaintiffs allege that

---

[1] Plaintiffs are Anna Patrick, Douglas Morrill, Roseanne Morrill, Leisa Garrett, Robert Nixon, Samantha Nixon, David Bottonfield, Rosemarie Bottonfield, Tasha Ryan, Rogelio Vargas, Marilyn Dewey, Peter Rollins, Rachael Rollins, Katrina Benny, Sara Erickson, Greg Larson, and James King (collectively, "Plaintiffs").  (Am. Compl. (Dkt. # 55) ¶¶ 16-66.)

[2] None of the parties requested oral argument and the court finds that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] The court exercises its discretion under Federal Rule of Civil Procedure 1 to decide the motion to stay before its noting date.  *See* Fed. R. Civ. P. 1 (directing courts to administer the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding").

Reed Hein hired Happy Hour—a marketing company founded by Reed Hein's co-founder Brandon Reed—and the Lampo Defendants to promote Reed Hein's services through Mr. Ramsey's radio show, podcast, and other media. (*Id.* ¶¶ 5-7, 115-44, 154-72 (describing Mr. Ramsey's financial advice business and his relationship with Reed Hein).) Plaintiffs assert that Reed Hein, through its relationship with Happy Hour, paid the Lampo Defendants over $30 million "to make false claims and instruct [Mr.] Ramsey's faithful listeners to hire Reed Hein." (*Id.* ¶ 5.) According to Plaintiffs, Mr. Ramsey "assured his listeners that he had vetted Reed Hein," and "made false statements about Reed Hein's knowledge, skill, and ability to get customers out of timeshare obligations." (*Id.* ¶ 7; *see also id.* ¶¶ 138-41 (providing examples of statements Mr. Ramsey made when endorsing Reed Hein).) Plaintiffs allege that these statements induced them to enter into contracts with Reed Hein, only to lose their money when Reed Hein failed to terminate Plaintiffs' timeshare obligations and refused to refund their money when the "exits" were unsuccessful. (*Id.* ¶¶ 3-4; *see also id.* ¶¶ 81-98 (describing Reed Hein's practices).) Plaintiffs assert that Mr. Ramsey continued to promote Reed Hein even after complaints, lawsuits, and arbitrations filed against Reed Hein should have placed him on notice that Reed Hein was defrauding his followers. (*Id.* at 8.)

In February 2020, Reed Hein compelled a lawsuit brought by one of its customers into arbitration pursuant to the arbitration clause in that customer's contract with Reed Hein. (7/26/24 Albert Decl. (Dkt. # 91) ¶ 3.) Subsequently, Plaintiffs' attorneys represented claimants in approximately 60 arbitrations against Reed Hein in 2020 and 2021, 14 of which proceeded to evidentiary hearings. (*Id.* ¶¶ 1, 3; *see also id.* ¶ 6, Exs.

2-14 (arbitration awards)).) In 2021, however, after Reed Hein stopped paying arbitration fees and awards, the AAA refused to accept additional arbitrations involving Reed Hein and granted complainants the right to sue Reed Hein in court pursuant to the AAA Consumer Arbitration Rules. (*Id.* ¶¶ 3-4.)

Counsel for Plaintiffs filed a class action in this court in October 2021 against Reed Hein, its founders, and other entities on behalf of "[a]ll persons who paid fees to Reed Hein for services to terminate their timeshare obligations, except those persons who received refunds of the fees that they paid." (*See id.* ¶¶ 4-5; 2/23/24 Order at 3-6 (discussing *Adolph v. Reed Hein & Assocs.*, No. C21-1378BJR (W.D. Wash.)).) In late 2022, the *Adolph* parties entered into a settlement that included entry of a $630,187,204 judgment against Reed Hein, Mr. Reed, and Mr. Reed's company Makaymax Inc., along with a covenant to "take no action to collect" on the judgment against those entities. (*See* 2/23/24 Order at 5-6; *see also id.* at 4 (noting that Reed Hein appeared to be insolvent at the time).) The court entered final approval of this settlement on May 19, 2023, and entered the parties' agreed judgment and covenant not to execute on June 15, 2023. (*See id.* at 5-6.)

Plaintiffs filed this proposed class action against the Lampo Defendants and Happy Hour on April 28, 2023, and amended their complaint on December 15, 2023. (*See* Compl. (Dkt. # 1). *See generally* Am. Compl.) They bring claims against Defendants for engaging in deceptive conduct in violation of the Washington Consumer Protection Act ("WCPA"), ch. 19.86 RCW; for negligently misrepresenting the nature of

Reed Hein's services; and for conspiring with Reed Hein to convince Mr. Ramsey's listeners to enter into agreements with Reed Hein. (Am. Compl. ¶¶ 220-28, 234-35.[4])

The court stayed discovery and issuance of a case schedule pending the resolution of the Lampo Defendants' motion to dismiss. (8/18/23 Order (Dkt. # 28).) The court lifted the stay and entered a class certification scheduling order in early December 2023. (*See* 12/8/23 Sched. Order (Dkt. # 54).) The Lampo Defendants answered the amended complaint and asserted affirmative defenses, including the defense of arbitration, on January 11, 2024. (Lampo Ans. (Dkt. # 63); *see id.* at 30 ¶ 17 ("Claims of Plaintiffs and/or absent class members may be subject to arbitration requirements.").) Happy Hour has not filed an answer. (*See generally* Dkt.)

On February 21, 2024, the Lampo Defendants served requests for production asking Plaintiffs to produce their contracts with Reed Hein. (6/20/24 Elder Decl. (Dkt. # 83) ¶ 2.) Plaintiffs produced the contracts signed by nine Plaintiffs on May 8, 2024. (*Id.* ¶ 3.) All of these contracts include arbitration clauses. (*Id.*) On June 13, 2024, Plaintiffs produced two more contracts with arbitration clauses. (*Id.* ¶ 6.) Although the remaining Plaintiffs have not been able to find their contracts, Plaintiffs acknowledge that those contracts "almost certainly contain the same or nearly identical arbitration clauses as those in the contracts which have been located." (MTC Resp. at 5 n.1.)

//

//

---

[4] The court dismissed Plaintiffs' unjust enrichment and conversion claims in earlier orders. (*See* 10/12/23 Order (Dkt. # 35); 12/5/23 Order (Dkt. # 53); 2/23/24 Order (Dkt. # 74); 5/20/24 Order (Dkt. # 79).)

The contracts signed by nine of the Plaintiffs include, in relevant part, the following language:

> **Arbitration of Disputes**
> Any claim or controversy arising out of or relating to this Agreement, including arbitrability of a dispute pursuant to this provision, shall be fully and finally settled by arbitration under the authority of the Federal Arbitration Act and pursuant to the Rules of the American Arbitration Association (the "AAA Rules"), conducted by one arbitrator mutually agreed upon by Reed Hein and Owner or chosen in accordance with the AAA Rules, except that the parties thereto shall have any right to discovery as would be permitted by the Federal Rules of Civil Procedure for a period of 90 days following the commencement of such arbitration and the arbitrator thereof shall resolve any dispute which arises in connection with such discovery.

(6/20/24 Elder Decl. ¶¶ 3, 8-14, Exs. 2-8.)  The remaining two contracts contain the following substantially similar language:

> **Arbitration of Disputes**
> Any claim or controversy arising out of or relating to this Agreement shall be fully and finally settled by arbitration in accordance with the Rules of the American Arbitration Association then in effect (the "AAA Rules"), conducted by one arbitrator mutually agreed upon by REED HEIN and OWNER or chosen in accordance with the AAA Rules.

(*Id.* ¶¶ 6, 15-16, Exs. 9-10, § 8.)  The Lampo Defendants assert that they did not know that Plaintiffs' contracts with Reed Hein included arbitration clauses until Plaintiffs produced them in May and June 2024.  (MTC at 4.)

The Lampo Defendants filed this motion to compel arbitration on June 20, 2024, more than six months before the parties' original agreed deadline for motions to compel arbitration.  (MTC; *see* 2/21/24 Order (Dkt. # 71).)  The Lampo Defendants filed their motion to stay on July 25, 2024.  (MTS.)

## III. ANALYSIS

The Lampo Defendants ask the court to order Plaintiffs to submit their claims to mandatory arbitration based on the arbitration clauses in their contracts with Reed Hein. (*See generally* MTC.)  Happy Hour joins in the Lampo Defendants' motion and makes additional arguments in favor of arbitration based on its separate role in the case. (*See generally* MTC Joinder.)  Plaintiffs assert that Defendants cannot compel them to arbitration because (1) Defendants are nonsignatories to Plaintiffs' contracts with Reed Hein; (2) the doctrine of equitable estoppel does not bar Plaintiffs from opposing arbitration; (3) Defendants waived their right to compel arbitration; and (4) the arbitration clauses are substantively unconscionable. (*See generally* MTC Resp.; MTC Joinder Resp.)  As discussed below, the court concludes that Defendants cannot invoke equitable estoppel to compel Plaintiffs to arbitrate their claims.  Thus, the court need not consider Plaintiffs' remaining arguments against arbitration, nor need it address the Lampo Defendants' motion to stay this case pending a decision on the motion to compel.

### A. Legal Standard

"A litigant who is not a party to an arbitration agreement may invoke arbitration . . . if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)).  The parties agree that Washington law governs the enforceability of the arbitration clauses in Plaintiffs' contracts. (*See* MTC at 5 n.4; MTC Joinder at 4 (joining in the Lampo Defendants'

equitable estoppel briefing); MTC Resp. at 7.) Thus, the court looks to Washington law to determine whether Plaintiffs must submit their claims to arbitration.

Because "[a]rbitration is a matter of contract," the "general rule is that 'a party cannot be required to arbitrate a dispute [it] has not agreed to arbitrate.'" *Norwood v. Multicare Health Sys.*, 548 P.3d 978, 984 (Wash. Ct. App. 2024) (first citing *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d 486, 490 (Wash. 2020); and then quoting *David Terry Invs., LLC-PRC v. Headwaters Dev. Grp., LLC*, 463 P.3d 117, 123 (Wash. Ct. App. 2020)). "Under this rule, nonsignatories to a contract generally are not bound by an arbitration clause in that contract." *Id.* (citing *Townsend v. Quadrant Corp.*, 268 P.3d 917, 922 (Wash. 2012)). Equitable estoppel, however, provides an exception to this rule. *Id.* (citing *Townsend*, 268 P.3d at 922). Washington courts recognize two types of equitable estoppel in the arbitration context: (1) "direct benefits estoppel, which focuses on whether the party opposing arbitration is claiming the contract's benefits while attempting to avoid the arbitration provision in the contract," and (2) "intertwined claims estoppel," which applies when "the claims asserted by the party opposing arbitration are intertwined with the underlying contract obligations." *Id.* at 986 (first citing *Townsend*, 268 P.3d at 922; and then citing *Terry Invs.*, 463 P.3d at 123). Defendants assert that both types of estoppel apply in this case and, as a result, the court must compel Plaintiffs to pursue their claims in arbitration. The court considers each below.

**B.    Direct Benefits Estoppel**

Direct benefits estoppel "may require a nonsignatory to arbitrate a claim if that person, despite never having signed the agreement, knowingly exploits the contract in

which the arbitration agreement is contained." *Townsend*, 268 P.3d at 922 (cleaned up). "[K]nowingly exploits" does not mean that the nonsignatory's claims must invoke specific terms of the contract. *See Marshall v. Hipcamp Inc.*, --- F. Supp. 3d ---, No. C23-6156TLF, 2024 WL 2325197, at *6 (W.D. Wash. May 22, 2024) (rejecting nonsignatory plaintiff's argument that direct benefits estoppel did not apply because his tort claims did not rely on the terms of the contract at issue). Instead, a nonsignatory "exploits" a contract if it "obtained a direct benefit" as a result of the contract. *Id.* (collecting cases).

Although the Lampo Defendants invoke direct benefits estoppel as a ground for compelling Plaintiffs to arbitration, they do not cite any Washington authority applying the doctrine where, as here, a nonsignatory defendant seeks to compel a signatory plaintiff to arbitrate its claims. (*See* MTC at 6-8; MTC Reply at 8.) To the contrary, the Lampo Defendants' cited cases apply direct benefits estoppel only in cases where a signatory defendant seeks to compel a nonsignatory plaintiff to arbitration. *See, e.g.*, *Townsend*, 268 P.3d at 922 (compelling nonsignatory children to arbitrate their claims because they received "the benefit of the bargain" along with their signatory parents); *Terry Invs.*, 463 P.3d at 123 (applying direct benefits estoppel only to claims brought by a nonsignatory plaintiff); *Dekrypt Cap., LLC v. Uphold Ltd.*, 20 Wash. App. 2d 1043, 2022 WL 97233, at *6 (Wash. Ct. App. Jan. 1, 2022) (unpublished) (applying intertwined claims estoppel to claims raised by signatory plaintiffs against nonsignatory defendants); *see also Ligeri v. Amazon.com Inc.*, No. 3:23-cv-603 (JAM), 2024 WL 3638241, at *7-8 (D. Conn. Aug. 2, 2024) (applying Washington law and concluding that claims raised by

nonsignatory plaintiffs who purchased Amazon selling accounts from third-party owners were subject to arbitration under the agreements the original owners signed because the nonsignatory plaintiffs benefited from their access to Amazon's buyer base); *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1169 (9th Cir. 2021) (applying federal common law and noting that where courts in other circuits had allowed a nonsignatory defendant to compel arbitration against signatory plaintiffs, it was "essential . . . that the subject matter of the dispute was intertwined with the contract providing for arbitration" (quoting *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013))); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045-46 (9th Cir. 2009) (applying "[g]eneral contract and agency principles" and declining to extend equitable estoppel beyond "the very narrow confines" of applying direct benefits estoppel to claims brought by nonsignatories against signatories and intertwined claims estoppel to claims brought by signatories against nonsignatories).

      The Lampo Defendants misleadingly cite *Norwood v. Multicare Health System* for the proposition that "[a] plaintiff seeks the benefits of a contract when that plaintiff's claims against a non-signatory are dependent on the terms of the contract containing the arbitration clause." (MTC at 6 (citing *Norwood*, 548 P.3d at 985-86).) *Norwood* says no such thing. Although it does state that direct benefits estoppel applies where "the party opposing arbitration is claiming a contract's benefits while attempting to avoid the arbitration provision in the contract," *Norwood*, 548 P.3d at 986 (citing *Townsend*, 268 P.3d at 922), the Court of Appeals expressly declined to address whether direct benefits estoppel applied to claims brought by a signatory plaintiff against nonsignatory

defendants, *id*. Instead, the Court of Appeals applied intertwined claims estoppel to the signatory's claims. *Id.*

When applying Washington law in a diversity case such as this one, the court must apply the law as it believes the Supreme Court of Washington would apply it. *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003). In the absence of a controlling Washington Supreme Court decision, the court must predict how that court would decide the issue, using intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids. *Id.*; *see also Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1045-46 (9th Cir. 2001). In particular, the district court must follow the state's intermediate appellate decisions "in the absence of convincing evidence that the highest court of the state would decide differently." *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990). Finding no Washington appellate authority applying direct benefits estoppel to compel a signatory plaintiff to arbitrate its claims against a nonsignatory defendant, the court declines to apply that doctrine here. Thus, the court denies Defendants' request to compel Plaintiffs' claims to arbitration on the basis of direct benefits estoppel.

**C.     Intertwined Claims Estoppel**

Defendants also contend that Plaintiffs' claims are subject to arbitration because those claims are "intimately founded in and intertwined with" their Reed Hein contracts. (MTC at 8; MTC Joinder at 4); *see Terry Invs.*, 463 P.3d at 124. This doctrine applies:

> when a party has signed an agreement to arbitrate but attempts to avoid arbitration by suing nonsignatory defendants for claims that are based on the same facts and are inherently inseparable from arbitrable claims against

> signatory defendants. . . . Courts applying equitable estoppel against a signatory have looked into the relationships of persons, wrongs and issues, in particular whether the claims that the nonsignatory sought to arbitrate were intimately founded in and intertwined with the underlying contract obligations.

*Norwood*, 548 P.3d at 984 (quoting *Terry Invs.*, 463 P.3d at 124 (cleaned up)).

In *David Terry Investments v. Headwaters Development Group*, for example, David Terry Investments ("DTI") and its manager, David Terry, entered into joint venture agreements with two entities managed by Steve Spady, including Headwaters Development Group ("HDG"). *Terry Invs.*, 463 P.3d at 119-20. Mr. Spady did not sign the agreements in his individual capacity, and two other companies he managed were also involved in the projects but nonsignatories to the agreements. *Id.* When the projects went south, DTI and Mr. Terry sued Mr. Spady and his companies, including the nonsignatory entities. *Id.* at 121. Mr. Spady and his companies moved to compel arbitration. *Id.* The Court of Appeals observed that the claims DTI and Mr. Terry raised against the nonsignatory entities were based on allegations that those entities received funds misappropriated by HDG, a signatory defendant, and that whether HDG misappropriated the funds depended on the terms of the contracts between it and DTI. *Id.* at 124. The court further noted that DTI's claims against Mr. Spady were based on Mr. Spady's alleged false representations before and during the agreements and were "intimately intertwined" with the agreements because Mr. Spady and HDG were "substantially the same 'person.'" *Id.* As a result, the court concluded that DTI's claims against Mr. Spady and the nonsignatory entities were "sufficiently intertwined with the joint venture agreements so as to require arbitration." *Id.*

*Norwood* is also instructive. In that case, Ms. Norwood was an anesthesiologist who signed a services agreement with a company ("LT") that contracted with health care professionals to work at medical facilities on a temporary basis. *Norwood*, 548 P.3d at 980-81. Her services agreement with LT included an arbitration provision that mandated arbitration of "any controversy or claim arising out of or relating to the interpretation, enforcement or breach of" the services agreement. *Id.* at 981-82. LT assigned Ms. Norwood to work at several nonsignatory medical facilities with whom it had separate client agreements. *Id.* Ms. Norwood alleged that after she reported unsafe medical practices at the facilities where she worked she was forced to resign from one and was terminated from the other. *Id.* at 982. She brought claims against the nonsignatory facilities for tortious interference with contract, wrongful discharge in violation of public policy, and intentional infliction of emotional distress. *Id.* The Court of Appeals concluded that Ms. Norwood's claims against the nonsignatory facilities were subject to arbitration under intertwined claims estoppel because her claims involved the services agreement in "at least five ways." *Id*. at 986. For example, Ms. Norwood's relationships with the nonsignatory facilities could not be understood without explaining the terms of the services agreement, which governed her assignment to the facilities. *Id.* Her interference with a contractual relationship claim depended on the existence of the services agreement, which was the only written contract to which Ms. Norwood was a party. *Id.* at 987. And her wrongful discharge claims depended on her allegation that there was an employment relationship between herself and the nonsignatories—which in turn depended on the interpretation of her services agreement. *Id.* The court concluded

that the services agreement "w[ould] be an integral part of any litigation of [Ms.] Norwood's claims" and, as a result, her claims were so "sufficiently intertwined" with that agreement that they were subject to mandatory arbitration. *Id.*

Here, in contrast to *Terry Investments*, none of the Defendants can be said to be "substantially the same person" as a signatory defendant, and whether Defendants misrepresented Reed Hein's "knowledge, skill, and ability to get customers out of timeshare obligations" and induced Plaintiffs to enter into contracts with Reed Hein does not depend on the interpretation of the contracts themselves. (*See* Am. Compl. ¶ 7; *see also id.* ¶¶ 138-41 (providing examples of statements Mr. Ramsey made when endorsing Reed Hein).) And in contrast to *Norwood*, the court need not interpret Plaintiffs' contracts with Reed Hein to understand the relationship—if any—between Plaintiffs and the nonsignatory Defendants. Indeed, all of Plaintiffs' claims in this action are based on Defendants' extra-contractual conduct. (*See id.* ¶¶ 220-22 (allegations regarding Plaintiffs' WCPA claim); *id.* ¶¶ 224-28 (allegations regarding Plaintiffs' negligent misrepresentation claim); *id.* ¶¶ 234-35 (allegations regarding Plaintiffs' conspiracy claim).) Neither the Lampo Defendants nor Happy Hour direct the court to any contractual terms that are at issue in this case. (*See generally* MTC; MTC Reply; MTC Joinder; MTC Joinder Reply.)

Defendants' insistence that Plaintiffs are estopped from opposing arbitration based on their allegation that Defendants were engaged in a conspiracy with Reed Hein is unfounded. Defendants cite *Blanton v. Domino's Pizza Franchising LLC*, a case from the United States District Court for the Eastern District of Michigan, for the proposition that

a signatory plaintiff's claims against a nonsignatory defendant must be arbitrated when the plaintiff alleges a conspiracy with a signatory non-party. (MTC Reply at 4 (citing *Blanton v. Domino's Pizza Franchising LLC*, No. 18-13207, 2019 WL 5543027, at *3-4 (E.D. Mich. Oct. 25, 2019) (applying Washington law), *aff'd*, 962 F.3d 842 (6th Cir. 2020)).) In *Blanton*, two former employees of Domino's franchisees brought a proposed class action in which they alleged a conspiracy between Domino's and its franchisees "to suppress wages and limit employment opportunities" in violation of federal antitrust laws and the WCPA. *Id.* at *1. The plaintiffs signed employment agreements with the franchisees that contained two different arbitration clauses. *Id.* They did not, however, sue the franchisees; instead, they sued only the parent company. *Id.* When Domino's moved to compel arbitration, the plaintiffs urged the court to deny the motion because Domino's did not sign the arbitration agreements. *Id.* at *2. Domino's argued that one of the plaintiffs was equitably estopped from avoiding arbitration based on the language of his arbitration agreement, which covered all claims "arising out of or relating to Employee's employment with the Company and/or the termination of Employee's employment." *Id.* at *4. In applying intertwined claims estoppel, the court first observed that under Washington law, "where the claims against a parent and subsidiary are based on the same facts . . . and are inherently inseparable, a court may order arbitration of claims against the parent even though the parent is not a party to the arbitration agreement." *Id.* at *3-4 (quoting *Wiese v. Cach, LLC*, 358 P.3d 1213, 1222 (Wash. Ct. App. 2015)). The court also noted that the plaintiff's claim that Domino's and the franchisee conspired to set unfair wages and prevent employment opportunities was

"intertwined with" and "inseparable" from the plaintiff's arbitration agreement, which covered "all employment-related claims." *Id*. at *4.  Accordingly, the court granted Domino's motion to compel. *Id.*

Here, in contrast with *Blanton*, Defendants are not subsidiaries of Reed Hein, and Plaintiffs' agreements to arbitrate do not have the same type of close relationship to their negligent representation and WCPA claims against Defendants as the *Blanton* employment agreement had with the plaintiff's employment-related claims against Domino's.  Thus, the court cannot conclude, based on *Blanton*, that these nonsignatory Defendants can compel Plaintiffs to arbitration by simply pointing to an alleged conspiracy with Reed Hein.

## IV. CONCLUSION

For the foregoing reasons, the court DENIES the Lampo Defendants' motion to compel arbitration and Happy Hour's joinder thereto (Dkt. ## 82, 84) and DENIES the Lampo Defendants' motion to stay pending the court's ruling on their motion to compel (Dkt. # 88) as moot.

Dated this 21st day of August, 2024.

JAMES L. ROBART
United States District Judge